

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA


Alexandria Division


DAVID A. RICHARDSON, JEFF A. SMITH,

EYVIND ODINSSON, JOHN EDGAR,

THOMAS MELNYCZYN, and

JOHN HAWKINS, on behalf of themselves and

all others similarly situated,


Plaintiffs,


v. Case No. ~~xxxxxxxx~~ 3:18cv023

JURY TRIAL DEMANDED


HAROLD CLARKE, Director, Virginia Department of Corrections ("VDOC"), ROSE

DURBIN, Agency Management Lead Analyst, VDOC, EDDIE L. PEARSON, Lead Warden,

Greensville Correctional Center, ("Greensville"), LANE TALBOTT, ADA Compliance,

Greensville,

Defendants

PLAINTIFF'S CLASS ACTION COMPLAINT

FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

## I. PRELIMINARY STATEMENT

1. This is a class action lawsuit is based upon a systematic and deliberate refusal on the part of the defendants, in concert with contract providers, have failed to comply with state and federal laws enacted and standing to protect the health, safety, and rights of the Plaintiffs; disabled prisoners secured under the custody, care, control, and protective supervision of the Virginia Department of Corrections, ("VDOC").

2. The agencies, organizations, and departments named as defendants in this case are: Virginia Department of Corrections, ("VDOC"); Greensville Correctional Center ("Greensville"): The individuals named as defendants are employees of the state, acting under color of state law in their official and in their individual capacities ("named defendants"). These state agency defendants and named defendants (collectively, "defendants") have failed to comply with state and federal laws, including but not necessarily limited to: Americans with Disabilities Act, 42 U.S.C. 12131 et seq., the Rehabilitation Act 29 U.S.C 794 et seq., the Virginians with Disabilities Act, Code of Virginia 51.5-40, and the Code of Virginia 2.2-3491, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C 2000cc et seq., and the Constitutions of Virginia and the United States.

3. Through policies, customs, and practices, the defendants have discriminated, and continue to discriminate against disabled persons (individually and as a class) who reside in the VDOC's custody, and are under the VDOC's care, supervision, custody, and control. They have done this

2

by failing to provide adequate and equal access to disability accommodations in a wide variety of settings, including, but not limited to communications, medical, educational, mental health, dietary, and religious.

4. VDOC refuses to provide individuals in its custody and control with adequate notifications of daily events, safety and emergency evacuation alert systems, individual visual and hearing accommodations, orthopedic, neurological, diabetic, and hypertension assistive disability devices. What disability devices the VDOC allows, the defendants or their contractors exact exorbitant surcharges, not limited to but including breathing machines, elevation devices, orthopedic cushions, shoes, insoles, and hearing aids to facilitate orders, abeyances, services, privileges, and institutional activities.

5. The VDOC denies disabled individuals in its custody equal access to communication devices to adequately, fairly, and equitably communicate with individuals inside and outside of the prison; including but not limited to fully operational, consistent, videophones, voiceover technologies, telephones equipped to facilitate communication with modern disability devices, equal in access to otherwise provided services to given to able bodied prisoners that would eliminate discrimination, i.e. electronic technologies, ebooks, captioned educational material, and equal access to email.

6. The VDOC denies disabled persons equal access to print, audio, video, educational, religious, recreational, and community media broadcast communications on a fair and equitable basis with individuals who are not disabled.

7. The VDOC denies medically disabled individuals suffering from various visual, orthopedic, skeletal, ambulatory, asthmatic, allergenic, gastroesophageal, gastrointestinal, pancreatic, hypertensive, diabetic, and Cancer disabilities and disorders care that is medically ordered, or

3

consistent with medical procedures, diets, and accommodations for their prospective disability needs.

8. As a direct result of the defendant's discriminatory policies, practices, and lack of procedural care and safeguards for disabled individuals under the VDOC's custody, care, and supervision:

a. Individual prisoners have been, and continue to be, unable to effectively communicate their needs, desires, and concerns to contract health care providers on and off site.

b. Individual prisoners have been, and continue to be, excluded from VDOC work, therapeutic, religious, and rehabilitative programming, or provided abridged participation.

c. Individual prisoners have been, and continue to be, unable to participate in worship or religious services, diets, and practices consistent with their sincerely held faith practices.

d. Individual prisoners have been, and continue to be, subject to disciplinary action, classification hearings, removal from religious diets, and disciplinary infractions that are due to misunderstandings and miscommunication with staff because of their disabilities.

e. Individual prisoners have been, and continue to be, unable to receive and respond appropriately to prison wide count procedures, safety announcements, evacuations, and other orders and expectations of staff that contribute to a hostile, antagonistic, and embittered reciprocation.

f. Individual prisoners have missed, and continue to miss, meals, appointments, exercise periods, classes, and other daily activities and opportunities as a direct result of individual disability limitations.

g. Individual prisoners have been, and continue to be, prevented from contacting family, friends, legal representatives, and various social contacts outside of the prison because of a lack of disability accommodations.

4

h. Individual prisoners have been, and continue to be, subjected to neurological, physical, mental, and psychological pain and suffering as the result of the refusal to accommodate disability needs.

i. Prisoners technically eligible for lower level security privileges, are denied privileges because of their disability requirements.

9. VDOC compounds its discrimatory practices by refusing to provide a direct, clearly delineated policy and pathway for the classification of disabled individuals in VDOC's custody. There is no consistent process adhered to under VDOC guidelines. Similarly, disabled individuals have been excluded from advantageous institutional settings, special housing areas, and units with disability aids. Better equipped facilities, where disabled prisoners enjoy greater freedoms, better disability accommodations, enhanced employment opportunities, and more rehabilitative programming accessibility than those allowed to prisoners with similar disability needs are regularly arbitrarily refused.

10. Prisoners with disabilities have been housed with disruptive, violent, disciplinary problematic prisoners who have both assaultive and other behavioral documented anomalies. Despite repeated complaints and confrontations that place the disabled prisoners at substantial risk, and despite staff assurances that such prisoners would be, at very least, screened in accordance with existing policies, so as not to be place the disabled prisoner with high risk predatory prisoners and gang members.

11. Prison staff routinely open cells so that deaf and hearing-impaired prisoners are at risk for assaultive and intrusive attack without due diligence as to the state (sleeping or awake) of the disabled occupant. There are no alerts on these automated doors that close without any notice, and staff have refused disability friendly locks and keys to secure persons and property despite

repeated requests.

12. Plaintiffs seek declatory, injunctive, punitive, and nominal relief on their own behalf, and on behalf of all the disabled individuals in VDOC's custody for harms suffered and for continuing harms under the defendant's, and defendants' contractors discriminatory policies and practices.

13. The defendant's discriminatory policies are compounded by the fact that they have been cognizant of their responsibilities under the Americans with Disabilities Act for numerous years, and have in that time built at least five prisons, none of which were built in compliance with the Americans with Disabilities Act Architectural Guidelines.

II. JURISDICTION

14. This Court has subject matter jurisdiction over this action pursuant to U.S.C. 1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiff's civil rights.

15. This court has jurisdiction to grant declatory relief pursuant to 28 U.S.C. 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

16. This Court has jurisdiction to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

III VENUE

17. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b) because some defendants reside in this district and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred are in this district.

IV. PARTIES

A. Plaintiffs

18. Named Plaintiffs David Richardson, Eyvind Odinsson, John Edgar, Thomas Melnyczyn, John Hawkins are men with various disabilities under 42 U.S.C. 12102(2);

19. David Richardson is deaf, and visually impaired. He lost his hearing gradually since age of fourteen. Mr. Richardson can speak English remarkably well, but relies upon a combination of lip reading and mainly self-taught ASL to understand others. In 1994 Mr. Richardson contacted Histoplasmosis while incarcerated at the Powhatan Correctional Center, and was found to have lesions from the fungal disease in his eyes. Mr. Richardson has had poor vision, is possibly legally blind, and has severe photosensitivity. As a result, Mr. Richardson wears darkly (85%) tinted corrective and bifocal lenses. The corrective lenses fail to provide adequate correction to give Mr. Richardson 20/20 vision, or to ease the pain incurred by light sensitivity. He was originally prescribed cover-up glasses, but the glasses allowed by the Virginia Department of Corrections are made by prisoners and no cover-up glasses were available. Mr. Richardson has serious allergies that have caused episodes of allergy induced asthma and fluid on his lungs. An Attending Physician ordered Mr. Richardson a single cell because of his need to be in an environment as free as possible from scented products, dust, skin particles and particulates including prayer oils and other reactive allergens. Mr. Richardson takes ten prescriptions daily, a total of twenty-three pills. Three of these prescriptions taken daily are for allergy symptoms, and he must use an inhaler twice a day. Mr. Richardson was prescribed these allergy medications by an otolaryngologist at the Virginia Commonwealth University, Medical College of Virginia Hospital after extensive examinations, including laryngoscopy, and lung study. The cause of Mr. Richardson's allergies was diagnosed as seasonal and environmental; without avoidance and treatment, Mr. Richardson has experienced episodes of fluid on his lungs. Mr. Richardson is allergic to many environmental allergens, including but not limited to scented soaps, shampoos,

conditioners, dust pollen, and most cleaning products as well as Aspire Metal-Free Sealer Floor Finish, and many other chemical agents employed by the VDOC daily. Mr. Richardson has had serious reactions to these products requiring steroid breathing treatments, as well as the periodic treatment with the steroid prednisone to relieve symptomatic responses. Mr. Richardson has had gastroesophageal reflux disease since he was fifteen. A number of gastroenterologists have made various recommendations because of four hospitalizations for pancreatitis, first diagnosed as reactions to hypertension medications, and continuing gastroesophageal reflux related attacks and abdominal spasms. Mr. Richardson is on long term Nexium treatment, and can eat no more than six ounces at a time, and must wait several hours between courses. Mr. Richardson has had poor tolerances to prescription remedies for his gastrointestinal reflux disease, including allergic reactions to various prescription treatments. The severity has in several instances induced vomiting and severe nausea. For approximately ten years Mr. Richardson has eaten in his cell, consuming meals six to eight times a day to stem reflux, choking, and the regurgitation of food. Mr. Richardson has numerous anxiety attacks, often on a daily basis, and was first ordered to eat in his room because of anxiety, where Mr. Richardson lost consciousness and was cut and injured in an unconscious fall. Mr. Richardson has orthopedic injuries to his spine, and has been referred for surgery. Mr. Richardson has Peyronie's Disease, and was provided a medical mattress and pain medications at Powhatan Correctional Center. These injuries cause pain, limited mobility, as well as sleep deprivation. Mr. Richardson has heel spurs and a neuroma; an orthopedist recommended surgery that was denied. Mr. Richardson has sought further recommended testing and treatment for polyps in his colon, anal pain, abdominal pain, sleep disorders, anxiety disorder, hearing and sight disorders, and accommodations without success.

20. Plaintiff Jeff Smith is, and was, at all times mentioned herein, designated "hearing impaired."

8

While at Powhatan Correctional Center Plaintiff Smith was afforded accommodations in accordance with ADA standards and requirements. These accommodations afforded Plaintiff Smith a job assignment as a teacher's aide, participation in programming objectives, and the ability to serve in a volunteer capacity as a mentor in Reentry programming. On October 27, 2014 Plaintiff Smith was moved to Greensville Correctional Center due to the partial closing of Powhatan Correctional Center. Plaintiff Smith has been repeatedly denied adequate notification of daily events, such as; Self-med Program announcements, chow call, cell/door breaks, and the announcement of activities, privileges, services, events. Plaintiff Smith has faced discriminatory classification, programming, and work assignment opportunities as a result of his disability status.

21. Mr. Eyvind Odinsson was diagnosed with moderate sensorineural bilateral haring loss. Mr. Odinsson received two hearing aids and was assessed a surcharge by the defendants for $500.00 for these auxiliary hearing devices. The surcharge has been placed on Mr. Odinsson's prison account as a copay loan. Mr. Odinsson has no means with which to pay this surcharge.

22. Mr. John Edgar has gradually lost his hearing and sight over a number of years. Mr. Edgar relies upon lip reading and manual writing for communication. Mr. Edgar has orthopedic injuries to his back that cause him immobilization for extended periods. Mr. Edgar has COPD which makes his breathing labored, especially at night.

23. Thomas Melnyczyn has a hearing loss, and relies upon his limited hearing, lip reading, and previously, manual writing for communication. Mr. Melnyczyn has the degenerative eye disease, optical neuropathy, that is an inherited genetic disposition. Mr. Melnyczyn has lost all vision in the center of his visionary field. Mr. Melnyczyn's vision has deteriorated to the point that he cannot read or write, and needs to be classified and considered legally blind.

9

24. John Hawkins has been diagnosed with severe-profound hearing loss. Mr. Hawkins requires the use of hearing aids which only aids the symptoms and the impairment. Mr. Hawkins required the use of TTY telephones. Mr. Hawkins was denied access to these phones for years. Additionally, Mr. Hawkins requires visual notifications, of which he presently is unable to access. According to medical experts Mr. Hawkins' condition will continue to deteriorate.

B. Defendants

i. State Agency Defendants

25. Virginia Department of Corrections ("VDOC") is the Commonwealth agency responsible for the supervision and custody of over 39,000 incarcerated individuals and nearly 60,000 individuals under court-ordered supervision.

26. Greensville Correctional Center ("Greensville") is a maximum-security VDOC facility in Jarrett, Virginia.

ii. Defendants sued in Their Individual and Official Capacities

27. Mr. Harold Clarke is the Director of the VDOC. He is aware of the VDOC's policies and practices regarding disabled prisoners.

28. Ms. Rose Durbin is the is the VDOC ADA Coordinator and Agency Management Lead Analyst, VDOC Division of Operations, and is responsible for ensuring that individuals in VDOC's custody have interpreters for offsite medical appointments. She is aware of VDOC's policies and practices regarding deaf and hard of hearing individuals and she is aware of specific written complaints by disabled individuals system wide about the violation of their rights.

29. Mr. Eddie L. Pearson, at all times relevant to the events described herein, was the Lead Warden of Greensville Correctional Center. As Warden, Mr. Pearson was the legal custodian of all individuals incarcerated at Greensville Correctional Center. On information and belief, he was

10

aware of the VDOC's policies and practices with regard to disabled prisoners, and aware of specific written complaints by disabled individuals and the continuing violation of disabled prisoner's rights.

30. Ms. Lane Talbott is the Institutional ADA Coordinator at Greensville Correctional Center. As the Institutional ADA Coordinator, Ms. Talbott is the legal custodian of all disabled individuals, their programs, property allowances, and disability accommodations while incarcerated at the Greensville Correctional Center. On information and belief, she is aware of the VDOC's policies and practices with regard to disabled prisoners, is aware of specific written complaints by disabled individuals and the continuing violation of disabled prisoner's rights.

31. All named defendants are sued in their official and individual capacities. At all relevant times, all defendants were acting under color of state law, pursuant to their authority as officials, agents, contractual agents, or employees of the Commonwealth of Virginia; within the scope of their employment as representatives of public entities, as defined in 42 U.S.C. 12131(1); as representatives of a "department, agency, special purpose district, or other instrumentality of a State" under 29 U.S.C. 794; and as representatives of "state agencies" under Code of Virginia 51.5-40 and Code of Virginia 2.2-3401.

V. STATEMENT OF FACTS

32. The VDOC has at least three times been sued by disabled deaf prisoners who were previously incarcerated at Powhatan Correctional Center. In 2002, Otis Hill sued due to lack of any sign language interpreter services for VDOC's mandatory pre-release life skills course, and in 2004, Wesley Chase sued VDOC over lack of access to educational programs. To this day, however, VDOC still refuses to provide sign language interpreters for a number of educational, religious, medical programs and services, mental health services, and other programs and due

process hearings, programs, and contracted medical appointments, programs, and additional essential program providers in the VDOC.

33. To this day the VDOC has not implemented substantive functional safety and notification policies and systems at its facilities. While the VDOC policy states that the VDOC provides interpreters for announcements, the VDOC is utilizing prisoners for daily notifications of activities which number in the hundreds; the system lacks functionality.

34. Prisoners assigned for notifications routinely are not notified by staff to make these announcements; prisoners making announcements must often depend upon an unintelligible and outdated public address system; these prisoners have been instructed they are not to work after 5:30 p.m., leaving notifications from then until 11:30 p.m. (1:00 a.m. on weekends) nonexistent. Often the prisoners assigned to notifications are on the telephone, email kiosk, watching television, using the toilet, at appointments, meals, at family visits, or involved in other daily living and personal activities and fail to properly and adequately notify the disabled.

35. Since Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988) and Pennsylvania Department of Corrections v. Yesky, 524 U.S. 206, 118 S. Ct. 1952 (1998) the VDOC has built and opened at least four major maximum or maximum/medium security prisons, none of which were built to comply with the Americans With Disabilities Architectural Guidelines (ADAAG). None of these institutions has any safety, security, or other accommodations required by private or public entities for disabled individuals. Greensville has no emergency exit signs, yet it houses individuals who are nearly blind and legally blind.

36. The VDOC was also sued by a hard of hearing woman at Fluvanna Correctional Center ("Fluvanna") after she was repeatedly disciplined for missing announcements she could not hear. To this day, however, the VDOC has not implemented substantive alerts to accommodate

12

the deaf, hard of hearing, visually impaired, and other disabilities. The VDOC continues to discipline prisoners for failing to respond to activities for which there are no adequate alerts.

37. Hill v. Virginia Department of Corrections, Chancery No. HS-948-5 ( Vs. Vir. Ct. (Richmond) 2002): Otis Hill, a deaf man incarcerated at Powhatan, sued VDOC under the Virginians With Disabilities Act, Code of Virginia 8.01-216. Hill, who was incarcerated in 1997, repeatedly "attempted to enroll in programs given at or by [V]DOC facilities, including anger management, substance abuse, and job training programs" throughout his nearly five years in prison. Hill's request for sign language interpreters to enable him to participate in these classes and his resulting grievances were denied. In 2002, Hill was informed that he would be required to take a mandatory life skills class prior to his release. Hill once again requested a sign language interpreter. VDOC employees told Hill that "we may not be ready for you" and instead informed him that they would "waive[ ]" the requirement that he participate in the pre-release life skills course. Hill, who continued to attend classes without an interpreter, eventually reached a settlement with the VDOC. Under the terms of the settlement, VDOC agreed to provide two course instructors and a "qualified, certified sign language interpreter" to meet with Hill who by this time had been released from prison, and provide with all 54 hours of his life skills course instruction.

38. Chase v. Baskersville, 508 F. Supp. 2d 492 (E.D. Vs. 2007), aff'd 305 Fed. Apex. 135 (4th Cir. 2008): In 2004, just two years after VDOC settles with Hill, Wesley Chase filed a pro se lawsuit against Powhatan and VDOC employees for their failure to provide him with a sign language interpreter for the functional literacy class which he was enrolled at Powhatan. Some of the defendants sued by Chase, including Sandra Parker, Principal of VC Education program at Powhatan, and Sharon Trimmer, Director of Special Education and Gifted Education at VC

Education, are no longer working at Powhatan, but limited programming objectives with interpreters continue. Alton Baskerville, was transferred to another institution in the VDOC system. Chase has since been released. Still the VDOC has refused to provide full and equal program objectives for the disabled.

39. Sorrells v. Wheeler, No. 3:08-cv-00039 (W.D. Vs. 2009): Jannett Sorrells, a hard of hearing woman incarcerated at Fluvanna , was repeatedly disciplined for missing morning count. She took to wearing prison daytime clothes to bed so that when she was awakened late by others who lived in her cellblock, she would not be disciplined for wearing her night clothes during count. Although at different times over a three year period VDOC personnel promised in writing to provide basic accommodations to Ms. Sorrell, such as awakening her five minutes before count, they failed to follow through on these promises and even went so far as to subject Ms. Sorrell to disciplinary hearings after the fact. Ms. Sorrell's suit was settled I March 2009.

40. The VDOC is aware of its obligations under state and federal laws. In 2010, the Minnis v. Johnson Case No. 1:10-cv-96-TSE-TRJ, the civil rights disability claims resulted in a settlement that the state has never complied with, despite having stipulated to this Honorable Court that the VDOC not only complied, but that they would continue to comply with the settlement in the Minnis case. The following are some examples of the failure to comply:

a. The deaf prisoners in the custody of the VDOC have not attained full and equal enjoyment of goods, services, facilities, advantages, privileges, and accommodations.

b. Stipulations that the VDOC would employ ADA Coordinators to oversee disability rights issues at each institution resulted in a "promotion from the ranks" implementation, and the individuals had no, or at best very limited disability training, education, or prior disability experience in their background.

c. Contact information for the VDOC ADA Coordinator is pro forma. Attempts to communicate on disability matters are met with recordings and responses from a "Correspondence Secretary."

d. Meetings with the Warden or Assistant Warden have been altered significantly because of the transfer of most of the Deaf Community from Powhatan Correctional Center to Greensville Correctional Center (a significantly larger prison complex with a convoluted bureaucracy) has resulted in meetings being little more than opportunities for mid-level administrators to rollback previous concessions and utilize the meetings to threaten and advance defense postures with statements like, "This isn't Powhatan."

e. Greensville Correctional Center regularly posts, publishes, and (more recently) shows videos that lack accommodation for the deaf and disabled. These video presentations are not captioned.

f. Deaf prisoners housed at alternate facilities for safety or security purposes have had to relinquish or been denied their rights as required by the ADA and the Minnis agreement.

g. Greensville has ceased posting the schedule showing the availability of Qualified Interpreters.

h. Qualified Interpreters are being routinely denied at medical programs and services where they were previously provided.

i. Deaf prisoners are being denied, restricted from, and in some cases removed from participation in religious meals, diets, and otherwise offered religious accommodation because of their failure to attend services where no interpreter is available.

j. Interpreters are not being provided at contact offsite medical providers.

k. Greensville Correctional Center has changed and altered the previous property allowances and procedures for obtaining property for the deaf, stating: That was what the administration at Powhatan Correctional Center allowed, we have a different administration here. when in reality the process and allowances were approved both systematically and otherwise by the department's

15

ADA Coordinator.

l. There is no longer a disability notice on medical files that a prisoner is deaf and requires an interpreter.

m. Deaf prisoners are no longer permitted to receive accommodations from outside disability specialized vendors.

n. Employees and contract providers refuse to utilize written notes in their contacts and consultations.

o. No VRI has ever been used when an interpreter is unavailable, and staff routinely inform prisoners that they cannot talk with them without an interpreter.

p. Prisoners are routinely missing announcements, alarms and orison wide events.

q. There is no Voiceover technology available, and the conferencing equipment has never accommodated voiceover technology.

r. Audio-visual media at Greensville does not have open or closed captioning.

s. Training of new employees has lapsed and is not routinely and annually applied.

t. Employees are not being advised in the proper use of Qualified Interpreters.

u. There is not now, and there was never monitoring of the treatment of deaf prisoners, nor the implementation of the settlement as stipulated by the section on monitoring and compliance.

v. Damages were not equitably paid, and a deaf prisoner at Greensville died several years after the settlement without receiving settlement.

41. The VDOC and various other defendants as well as the defendants' various contractors have not remedied their past pattern and practice of discrimination and continue to discriminate against the disabled. The deaf, hard of hearing, visually impaired, those with severe illnesses, and many otherwise disabled (in some cases severely disabled) prisoners have few if any

disability aids. This pattern and practice has resulted in disability-based discrimination in distinct areas of custody, security, and care, delineated as follows:

a. Inadequate access to sign language interpreters, Video Remote Interpreter ("VRI"), Computer-Assisted Real-Time Transcription ("CART"), oral interpreters, large print, magnification enhancement devices, and other auxiliary aids where necessary for the welfare, safety, and communication needs of the disabled.

b. A total lack of privacy for the deaf and hearing impaired while utilizing interpreter services during interviews that contain confidential medical interviews, PREA (Prison Rape Elimination Act) sexual assault interviews, Annual Review treatment formulations, institutional orientation, or other details that should not ordinarily be made public to incidental staff or other prisoners.

c. Inadequate visual prison-wide emergency alerts, lighted exit signs complying with state and federal regulations, including but not limited to individual cell notifications, door operating alert systems, and automated communication systems.

d. Accurate daily-living program and activity or mass-movement notifications consistent in quality, substance, and nature with aural or visual disseminated information provided to other prisoners, who do not have disabilities, with regard to programming objectives, meals, medical appointments, outside activities, religious programming, emergency drills, and the operation of electronic doors.

e. Medical accommodations, medical care and procedures, dental care, device distribution, and other constitutionally protected rights and activities that substantially accommodate documented medical infirmities and disabilities.

f. Inadequate access to visual accommodation devices and services for the visually impaired or legally blind.

g. No access to disability aids to provide adequate living and accommodation of healthy sleep patterns, and other disability accommodations consistent with disability needs.

h. Failure to provide equal access to privileges, media, communication, periodicals, literature, and assistive learning devices.

i. Overturning, overruling, reversing, and at times, outright ignoring medical orders by expert medical practitioners without consultation or review.

j. Improper denial of interpreters at contracted medical appointments.

k. Failure to provide disability accommodations at state contracted religious services and activities.

l. Improper security level assignments and/or assignments that are inconsistent with incentive based programming of disabled prisoners because of discriminatory classification practices.

m. Failure to protect disabled prisoners under custody of VDOC's custody at Greensville Correctional Center by not providing a secure environment, key locks and locks with sightless access, cell security, screening procedures of housing assignments, and group cell door operation without supervisory oversight that puts the disabled at risk for thefts and attacks.

A. Failure to provide interpreter services

42. For deaf and hard of hearing individuals who are able to rely on American Sign Language ("ASL") as their primary form of communication, use of a qualified ASL interpreter is necessary to ensure effective communication between a deaf or hard of hearing individual and an individual who does not use ASL to communicate.

43. A qualified sign language interpreter is necessary because ASL is a complete and very complex language, relying on signs constructed of hand signals and other gestures and body movements, incorporating facial expressions and postures. It is a language foreign to any other

18

language including English. ASL has its own distinct vocabulary, rules of grammar, syntax, etymology, phonology, and principles as well as philosophical linguistics.

44. Written language is different from ASL, and most individuals deaf from birth, who did not acquire English in the traditional way do not comprehend written language. Even those schooled in the once taught "manually coded English" have not utilized these skills in their community and have a difficult time reading or writing in traditional English. Many prisoners lack educational acuity to communicate in writing, and may not write at all. Mr. Edgar has filed numerous complaints where he requested staff write their communications to him in instances where there was no immediate security need, and staff have refused.

45. Lipreading or speechreading is often misconstrued with regard to deaf and the hearing disabled. A study concluded that even the best speechreader in a one to one situation could only understand twenty six percent of what was said, and that even the upper intelligent deaf and hard of hearing individual could understand only five percent of speechreading.1 Certain letters, like T, D, Z, S, and N are all very similar, and look nearly identical. One complex word can throw off the meaning of an entire context. Lipreading is very complex, and fraught with difficulties for a person who has never spoken, and is difficult even for a late deaf individual. For deaf who lost their hearing slowly, lipreading can be useful, but widespread assumptions as to the efficacy of lipreading amongst the general public are generally inaccurate and misrepresented. For instance, many VDOC Wardens, ADA Coordinators, Unit Managers, Counselors, and security personnel tell staff "If you look directly at them and speak slowly they can understand what you are saying." These assumptions are patently false, and propagated by under educated, or uneducated individuals, who are operating solely upon assumption. Generally, lipreading is less effective than writing, and it should not be utilized unless it is the individual disabled prisoner's choice.

Mr. Edgar has repeatedly requested and been denied an oral interpreter for due process hearings and document service, as well as medical and treatment services and objectives.

46. The VDOC lacks any sort of CART and has made little or no accommodation for the disability needs of the VDOC prisoners that were moved from Powhatan Correctional Center to Greensville Correctional Center in 2014.

47. The VDOC has curtailed many of the disability aids and interpreter services for programs and services that were generated by the Minnis v. Johnson settlement, put into regular practice at Powhatan, citing a lack of willingness on the part of the administrators at Greensville Correctional Center. These actions, which included the VDOC move of only a portion of the protected class resulted in violations to their civil rights and to specific clauses of the Defendant's previous concessions.

1. M. Vernon and E. Mindel, They Grow In Silence:The Deaf Child And His Family (Silver Sorings, MD,: National Association of the Deaf, 1971), p. 96.Richardson

48. The VDOC has refused to employ oral interpreters for programs and activities of the hearing impaired who do not speak or understand ASL (American Sign Language). These services have been repeatedly requested and lack of services grieved by Mr. Edgar.

49. The VDOC has refused to allow accommodation of the visually impaired, and has refused to make written directives, commissary lists, pamphlets, rules and regulations, and other printed materials available in a medium which the visually impaired, deaf, hard of hearing, and other disabled prisoners can assimilate to equally avail themselves of the goods, services, facilities, privileges, advantages, and accommodations.

50. The VDOC has, at Greensville Correctional Center, refused to provide caregivers trained in communication techniques, guides for the visually impaired, and other caregivers compatible with disseminating disability needs of the disabled prisoners, while employing such caregivers at other facilities.

51. The VDOC has employed sign language interpreters, but has failed to utilize them in ways that give notification to the deaf and hearing impaired prisoners on an ongoing and regular basis.

52. The VDOC and the VDOC's contract providers have obstinately refused to communicate in writing, and insist that disabled prisoners can hear and that they do not have to write to communicate. Mr. Edgar has grieved this multiple times.

53. The VDOC, by and through their contracted medical provider, has refused to provide recommended disability items, medical care, prosthetics, and follow up consultations with interpreters based on the reasoning that the disability accommodations considered by other defendants to be "comfort items" and should be retracted or rescinded.

54. Interpreters employed by the VDOC often sit in an office with a counselor reading novels and other material while activities, medical programs, and programs generally have no interpreter services.

B. Medical services, accommodations, and general disability aids

55. The VDOC has an unalienable responsibility to provide medical care for all prisoners in their custody. This includes general practitioner care, contracted medical testing and diagnostic care, specialty and emergency care, medicinal distribution, dental, and mental health services.

56. Disabled individuals require diverse services to communicate effectively with medical providers.

57. Thomas Melnyczyn is legally blind and hearing impaired. Mr. Melnyczyn has tried

21

repeatedly, without success, to have staff make copies of his medical reports in a medium (large print) that he can read. As a result, Mr. Melnyczyn is forced to have other prisoners read him these confidential reports.

58. John Edgar has repeatedly requested an oral interpreter for all medical appointments because his hearing impaired status is at or near the legally deaf level. Despite repeated requests, interpreters from the company Purple has repeatedly told Mr. Edgar and medical providers that Mr. Edgar does not know ASL, and that the company has no oral interpreters. Staff, including Unit Manager Robertson, have obstinately told Mr. Edgar and the medical service providers on and off site that all they are required to do is look directly at Mr. Edgar and speak very loud. This not only precludes communication with Mr. Edgar, but it has compromised his medical confidentiality in areas where other prisoners hear and repeat private and confidential information being disseminated.

59. Mr. Richardson has for example, repeatedly requested an interpreter be present at his medicine pickup that takes place with him standing outside, attempting to lipread through a small tinted window. Often Mr. Richardson is unable to understand or communicate effectively as to various problems associated with why he has not received medicines, refills, and other problems. Because of the necessity for frequent changes and unforeseen delays, Mr. Richardson has a number of times been completely without allergy, asthma, pancreatic, and hypertension medications. Mr. Richardson has been told that the interpreter is at another prisoner's disposal at that time. The medical provider, under the supervision of Nurse Elizabeth Shaw, has refused to accommodate Mr. Richardson for self med pickup at an alternate time and in a manner that accommodates his disability needs. Mr. Richardson went to the dental clinic at Greensville in March of 2016, and during consultation was told that it was a good thing that he brought an

22

interpreter with him because they didn't know that he was deaf. On another occasion at an optometrist appointment when Mr. Richardson wrote that he needed an interpreter, a security officer asked why he hadn't brought one with him. Mr. Richardson was permitted an interpreter under the Minnis agreement, and had an interpreter at every medical appointment, including the self med program.

60. Dr. Vincent Gore is the lead physician at Greensville. Dr. Gore, at request of security and referral by Nurse Elizabeth Shaw, routinely reverses medical orders by an attending physician without consultation of any kind with the patient. Mr. Richardson was permitted a single cell because of his light sensitivity, severe allergies, and critically chronic digestive problems. The order was reversed and subsequently required intervention by ADA Coordinator Barry Marano in order to get Warden Pearson to intercede and supersede Dr. Gore's order to provide the disability accommodation.

61. In addition Mr. Richardson has repeatedly requested a medical mattress (removed from him when transferred to Greensville) because of painful orthopedic conditions in his neck, back, and hip. Mr. Richardson also suffers from Peyronie's Disease. Peyronie's Disease is a painful condition of the penis, which was possibly caused and certainly exacerbated by injury incurred because of two inches of batting on undergirding of a steel bed. Because of this disease, and Mr. Richardson's erections at night while sleeping, he experiences excruciating pain, this pain is enhanced, and further exacerbated by the defendant's taking the disability accommodation of a medical mattress.

62. Mr. Edgar has suffered pain, indignities, and injury similar to Mr. Richardson. Mr. Edgar, despite evidence in his favor, was removed from his religious diet as a result of missing meals that he had no notification were taking place. Mr. Edgar also suffers from a variety of medical

disabilities that have been ignored by the medical department, security staff, and the VDOC despite repeated requests, complaints, and grievances.

63. Mr. Edgar has repeatedly requested an oral interpreter. Despite repeated assurances from the VDOC's ADA Coordinator, Barry Marano, staff coordinators at Greensville have refused to provide Mr. Edgar an oral interpreter. When an interpreter has been provided, it has been an inappropriate ASL interpreter and Mr. Edgar, despite numerous requests, and being late deafened while in prison, is unable to receive sign language instruction as was stipulated in the Minnis agreement. Mr. Edgar requested that the optometrist write instructions on a pad provided by the institution for communication with deaf and hearing impaired prisoners, the optometrist refused. This too violated the Minnis agreement.

64. Mr. Melnyczyn has been diagnosed with Menier's Disease, Genetic Optic Neuropathy, and has requested a number of disability aids. Mr. Melnyczyn has requested accommodations that include a lamp so he can read; access to large print materials with regard to memoranda distributed by the VDOC; a lock to secure his property compatible with his disability needs; and someone to assist him (a neutral party) in writing requests, grievances, medical complaints, commissary orders, and other necessities. Despite repeated requests, no accommodations gave been offered or approved.

65. Mr. John Hawkins has requested, in accordance with medical recommendations, to be moved to the housing unit in Building 4, designated for the deaf and hearing impaired. This unit has signs, a visual notification system, conferencing equipment, posted warnings and notifications for staff awareness, and an enhanced emergency warning system. The defendants have repeatedly refused to move Mr. Hawkins despite medical recommendations.

66. Mr. Hawkins has been unable to utilize the telephone system in his housing unit due to his

24

hearing loss and excessive noise in his living area. Mr. Hawkins has addressed these matters verbally with staff and through the grievance procedure.

67. The VDOC is aware of the disability needs of their Plaintiffs, but refuse lawful accommodations. Staff have routinely disregarded requests for interpreter services for programs, due process hearings, and various other religious and programming services.

68. Disabled prisoners are often unable to adequately explain their conditions to prison personnel, or comprehend what is taking place medically or otherwise in many circumstances; personnel often yell at disabled prisoners and tell them to read their lips. This practice often compromises medical and other confidential information. Staff erroneously inform other staff members and the public in a variety of settings that if the look directly at a deaf or hearing impaired prisoner and speak loudly they will be understood.

69. Often staff attempt to communicate with many of the deaf prisoners by writing, using a medium too difficult to grasp, or writing too small to be legible. Mr. Melnyczyn has repeatedly requested his counselor, Unit Counselor Joy Smith, make large print documents available to him which would enable him to read. Mr. Edgar and Mr. Richardson have had to rely upon other prisoners, who are often manipulative and unreliable, to read, fill out commissary order forms, write emails, and interpret rules, notices, and memoranda for them, only to subsequently discover that the service and information is deficient or incorrect.

70. When disabled individuals attend medical appointments off site there are no provisions contractually to provide disabled accommodations. In many instances disabled prisoners are being subjected to complex medical procedures without any consultation. These appointments almost always require the patient sign documents that explain a procedure that disabled prisoners cannot see, read, or understand. Mr. Richardson recently had a colonoscopy and the sign

language interpreter had to leave for another appointment before Mr. Richardson's procedure started. The waivers were such that he could not read them, or even see where he had to sign.

71. Because of inadequate oversight there are often times when no interpreter is available; Unit Counselor Smith, when Mr. Richardson complained he had no interpreter for a medical appointment, told him he should have refused treatment. Multiple appointments for treatment and care have been delayed or rescheduled because no interpreter was available. Mr. Edgar has either been denied interpreters, or been provided an inadequate ASL interpreter. Mr. Edgar's disability requires an oral interpreter as he knows only how to finger spell.

72. The VDOC continue to use waist chains and the black box to shackle prisoners at off site medical appointments. These restraints make communicating in sign language and writing virtually impossible. While security staff remove restraints for procedures (leaving on leg irons) they often will not remove them for communication purposes, or use readily available alternative restraints.

73. Mr. Richardson has repeatedly raised the issue of privacy in all communications. Mr. Richardson had to learn sign language on his own, and speaks rudimentary sign language at best. The Minnis settlement agreement stipulated a prisoner who became deaf while incarcerated (as did Mr. Richardson), that the prisoner would be provided sign language instruction. When instruction was offered to the best of Mr. Richardson's knowledge and belief, the instructor had no credentials, or a teaching certificate required by law in Virginia. Two weeks into instruction Unit Manager Robertson stipulated the Mr. Richardson could either go to his self med pick up, or to sign language class, but not both. The only self med pickup day an interpreter was available was Wednesday, and it is held (as are many private consultations at Greensville) in front of many other prisoners, some who are very fluent in sign language. Unlike speaking, sign language can

be read and understood from a great distance. Mr. Richardson made multiple requests to Nurse Elizabeth Shaw citing these problems, but Nurse Shaw refused any alternate accommodation. Unit Manager Robertson later told Mr. Richardson that he would no longer receive an interpreter for the self med program because of an additional conflict with the interpreter's schedule.

74. Medical providers and VDOC staff that facilitate medical consultations, procedures, and distribution of medicines without proper disability accommodations violate the patient's rights. Medical procedures that are not private, do not include oral interpreters, or require complex medical waivers and communications where an accommodation is necessary, but not provided to facilitate the comprehension of the materials, violates the patient's rights under the Americans with Disabilities Act. Furthermore, it is a violation for any medical institution or medical provider to fail to supply adequate interpreter services as stipulated by the Code of Virginia 2.2-3401, as well as the Constitutions of the United States and Virginia.

C. Educational, Mental Health, and Rehabilitation Programs and Services

75. The VDOC has mental health services and programs it provides department wide including at Greensville Correctional Center. In addition to the mental health services there are other programs: Counseling Services Thinking for A Change; Anger Management; Substance Abuse; Sex Offender Programming; and educational classes.

76. VDOC also provides educational classes of various kinds system wide; different institutions offer a variety of various instruction. Code of Virginia 22.1-340.

77. VDOC also offers academic functional literacy classes for prisoners testing below an eighth grade level, and have a variety of tools to identify and to work with prisoners who have learning disabilities. Code of Virginia 22.1-344.1.

78. In order to participate in educational objectives, rehabilitation program, and mental health

27

services, disabled individuals need equipment as well as interpreters to receive equitable treatment.

79. Since arriving at Greensville the deaf, hearing impaired, and disabled individuals have systematically been discriminated in their attempts to work, receive educational programming, and have effective access to mental health and counseling services. This denial includes their refusal to provide adequate interpreter services and privacy during interviews where interpreters are utilized.

80. Mr. Richardson has in the past admittedly been emotionally, physically, and sexual abused. During various times during intake, while seeking counseling, and in attempting to get treatment Mr. Richardson has utilized an interpreter. The areas adjacent to the offices and interview rooms are open to other prisoners who have effective understanding of sign language, who are not deaf, but have either been provided sign language instruction by the VDOC, or learned it by other means. This has seriously compromised the privacy issues of Mr. Richardson's treatment. On February 22, 2017, while seeking counseling Mr. Richardson sought a limited counseling session in which he desired to relate previous incidents of abuse, but asked that there be no interpreter present in order to protect his privacy. Counselor Smith informed Mr. Richardson that Unit Manager Robertson had instructed Counselor Smith that she was not to talk to prisoner Richardson without an interpreter.

81. Mr. Edgar has repeatedly requested oral interpreters for treatment, educational, and programming objectives as well as interviews. Staff have repeatedly responded to his requests by stating they have been informed they only need to look Mr. Edgar directly in the face and speak loudly. Interpreters from the Purple agency, who have on occasion provided interpreting services to Mr. Edgar are not oral interpreters, and lack credible certification to provide adequate

interpreter services, but have done so to try and assist.

82. Mr. Hawkins has repeatedly sought services for notification, communication, and other accommodations and accompaniments compatible with his disability needs and been either denied, or told that these accommodations would be made available to him. He has received little that has been promised.

83. Mr. Melnyczyn has repeatedly sought accommodations to be able to participate in programming objectives, including but not limited to lamps and other means of assistance allowed to other disabled individuals. Mr. Melnyczyn has received no accommodations compatible with his needs or his requests.

D. Work and Vocational Educational Programs

84. The VDOC has various work programs including training, apprenticeship, and VC Enterprise at the Greensville facility.

85. The current practice of the VC Enterprise work areas is that they do not ask for or utilize interpreters.

86. At a monthly meeting for the deaf, administrators have made it clear that no interpreters would be available for the volunteer participation in the dog training program.

87. In several instances VDOC has supplied interpreters for reentry programming, while refusing to have adequate services for interpreting services at medical appointments or other essential services. There is little and often no planning and monitoring of the daily need for interpreters, or an out and out refusal to schedule multiple interpreters where needed.

88. The VDOC has not provided Work, Vocational, and Educational areas with adequate notification and architectural design features that accommodate disabilities.

89. VDOC's refusal to provide adequate interpreters for Work, Vocational, and Educational

Programs as well as making additional programming and architectural design features to accommodate disabilities needs violates the rights of the disabled under the U.S. and Virginia Constitutions, the Americans With Disabilities Act. It clearly violates obligations to provide sign language interpreters under Code of Virginia 2.2-3401.

E. Religious Programming and Services

90. The VDOC contracts religious services for the prisoners at Greensville Correctional Center, and at various institutions throughout the state. Chaplains provide counseling, programming, and coordination of these religious activities through the Chaplaincy Service of Virginia.

91. Disabled individuals, especially the deaf and visually impaired need interpreters and accommodations to participate in these religious activities.

92. The VDOC employs a sign up system to participate in religious programming. There are quarterly sign up periods posted throughout the facilities that visually impaired and the deaf may not be able to see or to understand.

93. The VDOC is aware that disabled individuals need disability accommodations and disability aids to participate in religious programming.

94. Mr. Richardson practices a religious faith that is multi-denominational in observances and practices. This sincerely held religious belief incorporates practices from the Jewish, Catholic, Buddhist, and Islamic traditions, ceremonies, prayers, and fasting. Mr. Richardson has made the VDOC aware of these beliefs by his participation with these practices for more than twenty (30) years.

95. The current VDOC policy of not allowing adherents of particular faith groups to practice with practitioners of other faith groups, while allowing some faith groups and individuals in those groups to actively participate in more than one group, is a practice that discriminates

against Mr. Richardson's sincerely held religious faith.

96. Currently VDOC policy does not provide access to interpreters for state sponsored religious programing and services. At one time a volunteer interpreter occasionally came to interpret for Protestant service. Mr. Richardson and the other Plaintiffs have repeatedly requested to be included in all aspects of their sincerely held interfaith religious beliefs, most importantly including accommodations for dietary religious observances. The VDOC has intentionally and purposely discontinued a diet consistent with kosher standards that the Plaintiffs have participated and observed consistently for years. There is currently no substantial kosher diet consistent with standards promulgated by the acceptable dietary observances; prepared and served according to the requirements of the Jewish law. In addition the diet is substandard in meeting nutritional values for recommended daily allowances as promulgated by the National Academy of Sciences. The defendants have denied the Plaintiffs participation in practices, observances, and holy days that dictate religious diets and accommodations. In addition the Plaintiffs have not been permitted to fully participate in religious accommodations offered to other prisoners solely because of their disabilities. There has been a deliberate failure on the part of the defendants to provide them with access and notice of those accommodations, activities, and services.

97. The Plaintiffs are repeatedly threatened with disciplinary action for wearing religious head coverings. The VDOC has no penological interest in forbidding Plaintiffs to wear a kufi head covering in certain areas. Plaintiffs do not possess the ability to read or to understand the policy and practice of the prohibition of their religious head covering.

98. The disabled prisoner's failure to have adequate accommodations, a free exercise of religious practice, has created harm, is a continuing harm, and violates their First Amendment right to the

31

exercise of religious freedoms. The VDOC's refusal to enact a policy that provides for the free exercise of religion, and accommodates the disabled in doing so serves no governmental and security interest. The policies currently in place are not the least restrictive means to serve or to advance a legitimate government interest. VDOC has therefore failed to accommodate disabled individuals in violation of the Virginia and United States Constitution, the Americans with Disabilities Act, the Virginians with Disabilities Act, and the Religious Land Use and Institutionalized Persons Act of 2000, as well as the Code of Virginia 2.2-3401.

E. Communication, Assistance, and Facilitation of Discourse with VDOC Staff, Medical Practitioners, and General Service Employees

99. VDOC has a legal obligation to create a system for communication that is readily understood by a disabled individual in its custody and care.

100. The VDOC has a responsibility to ensure that individual disabled prisoners enjoy the same rights, privileges, and ability to communicate as other prisoners under its care and supervision.

101. The VDOC has a mandate to allow disabled prisoners to actively and fully participate in the grievance process; commissary availability and communications; dietary programs; access for application to jobs, programs, and other service considerations; and to do so in a fair and systematic way that provides for equal access as well as accommodations that facilitate such access.

102. Staff at Greensville routinely refuse to communicate with the disabled in writing, or by utilizing interpreters available nearly every business day. Often interpreters are sitting in offices out of sight and out of areas where prisoners are in need of their services and expertise. The areas where interpreters are obviously needed, where the disabled need them to communicate with staff, to understand notifications, discuss property and commissary transactions, are void of

services. Instead of being synchronized by the Institutional ADA Coordinator, and available in these areas, the interpreters are most often found sitting in an administrative office reading a book.

103. Staff as well as contracted professionals often refuse to accommodate the disabled, the Plaintiffs, Mr. Edgar, Mr. Richardson, Mr.Smith, Mr. Melnyczyn, and Mr. Hawkins, and Mr. Odinsson, in a medium conducive to their particular disability needs.

104. Staff refuse to participate in writing requests, complaints, and grievances, or in responding to these items, that the Plaintiffs either do not feel comfortable having other prisoners complete for them, or that might compromise their safety when sensitive information therein is known and processed by other prisoners.

105. Staff refuse to make sufficiently large print memoranda, commissary lists, commissary order forms, orientation materials, and other communications available to the visually impaired. Both Mr. Richardson and Mr. Melnyczyn have repeatedly requested large print materials and been refused accommodation of sufficient size to read.

106. Unit Manager Robertson has employed prisoners to communicate security, custody, emergency, and control commands that are otherwise issued only by staff to the disabled Plaintiffs. The prisoners making these notifications cannot understand the aural commands on the public address system. Many notifications are too small to be visibly viable, or in color formats very hard to read. Often notices are wrong, placed in inverse order, or standby notices are given an hour or more before the activity; senior staff have told Mr. Richardson that standby should be no more than three to five minutes in length.

107. The staff coordinating movement at Greensville routinely employ a three (3) minute moratorium on the movement to meals, pill lines, and other constitutionally protected services.

These constitutionally protected activities are forfeit if a disabled prisoner has failed to get to the unit door within three (3) minutes of the audible.

108. Unit Manager Robertson has employed the dangerous practice of turning off and on the unit lights for notification purposes. Mr. Richardson has repeatedly asked that strobes be positioned in the ceiling of the unit for notification. There are no in-cell notifications for activities, emergencies, fires, or any services. The Plaintiffs have complained repeatedly of missing meals, medication dispensing, as well as outside exercise periods because of their visual and other disability limitations. The turning off and on of the unit's lights has created a danger for the visually impaired. Mr. Richardson and Mr. Melnyczyn have tripped and nearly fallen a number of times when the lights were switched off and on.

109. Mr. Edgar was written an infraction when a Sergeant, while conducting count maintained that the count was audibly announced, the lights were flashed, and Mr. Edgar was not standing when the Sergeant reached the cell door. Mr. Edgar is both hearing and visually impaired.

110. On more than one occasion Greensville staff have refused to communicate with all of the Plaintiffs. Staff have yelled at them, humiliated them, and screamed "Read my lips." On more than one occasion. Mr. Richardson and Mr. Edgar have attempted to explain to staff that they haven't understood them, and had the staff repeatedly tell other staff, as well as prisoners, "I know he can hear." and "All of them can hear when they want to." Staff often say: "He's not deaf." Seasoned staff routinely make these kinds of statements to staff in training, which only serves to create further misunderstandings and communication problems for the Plaintiffs, and the disabled community as a whole. The Plaintiffs are continually defending their disabilities, and disability needs.

111. Despite repeated efforts and information as to the very real shortcomings in

34

communications, alerts, and announcements, the VDOC has staunchly refused to install a notification system that will allow the disabled to have full and unfettered access to the facility services, advantages, and safe accommodations in conformance with the Americans with Disabilities Act Architectural Guidelines and the Code of Federal Regulations.

112. Institutional living is primarily comprised of aural announcements and oral communication systems for wake up, meals, medical services, outdoor activities, exercise, work call, program activities, lockup times, standing counts, drills, emergency evacuations, shakedowns and searches, and many other daily announcements of varied content. These notifications are not just important, but often vital in receiving services and behavioral compliance. Auditory announcements may number in the hundreds per day. In addition there are audible declarations to standby, and pronouncements for last call.

113. The Plaintiffs' disabilities make comprehension of activities under the current system untenable, and the Plaintiffs have been placed at a great disadvantage, as well as in danger.

114. Prisoners at Greensville, upon hearing an audible announcement must come to their cell door (if they can even understand the announcement) and try to determine what was announced (on a largely inaudible intercom) by peering through a five-inch-wide by twenty-four-inch-high window in an otherwise solid door. In order to exit their cell a prisoner must then press a call button. A single officer, in a control booth, will then hopefully open one of the approximately one hundred and seventy (170) doors under their sole control, to allow that prisoner to exit the cell. From that announcement the prisoner must exit the living area within three minutes. This remains true no matter it was the prisoner was doing when the announcement was made; dressing, using the toilet, or any other activity. There is generally a last call announcement by the one officer in the control booth. Half of the notifications listed and posted by prisoner workers

do not have a last call to select. The entire system is more form than substance.

115. Mr. Richardson, Mr. Edgar, Mr. Melnyczyn, and Mr. Odinsson have all missed meal, medications, and many other activities. Mr. Hawkins can't get moved to the disability housing unit, and doesn't have the benefit of any visual notifications in his unit.

116. No notification system that the VDOC has employed has worked. Mr. Richardson was well satisfied with vibrating text pagers once employed, but notifications to the pagers were implemented offsite at VDOC headquarters. After an extended hospital stay, Mr. Richardson returned to find other disabled prisoners had decided didn't like the pagers, so they had been deactivated. When the ADA Coordinator asked for Mr. Richardson's pager to be reactivated with an appropriate schedule, the tech representative said, "For one inmate." and ignored the request. Mr. Edgar utilized the pager's alarm capability until Unit Manager Robertson confiscated the device.

117. The VDOC's failure to provide means of alerts to the disabled prisoners in its custody for daily events, programs, activities, safety notices, and other general activity alerts have resulted in harm to the Plaintiffs. Failures to remedy this lack of notification puts disabled prisoner at risk of serious harm, loss, and has consequently resulted in losses that violate their rights under the U.S. Constitution, the Virginia Constitution, the Americans with Disabilities Act, the Virginians with Disabilities Act, the Religious Land Use and Institutionalized Persons Act of 2000, and the Code of Virginia 2.2-3401.

F. Inadequate Access to Communication Systems and Equitable Media Devices and Content

119. The VDOC provides individual able prisoners in their custody a variety of communication and media devices to utilize for communications with family, friends, associates, lawyers, and other persons as they so desire outside of the prison. The VDOC also has provided email service

36

and media devices that include audio and visual media content, but this content has no disability functionality.

120. Many disabled prisoners cannot use a standard telephone for communicating. In order to use TTD or TTY there must be like equipment installed or available to the person receiving the call. Mr. Richardson has no family or friends with TTY equipment. This type of equipment is antiquated, and most of the individuals that the deaf and hearing impaired call do not have this outdated equipment. The VDOC has made no provisions to assist Mr. Richardson, and provides conferencing equipment only in a platform for prisoners proficient in ASL (American Sign Language).

121. The VDOC is aware that disabled prisoners cannot use the standard telephones, but has failed to make reasonable alternatives and instructional materials available to accommodate disabilities. This is especially true for the hearing and visually impaired. Most visually impaired including Mr. Melnyczyn cannot see the numbers on the prisoner's telephones currently available. This means in order to process a call Mr. Melnyczyn, and other impaired prisoners must compromise personal information.

122. Mr. Richardson has repeatedly asked to use the voiceover telephone that was available at Powhatan Correctional Center, and for two years has been told there is no cord. There are no voiceover telephones available. The TTY equipment is not designed for voiceover use.

123. The conferencing equipment that was supposed to be videophone technology, that VDOC committed to making voiceover capable in the Minnis v. Johnson (page 16, 3. Videophones, paragraph 2) settlement has never materialized. The conferencing equipment utilized has never supported voiceover or real-time captioning; systems that are available in local regional jails. The VDOC has never made videophones available as they agreed to do.

37

124. The current TDD/TTY service available at Greensville is poorly positioned, hard to read, and is often inoperable because of disrepair and background noise. Because of the positioning, and the model TTD/TTY currently being used, voiceover is very difficult and nearly impossible to use under even optimal noise conditions, and was not designed, and has not been positioned for voiceover use. The present location is in a room where eighty four prisoners play games and cards, watch television, exercise, and the TTD/TTY cannot be used with crowd background noise.

125. Previously a CapTel voiceover telephone was located with the conferencing equipment, in a separate (quiet) room with access limited to disabled prisoners who were on a list determined by their disability needs. The current system is in a telephone bank, and the TDDs are on telephones that are open and operable as normal telephones. Many hearing impaired and other prisoners are utilizing the system that have no need for it. The conferencing equipment is free, and there is no comparable communication for the hearing and visual impaired disability needs. The technology exists, but the VDOC refuses to make it available on an equal and non-discriminatory basis.

126. Mr. Richardson has requested multiple times that he be allowed to use the videophones with the Video Relay Service (VRS) and special equipment he has purchased at his own expense, and that he be able to utilize special headphones, or there be a CART (Computer- Assisted Real-Time Transcription) set up so he can understand the interpreter using services that meet his disability needs. The VDOC committed to working with the provider (Purple) to provide a service to facilitate Mr. Richardson's disability needs, but results never materialized. Other deaf prisoners utilize the conferencing equipment daily from 8:00 a.m. until 11:00 p.m. at no charge.

127. In addition to Mr. Richardson's hearing disability, he has visual disabilities that include photosensitivity, and poor vision which cannot be corrected to 20/20 because of lesions from his

contacting Histoplasmosis at Powhatan Correctional Center in 1994, possible side effects from prescription drugs, and degenerative eye disease.

128. Mr. Richardson has tried to use the VRS (Video Relay Service) available on the video conferencing equipment, but cannot adequately see to utilize the conferencing equipment because of his vision disabilities, and his limited ASL (American Sign Language) skills.

129. Mr. Melnyczyn, Mr. Edgar have tried to use the TDD, but the operations and noise factors have prevented their ability to operate and use with any success with family and friends.

130. Mr. Hawkins until recently had no access to any communication device because there was no telephone (TTY) or conferencing equipment installed in his building, and he is restricted from accessing the equipment in other buildings. The TTY recently installed has no instructions.

131. VDOC has contracted services with Jpay. Jpay is a media content company that provides services nationwide to prisoners and their families. Mr. Richardson has repeatedly made requests of Jpay media electronically through the Jpay media grievance procedure that they make their media content disability accessible. Mr. Richardson has requested bigger screens for his media device, a big buttons app for email composition, and print media comparable to the content for hearing and non-disabled customers. Mr. Richardson has requested print copies of his emails, and Jpay responded they are not approved by the VDOC. Mr. Richardson has requested large print visual material comparable to the audio materials to no avail. Jpay has failed to provide any disability aids, and won't even change their pointer color to aide in Mr. Richardson's ability to see it when utilizing the kiosk to facilitate transactions with Jpay media. Mr. Richardson has repeatedly requested bigger screens or an eBook for email and media services without success.

132. Mr. Edgar's vision and hearing disabilities have made it impossible for him to use Jpay without the help of other prisoners. Mr. Edgar is uncomfortable providing password information,

and personal information to other prisoners for transmission, but has no reasonable alternative. Mr. Edgar also cannot hear to utilize audio books, and would like to have similar print media for his disability accommodation.

133. Mr. Melnyczyn cannot use Jpay media at all because of his disabilities, and his family has asked him not to use other prisoners to transmit messages.

134. VDOC and Jpay has denied Mr. Richardson, Mr. Melnyczyn, Mr. Edgar, and Mr. Hawkins' requests as a matter of policy, and remained unresponsive with the media provider for disability accommodations. The VDOC has made no contractual attempts to remedy the discriminatory practices of Jpay media.

135. The VDOC, GTL, and Jpay have failed to provide adequate means for individual disabled prisoners to communicate and enjoy the privileges associated with the media accessibility and content that has been provided to non-disabled incarcerated prisoners. These failures have resulted in harm, and will certainly cause continuing and future harm entailing such discriminating factors that clearly violate the Plaintiffs' rights availed to them by the Constitution of Virginia, the U.S. Constitution, the Americans with Disabilities Act, the Virginians with Disabilities Act, and as Jpay also provides religious content, the Religious Land Use and Institutionalized Persons Act of 2000, as well as the Code of Virginia 2.2-3401.

G. Disability Aids and Disability Accommodations

136. The VDOC has consistently and systematically failed to provide, prescribe, and allow disabled individual prisoners in custody disability aids, devices, and accommodations consistent with their needs. This includes accommodations free from exorbitant surcharges. Devices consistent with their disabilities, which allow them to function in a manner logically coherent with aspects of everyday institutional life, as is accorded to prisoners without disabilities.

40

137. The VDOC has repeatedly and capriciously disallowed some prisoners hearing aids and Bluetooth devices, while permitting them to other prisoners at Greensville and Powhatan Correctional Center. These devices are the industry standard.

138. Mr. Richardson had an inline amplifier that he was permitted to purchase to mitigate his disability when listening to music. Upon arrival at Greensville the intake officer told William Jarrett, Warden, Greensville, they did not know what the device was. Mr. Richardson (in the presence of ADA Coordinator Marano) explained what the device was, and ADA Coordinator Marano argued Mr. Richardson should be allowed the amplifier and many other of his previously permitted property and disability items and aids, Mr. Good responded that he would review the items with defendant Pearson. Mr. Richardson was denied serval hundred dollars of his personally purchased disability allowances from Powhatan Correctional Center. Mr. Marano maintained he would continue to try to get Mr. Richardson his personal property, but to no avail.

139. The VDOC has now restricted disability aids, accommodations, and purchases to the Keefe Corporation; Keefe is a price gouging prison commissary supplier with no disability allowances, or experience.

140. The VDOC's failure to provide disabled prisoners in its custody accommodations that facilitate their ability to function in daily events, programs, educational opportunities, activities, safety and general activity alerts as all prisoners, and void of exorbitant surcharges (copays) has resulted in specific hardships and harm. Failure to remedy the copays, surcharges, and disparities has put disabled prisoners at risk of serious hardship, harm, loss, and has consequently resulted in deterrent losses that violate their rights under the Virginia Constitution, the U.S. Constitution, the Americans with Disabilities Act, the Religious Land Use and Institutionalized Persons Act of 2000, C.F.R. 35.160(b)(1), 28 C.F.R. 35.104, 28 C.F.R. 35.130(f), 28 C.F.R. 35.160(a), and the

41

Code of Virginia 51.5-40, as well as Code of Virginia 2.2-3491.

H. Improper Classification of Disabled Prisoners

141. VDOC had previously utilized a classification system that assigned prisoners based upon their treatment needs, severity of crimes, and their behavior patterns while incarcerated. The exception to this was the classification of all deaf prisoners, as a result of the Minnis settlement agreement, which stipulated that all deaf prisoners would be assigned to Powhatan Correctional Center. Deaf prisoners housed elsewhere were to be entitled to all of the benefits of the Minnis settlement. The VDOC failed to adhere to this agreement by:

a. The VDOC never made the Minnis settlement applicable to a prisoner confined at Greensville who was on dialysis, including the monetary compensation. The prisoner died.

b. A prisoner who was a recidivist and could not be housed at Powhatan Correctional Center, was coerced into waiving his settlement rights because while on parole he had called the police on a gang member who was housed at Powhatan Correctional Center. This prisoner was sent to River North Correctional Center.

c. The VDOC violated the agreement by dividing the Deaf Community, and moving a segment of that group to Greensville on October 27, 2014. While the current Plaintiffs would be time barred from bringing a complaint, and while Mr. Richardson sought to reinstate the Minnis case, the VDOC ADA Administrator Marano has told Mr. Richardson that he (Barry Marano and the state) have committed to the Honorable Judge Ellis, I I I that it is the VDOC's intention to continue to follow the Minnis settlement. That is patently false, and has been false since the Plaintiff's move to Greensville Correctional Center.

142. The VDOC classification process suddenly dissevered this limited group of prisoners based upon their disability needs, the group included many hearing impaired and a number of other

multiple or singularly disabled individuals. Partially closing Powhatan Correctional Center in 2014 led to not only the cleaving of the deaf community itself (a number of deaf prisoners were left behind to work in key VC Enterprise work assignments) but a significant rollback of the privileges, work assignments, services, axillary aids, including, but not limited to communications, medical, educational, mental health, dietary, and religious accommodations. The VDOC only made these classification determinations based solely of the decision to close Powhatan Correctional Center for budgetary reason. One of the most significant losses was that the ADA Coordinator, Mr. Barry Marano, was reassigned to VDOC Headquarters.

143. VDOC has made no work, educational, or vocational programs available for the disabled on the same basis as they have made programming objectives for able bodied prisoners at Greensville Correctional Center. The disabled prisoners have special needs, and the decision to close Powhatan Correctional Center, and the transfer took place in approximately three weeks was rife with violations of the ADA, State and federal laws, as well as the Virginia and U. S. Constitutions. Stephanie Robertson, the Unit Manager at Greensville Correctional Center, told the arriving disabled prisoners on October 27, 2014, that she was given four days notice. The staff at Greensville had no experience and no training to work with, communicate with, and house disabled prisoners. Greensville Correctional Center had not moved the prisoners from the cells where the disabled prisoners were to be housed, and there was significant hostility not only among the prisoners who had to move, but the disabled prisoners were told they wouldn't be housed in a living area to themselves by Mr. Marano. In reality more than a dozen Greensville prisoners would be housed with the disabled prisoners. In addition, many property items allowed at Powhatan Correctional Center, including disability items, locks to secure property, and many other property items were confiscated and destroyed because they were disallowed at

Greensville.

144. The VDOC has made no accommodations for disabled prisoners in the classrooms throughout the VDOC, or at Greensville Correctional Center upon their arrival.

145. Deaf individuals are classified at Greensville Correctional Center, but the VDOC has instituted no provisional educational, vocational, or other program objectives for the deaf, disabled, and the hearing impaired. Mr. Edgar has repeatedly requested an oral interpreter, and Purple Communications has repeatedly utilized interpreters who are not qualified. In some instances, when Mr. Edgar asked for an oral interpreter he was summarily denied.

146. Greensville Correctional Center has denied interpreter services previously allowed as routine at Powhatan Correctional Center rather than employ additional interpreters.

147. Mr. Richardson has repeatedly requested an interpreter both on and off site for medical programs, consultations, and procedures. Mr. Richardson has repeatedly been denied interpreter service for the self medication program. The self medication program objectives require communication about changes in medications, possible side effects from prescription drugs, changes in prescriptions, changes in prescription strength, renewals, missing prescriptions, and other considerations. Mr. Richardson has been summarily denied interprets for medical needs, programs, and services.

148. Mr. Edgar has repeatedly requested interpreter services for classification, disciplinary, medical, and other program objectives and been repeatedly refused these essential services that would assist him in comprehending the proceedings.

149. The plaintiffs collectively have been denied privileges, services, and fair representation in the classification process, as well as privileges at lower level facilities because of their disabilities, or their disability needs.

44

## VI. CLASS ACTION CERTIFICATION

150. Plaintiffs collectively have brought claims based upon the ADA, the Rehabilitation Act, the Virginians with Disabilities Act, the Code of Virginia, the Religious Land Use and Institutionalized Persons Act of 2000, the Virginia Constitution, and the United States Constitution on behalf of themselves and on the behalf of all those similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

151. Plaintiffs seek to represent the class which is composed of all disabled prisoners incarcerated in the VDOC, or are now and will be incarcerated under the VDOC's supervision. Prisoners who are now or may become disabled under the meaning and auspices of the disability laws both federal and state. Plaintiffs who until now have been denied their rights to effective communication, effective educational services, auxiliary aids, services, and accommodations in keeping with the ADA.

152. As a result of incarceration many disabled individuals have been denied, in violation of statutory and constitutional rights, as described in the complaint.

153. Plaintiffs represent a class seeking declaratory and injunctive relief to curtail the defendant's unlawful and unconstitutional practices and policies. Plaintiffs also seek nominal, compensatory, and punitive damages, as well as attorney fees, where appropriate.

154. There are currently hundreds of disabled individual prisoners in the custody of the VDOC. There is no consistent classification process in place to process or to identify these individual prisoners. There is currently no institution that facilitates, or has the architectural standards, safeguards, and accommodations to facilitate the disability needs of prisoners in VDOC custody.

155. All class members named as plaintiffs in this complaint are equally disadvantaged by the conditions, unlawful treatment, and disadvantages described in this complaint, and numerous

other questions of law and common facts that exist as to all Class members. The pertinent questions would include, but are not limited to: whether the defendants have systematically failed to provide effective treatment, classification, auxiliary aids, accommodations, architectural standards and safeguards, effective communication standards, medical devices, and protective devices and services to individuals and individual prisoners in VDOC custody; whether the disabled under the VDOC have been denied effective communication and services with medical personnel, classification systems and services, educational systems and services, as well as access to services, programming, and privileges comparable to access provided to prisoners who suffer no disabilities; whether the VDOC contract providers have systematization at the behest of the VDOC have been party to a system wide act and concerted effort of discrimination propagated by the VDOC and its various contractors; whether the VDOC and its actors have placed an undue and substantial burden on their disabled prisoner's exercise of religion; whether the VDOC and the agents have failed to notify, include, and adequately provide announcements and prison wide access to services, programs, advantages, and privileges in a manner inclusive to the deaf, hearing impaired, and other disabled prisoners as it has for those without disabilities; whether the defendants have in part or as a whole acted generally, specifically, in their official and individual capacities sought to discriminate against the disabled prisoners in their custody and care.

156. Plaintiff's claims are typical of the claims of all members of the class. The policies, practices, and procedures in the complaint apply equally to the named Plaintiffs and to all members of the class, and stem from the systematic policies and practices that affect all members of the class.

157. Plaintiffs will equitably represent members of the class. Plaintiffs' interests are seeking

protective as well as statutory and the constitutional rights of the disabled who are currently

incarcerated, or who may in the future be incarcerated in the Virginia Department of Corrections.

158. The defendants have acted and refused to act in abeyance of statutory and constitutional

mandates appropriate to the disabled class, therefore making injunctive and declatory timely with

regard to the class as a whole.

VII. CLAIMS FOR RELIEF

A. COUNT I

Discrimination with regard to a Disability that Violates the American with Disabilities Act

159. As included by reference the plaintiffs reassert every claim above as being fully set forth

herein.

160. Congress enacted 42 U.S.C. 1201(b)(1) ON July 12, 1990, to mandate "the elimination of

discrimination against individuals with disabilities." Title II of the ADA states: "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of services, programs, or activities of a public entity, or be subject to

discrimination by any such entity." 42 U.S.C. 12132.

161. The plaintiffs are individuals with disabilities within the meaning and as defined by the

ADA, under 42 U.S.C. 12131(2).

162. Claims under that ADA are consequently brought against Harold Clarke, Rose Durbin,

Eddie L. Pearson, Lane Talbott, (collectively "named defendants"), in their official capacities,

and the Virginia Department of Corrections ("VDOC"), Correctional Enterprises ("VC

Enterprises"), the Virginia Department of Correctional Education ("VC Education"),

163. The ADA has been in force and applicable in the United States at all times relevant to this

action, and their plaintiffs had the right to be free from discrimination from the defendants as

disabled persons. 42 U.S.C. 12132.

164. Effective communication as regulated by the U.S. Department of Justice ("DOJ")
implementing Title II is clearly an essential part of the nondiscrimination mandate. 28 C.F.R.
35.160.

165. Title II regulation states that any "public entity shall take appropriate steps to ensure that
communications with applicants, participants, and members of their public with disabilities are
as effective as communications with others. 28 C.F.R. 35.160(a).

166. Title III mandates under law that the continuing state agency named defendants'
(collectively "defendants") and their departments, subsidiaries, instrumentalities, contractual
providers, failure to protect and provide the disabled the same access to opportunities, services,
facilities, advantages, benefits, activities, programs, privileges, and accommodations is
discriminatory and violates 28 C.F.R. 36.104.

167. The plaintiffs' inability to communicate, participate in, and receive effective
accommodation to assist them in normal life activities violates their public accommodation rights
under the ADA.

168. The inability of the plaintiffs to effectively communicate and fully participate with
educational, mental health, employment, rehabilitative programming, daily life activities, sleep,
routine notification, memoranda, safety alerts, and family and associate communications with
persons inside and outside of the prison as the non-disabled violates their rights under the ADA.

169. To ensure not only effective communication, but overall access for the disabled in an
institutional setting (living environment) facilitated by the government, where the prisoners have
no alternative choice of residence, means "a public entity shall furnish appropriate auxiliary aids
and services where necessary to afford an individual with a disability an equal opportunity to

participate in, and enjoy the benefits of, a service program, or activity conducted by a public

entity." The VDOC is charging a surcharge for disability items coveted under terms of insurance,

and calling these accommodations items subject to a copay. 28 C.F.R. 35.160(b)(1).

170. Auxiliary aids include, but are not limited to, "qualified interpreters or other effective

methods of making aurally delivered materials available to individuals with hearing

impairments," 42 U.S.C. 12103, such as computer-aided transcription services, assistive listening

systems, closed captioning decoders, open and closed captioning, TDDs, videotext displays,

voiceover devices, and written materials, both handwritten and texts. 28 C.F.R. 35.104.

171. Additionally, the, "public entity may not place a surcharge on any particular individual with

a disability or any group of individuals with disabilities to cover their cost of measures, such as

their provision of auxiliary aids or program accessibility, that are required to provide that

individual or group with the nondiscriminatory treatment required by the Act or this part." 28

C.F.R. 35.130(f).

172. Defendants have placed, in violation of the ADA, statutorily prohibited unconstitutional

burdens on the Plaintiffs solely because of their disabilities. They have done this by failing to

provide effective disability accommodations for the prisoners who has a physical or mental

impairment that substantially limits one or multiple major life functions, and by failing to

adequately ensure access to auxiliary aids by the disabled prisoners that are in the VDOC's

custody, control, security, and care or otherwise under the supervision of the VDOC. Clarke,

Durbin, ("VDOC named defendants") and VDOC have also accomplished this by applying an

unreasonable lack of access and a heavy surcharge for the disabled prisoners who need disability

accommodation, and need such as is required to not only provide them with equitable and

reasonable access to VDOC's services, privileges, facilities, programs, and advantages, but also

to ensure nondiscrimination as mandated by the ADA.

173. The VDOC has not only denied disability accommodations, but they have sought to, prevented, and restricted expert psychological and medical providers from determining and prescribing the plaintiff's auxiliary aids and the services necessary to address their disability needs. These conditions of failure and denial are continuing, ongoing, and daily practices of the defendants who are not only assessing surcharges, labeling disability aids as "comfort items" as reasoning for denial, but who have actively and purposely sought to shutdown pathways for disabled prisoners to obtain reasonable disability accommodations.

174. To ensure disability aids and accommodations, and in determining what type is necessitated "a public entity shall give primary consideration to the request of the individual with disabilities." The VDOC has actively denied and rescinded disability aids. 28 C.F.R. 160 (b)(2).

175. On information and belief, the failing to allow effective disability and axillary aids and services, benefits, activities, programs, and privileges are the policies, regular practices, and regular customs and mores of the defendants.

176. Defendants' failure to provide appropriate auxiliary and disability aids, or to facilitate a pathway for the provision of disability accommodations has subjected the Plaintiffs to discrimination on the basis of their disabilities in violation of their rights under their ADA, that include, but are not limited to the following:

a. Inadequate access to diets consistent with disability needs;

b. Inadequate access to visual aids;

c. Inadequate access to sleep aids;

d. Inadequate access to communication devices;

e. Inadequate access to pediatric accommodations;

f. Inadequate access to prison wide alerts;

g. Inadequate means to protect themselves;

h. Inadequate means to protect their property;

i. Improper institutional setting and assignment;

j. Inadequate sign language and interpreter services;

k. Unlawful surcharges on disability devices; and

l. Inadequate access to accommodate disability needs in accordance with The Architectural

Barriers Act of 1968.

177. Further, the VDOC and VDOC named defendants discriminate against plaintiffs, solely on

the basis of their disabilities, and refuse to equally and equitably apply classification to disabled

individuals, instead assigning them to facilities inconsistent and regardless of their disability

needs, and regardless of the nature of their disability. VDOC buildings covered under the U.S.

Architectural and Transportation Barriers Compliance Board (Access Board) must be accessible

to disabled people, and the buildings currently housing disabled prisoners fall far short of these

mandates.

178. The VDOC and the VDOC named defendants have failed to define, develop, and make

available consistent policy safeguards and opportunities for the disabled community of prisoners

as available to the non disabled individual prisoners.

179. The proximate result of the defendants' failure and the basic violations against the plaintiffs'

rights under the ADA has caused the Plaintiffs to suffer from discrimination, unequal treatment,

and an institutional exclusion (which includes being denied by the defendants' the services,

benefits, activities, programs, privileges, and human rights), promulgated under the laws of the

United States, including financial loss, the loss of dignity, frustration, humiliation, emotional,

psychological, and physical pain and suffering, anxiety, trauma, embarrassment, the unrequited loss of rights and privileges, including unnecessary disciplinary measures, and severe and unmitigated injuries to their health.

B. Count II

Discrimination Based Upon a Disability in Violation of the Rehabilitation Act (29 U.S.C. 794 et seq.)

180. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

181. The Rehabilitation Act is to ensure no "qualified individual with a disability in the United States... shall, solely by reason of [ ] disability, be excluded from the participation in, be denied their benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. 794(a).

182. The Plaintiffs are qualified individuals with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. 705(20).

183. Defendants receive Federal financial assistance within the meaning of 29 U.S.C. 794(a).

184. Operations across a wide spectrum in the VDOC, VC Enterprises, VC Education, and departments, agencies, instrumentalities, and contractors, including Greensville, are and operate "program[s] or activit[ies]" within the meaning of 29 U.S.C. 794 (b)(1)(A)-(B) and or (b)(2)(B).

185. At all times relevant to this action, the Rehabilitation Act was in full force and effect in the United States and Plaintiffs had the right not to be subjected to discrimination by the defendants on the basis of their disability 29 U.S.C. 794 (a).

186. The Department of Justice regulation implementing the Rehabilitation Act has clarifies requirements for Federal financial recipients, including correctional facilities, stating a "recipient

that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the persons in the program receiving federal financial assistance." 28 C.F.R. 42.503(f).

187. Appropriate auxiliary aids include, but are not limited to, "brailed and taped material, qualified interpreters, readers, and telephonic devices." 28 C.F.R. 42.503(f).

188. The defendants continue to discriminate and impair the Plaintiffs' rights and ability to communicate effectively with medical personnel, prison staff, and individuals outside of prison, and have excluded Plaintiffs' from educational, vocational, employment, religious, and prison wide announcements and alerts. This discriminatory treatment has been accomplished by a failure to provide appropriate aids and accommodations in accordance with their Rehabilitation Act.

189. The defendants' failure to provide appropriate auxiliary and disability aids and services continued to this day, and this is discriminatory treatment that denies Plaintiffs' access to VDOC's services, privileges, facilities, programs, and advantages, and also fails to ensure nondiscrimination and appropriate aids and accommodations as are mandated by the Rehabilitation Act.

190. Defendants' failure to provide auxiliary aids and services has subjected Plaintiffs' to discriminatory treatment that includes but is not limited to the following:

a. inadequate access to visual educational aids consistent with disability needs;

b. inadequate access to written materials for educational purpose;

c. inadequate access to captioned educational aids;

d. inadequate access to disability equipped communication devices;

53

e. inadequate access to pediatric accommodations in the educational setting;

f. inadequate access to prison wide, and in cell visual alerts for educational activity notification;

g. inadequate alerts in educational and vocational sites;

h. inadequate access to educational technology that connects to existing modern disability devices;

i. no vocational and educational disability equipped institutional setting and assignment planning;

j. inadequate sign language and interpreter services for program and educational purposes;

k. unlawful surcharges, on, with, or for the auxiliary disability devices; and

l. inadequate access to vendors to accommodate disability needs.

191. Further, the VDOC and VDOC named defendants discriminate against plaintiffs, solely on the basis of their disabilities, and refuse to equally and equitably apply classification to disabled individuals, instead assigning them to facilities inconsistent and regardless of their disability needs, and regardless of the nature of their disability.

192. Defendants' systemic failure to comply with the Rehabilitation Act has resulted in harm to the Plaintiffs, and will continue to harm the Plaintiffs until and unless the defendants' area ordered by this Court to make permanent modifications to their practices, procedures, planning and policies pursuant to the Rehabilitation Act.

C. COUNT III

Violation of the Virginians with Disabilities Act

(Code of Virginia 51.5-40)

193. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

194. The Virginians with Disabilities Act stipulates no "qualified person with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving state financial assistance or under any program or activity conducted by or on behalf of any state agency." Code of Virginia 51.5-40.

195. Plaintiffs are qualified individuals with disabilities within the meaning and definition of the Code of Virginia 51.5-40.

196. VDOC, VC Enterprises, VC Education, and Greensville receive state financial assistance within the meaning of the Code of Virginia 51.5-40.

197. Operations across a wide spectrum in the VDOC, VC Enterprises, VC Education, and departments, agencies, instrumentalities, and contractors, including Greensville, are and operate "program[s] or activit[ies]" within the meaning of Code of Virginia 51.5-40.

198. At all times relevant to this action, the Virginians with Disabilities Act was in full force and effect in the United States and Plaintiffs had the right not to be subjected to discrimination by the defendants on the basis of their disability. Code of Virginia 51.5-40.

199. Acting under the color of state law the defendants have subjected the Plaintiffs to discrimination solely on the basis of their disability, in violation of their rights under the Virginians with Disabilities Act. Their defendants have done this by failing to provide disability aids, accommodations, and auxiliary aids and services in the form of visual aids, interpreter services, and adequate visual, audio, and effective communication aids.

200. The defendants failure to provide effective communication aids and disability accommodations for individuals with hearing, visual, orthopedic, and other disabilities denies and is a continuing denial, solely on their basis of their disability, and the Plaintiffs have been

denied the access to the defendants' services, benefits, activities, programs, and privileges on an equal basis as the access provided to non-disabled prisoners.

201. On information and belief, the failure to provide effective communication aids and other disability aids, and the failure to provide comparable access to services, benefits, activities, programs, or privileges are policies, regular practices, and the customes and mores of the defendants. These practices are ongoing and continue to this date.

202. Defendants' failure to provide appropriate auxiliary aids, notification devices, and services consistent with disability needs has subjected Plaintiffs' to discriminatory treatment that includes but is not limited to the following:

a. inadequate access to visual aids consistent with disability needs and the Americans with Disability Act Architectural Guidelines;

b. inadequate access to written materials for notification and communication purposes;

c. inadequate access to captioned administrative memoranda and informational aids;

d. inadequate access to disability equipped telephones and communication devices;

e. inadequate access to pediatric accommodations in the cells, dining, and housing unit settings;

f. inadequate access to prison wide, and in cell visual alerts for program and activity notification;

g. inadequate alerts in general institutional offices, school, gymnasium, dining, and other sites;

h. inadequate access to media technology that connects to existing modern hearing aids, visual aids, and disability devices;

i. no disability institutional planning objectives;

j. inadequate sign language and interpreter services for program, religious, medical, notification, and other purposes;

k. No privacy protection in areas where confidential information is exchanged in the view of

other prisoners who know and can interpret sign language.

l. unlawful surcharges, on, with, or for the auxiliary disability devices; and

m. inadequate access to vendors to accommodate disability needs.

203. Further, the VDOC and VDOC named defendants discriminate against plaintiffs, solely on the basis of their disabilities, and refuse to equally and equitably apply classification level privileges to disabled individuals. These assignments are inconsistent with their disability needs, the nature of their disability, and the nature of the accommodations available at a particular institutional setting to meet the individual prisoner's disability need.

204. Defendants' systemic failure to comply with the Code of Virginia 51.5-40 has resulted in harm to the Plaintiffs, making the defendants liable for harms suffered. These harms to the Plaintiffs will continue to adversely affect the Plaintiffs until and unless the defendants are ordered by this Court to make permanent modifications to their practices, procedures, planning and policies pursuant to the Code of Virginia 51.5-40.

C. COUNT IV

Violation of the Code of Virginia 2.2-3401

205. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

206. The Code of Virginia requires that "[w]henever a deaf person applies for or receives any license, service, assistance or other right or benefit provided by a [ ] [state] agency, the agency shall either request the Virginia Department for the Deaf and Hard-of-Hearing to appoint a qualified interpreter for the deaf or appoint such an interpreter from a list of qualified interpreters maintained by the Department to assist the deaf person in communicating with agency personnel." Code of Virginia 2.2-3401(B).

207. VDOC, VC Enterprises, VC Education, and Greensville are state agencies that provide services, assistance, and benefits to the Plaintiffs within the meaning of the Code Virginia 2.2-3400. These services, assistance, and benefits include but are not limited to programs offered by the VDOC, apprenticeship courses and classes, VC Educational classes, medical services offered by VDOC and the VDOC's medical contractors and providers, religious services of the Chaplaincy Services of Virginia, GTL, Jpay, and any other means allotted for external communications, and communication with VDOC personnel.

208. Plaintiffs have requested services, assistance, and benefits from the defendants and the defendants' service providers, including but not limited to the services, assistance, and benefits listed above and have requested that interpreters be provided in accordance with Code of Virginia 2.2-3401(B).

209. The defendants through their policies and practices have consistently denied and failed to provide adequate sign language interpreters for the deaf and hearing impaired individuals under VDOC security, custody, care, and supervision.

210. The VDOC's failure to provide disabled prisoners in its custody proper interpreter accommodations to facilitate their ability to function in daily events, programs, educational opportunities, activities, safety and general activity alerts, as it provides to all other prisoners under its supervision, creates disparities, and has put disabled prisoners at risk of serious hardship and harm, this violates their rights under the Virginia Constitution, the U.S. Constitution, the Americans with Disabilities Act, the Religious Land Use and Institutionalized Persons Act of 2000, C.F.R. 35.160(b)(1), 28 C.F.R. 35.104, 28 C.F.R. 35.130(f), 28 C.F.R. 35.160(a), and the Code of Virginia 51.5-40, as well as Code of Virginia 2.2-3491.

E. COUNT V

Religious Land Use and Institutionalized Persons Act of 2000

"Substantial Burden on Religious Freedom"

(42 U.S.C. 2000cc et seq)

211. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

212. Government may not impose substantial burden on religious exercises of institutionalized even if the burden results from a rule of general applicability. 42 U.S.C. 2000cc-1.

213. Plaintiffs are "institutionalized persons" within the meaning of the Religious Land Use and Institutionalized Persons Act of 2000cc-1.

214. VDOC acting as a department, agency, or instrumentality of the Commonwealth of Virginia, is a branch of the government as defined by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). Religious Land Use and Institutionalized Persons Act of 2000cc-5(4).

215. Claims under the RLUIPA are brought against defendants Clarke and Pearson in their official capacity as employees of the VDOC.

216. VDOC and VDOC RLUIPA defendants and VDOC contract providers have deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, a right secured by RLUIPA. The defendants have unlawfully imposed a substantial burden on the Plaintiffs' religious exercise. The defendants have done this by failing to provide adequate means for disabled prisoners to effectively communicate at religious services, to have materials available to them in a medium that is suited to their disability needs, and to be provided some manner with which to practice their religious rights. The substantial burden effects programs that receive federal financial aid.

F. COUNT VI

Violation of United States Constitution

Freedom from Cruel and Unusual Punishment: Eighth and Fourteenth Amendments

(42 U.S.C. 1983)

217. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

218. Under the Eighth and Fourteenth Amendments of the United States Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

219. The VDOC defendants have, in their individual and official capacities, sought, deprived, and continue to deprive Plaintiffs of their right to be free of cruel and unusual punishment as secured by the Eighth Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment.

220. The VDOC defendants have, in their individual and official capacities, systemically deprived Plaintiffs access to basic human rights and services, as well as access to vital information during their incarceration, including but not limited to their incarceration at Greensville Correctional Center. The named defendants and their agents have failed to notify Plaintiffs of alerts, announcements, safety instructions, and activities and services, as well as access to information in services where dialog is an essential part of normal communications. In many instances VDOC and their agents, contractors, and instrumentalities have denied the disabled access to fair and equitable essential services, information, and accommodations. The behavior on the part of the defendants has not only placed the Plaintiffs at substantial risk in the past, but the defendant's actions place the disabled Plaintiffs at the risk of serious future harm.

221. VDOC defendants have direct and actual knowledge of the unconstitutional conditions to which the Plaintiffs were subjected to at numerous times and at multiple institutions throughout the VDOC, and continue to be subjected to at Greensville. Plaintiffs have submitted complaints to VDOC staff requesting relief in good faith. The defendants have deliberately failed to take corrective action.

222. The VDOC has actual knowledge of the substantial medical risks, safety risks, and inadequate notifications within the VDOC, of the contractual medical providers, as well as the other various contract providers who render services and have asked disabled prisoners to medical procedural waivers and various other contracts and agreements without accommodations necessary to read and understand the information as presented. The defendants continue to implement these unconstitutional conditions and practices in direct and knowing violation of the Eighth and Fourteenth Amendments to the United States Constitution.

223. VDOC named defendants' failure to comply with the Eighth and Fourteenth Amendments of the United States Constitution has resulted in harm to the Plaintiffs, and will continue to result in harm to the Plaintiffs, as Plaintiffs will remain in the custody and under control of the VDOC and will continue to attempt to avail themselves of medical treatment and other services until and VDOC named defendants are ordered by this Honorable Court to modify their policies, practices, procedures, and mores pursuant to the Eighth and Fourteenth Amendments of the United States Constitution.

G. COUNT VII

Violation of their United States Constitution

Free Exercise of Religion:

First and Fourteenth Amendments

61

(42 U.S.C. 1983)

224. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

225. Under the First and Fourteenth Amendments of the United States Constitution, States, "shall make no law respecting an establishment of religion, or prohibiting their free exercise thereof." U.S. Const. amend. I

226. VDOC in concert with the Chaplaincy Services of Virginia, in their individual and official capacities, deprived and continued to deprive Plaintiffs of the free exercise of religion, as secured by the First Amendment of the United States Constitution and made applicable to the States by the Fourteenth Amendment, by discriminating against Plaintiffs because of their disabilities, including but not limited to mode of speech, inability to see, and belief system and practices outside of mainstream religious doctrine. Practices and policies have substantially burdened the Plaintiffs' religious exercise.

227. VDOC and the Chaplaincy Services of Virginia, failure to comply with their First and Fourteenth Amendments of the United States Constitution has resulted in harm to the Plaintiffs, and will continue to result in harm to the Plaintiffs as Plaintiffs have and will remain in the custody of the VDOC and continue to attempt to participate in weekly worship services, religiously dietary needs, and religious doctrine, practices, and holy days until and unless VDOC named defendants and the Chaplaincy Services of Virginia and their agents are ordered by this Honorable Court to make modifications to the policies, practices, procedures, and mores pursuant to the First and Fourteenth Amendments of the United States Constitution.

H. COUNT VIII

Violation of the United States Constitution

Free Speech: First and Fourteenth Amendments

(42 U.S.C. 1983)

228. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

229. Under the First and Fourteenth Amendments of the United States Constitution, States, "shall make no law...abridging the freedom of speech." U.S. Const. amend. 1.

230. VDOC named defendants have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their freedom of speech, as secured by the First Amendment of the United States Constitution and made applicable to the States by the Fourteenth Amendment, by preventing Plaintiffs because of their disabilities, including but not limited to mode of speech, inability to see. Despite multiple complaints and requests for accommodations that would enable communications. VDOC named defendants continue technological, and telecommunication devices that would give the disabled the ability and the possibilities of communicating and receiving communications with people inside and outside of the prison.

231. VDOC named defendants' failure to comply with the First and Fourteenth Amendments of the United States Constitution has resulted in harm to the Plaintiffs, and will continue to result in harm to the Plaintiffs. The Plaintiffs have, will, and must remain in the custody of the VDOC and continue to attempt to establish communications, and communicate with people inside and outside of the prison, until and unless VDOC named defendants and their agents are ordered by this Honorable Court to make modifications to their policies, practices, procedures, and mores pursuant to the First and Fourteenth Amendments of the United States Constitution.

I. COUNT IX

Violation of the Constitution of Virginia

Free Exercise of Religion: Constitution of Virginia Article I, Section 16

232. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

233. Under Article I, Section 16 of the Constitution of Virginia, " all men are equally entitled to the free exercise of religion" and "no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burdened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief." Va. Const. art. I section 16.

234. VDOC in concert with their agents, the Chaplaincy Services of Virginia, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their free and equal exercise of religion, as secured by the First Amendment of the Virginia Constitution. Defendants have only provided volunteer interpreters who come twice a month to only the Protestant services.

235. VDOC in concert with their agents, the Chaplaincy Services of Virginia, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their free and equal exercise of religion, as secured by Article I, Section 16 of the Constitution of Virginia, by discriminating against Plaintiffs' because of their disabled condition and by substantial burdening their free and unencumbered religious exercise.

236. VDOC named defendants' and the VDOC in concert with their agents, the Chaplaincy Services of Virginia, in their individual and official capacities, failed to comply with the First Amendment, Article I, Section 16 of the Virginia Constitution. This failure has resulted in harm to the Plaintiffs, and will continue to result in harm to the Plaintiffs. The Plaintiffs have, will, and must remain in the custody of the VDOC and continue to attempt to practice their sincerely held religious beliefs and convictions, until and unless VDOC named defendants and their agents are

ordered by this Honorable Court to make modifications to their policies, practices, procedures, and mores pursuant to the First Amendment of the Virginia Constitution.

J. COUNT X

Violation of the Constitution of Virginia

Free Speech: Constitution of Virginia Article I Section 12

237. Plaintiffs reallege and incorporate by reference every allegation above as if fully set forth herein.

238. Under the Constitution of Virginia, "any citizen may freely speak, write, and publish his sentiments on all subjects." Va. Const. art. 1 section 12.

239. The VDOC named defendants have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their freedom of speech, as secured by the First Amendment of the Virginia Constitution, by preventing Plaintiffs because of their disabilities, including but not limited to mode of speech, and their inability to see to express themselves freely. Despite multiple complaints and requests for accommodations that would enable and facilitate communications. VDOC named defendants continue to deny technological, and telecommunication devices that would give the disabled the ability and the possibilities of communicating and receiving communications with people inside and outside of the prison freely, while allowing mediums for these communications to able prisoners.

240. VDOC named defendants' failure to comply with the First Amendment of the Virginia Constitution has resulted in harm to the Plaintiffs, and will continue to result in harm to the Plaintiffs. The Plaintiffs have, will, and are compelled to remain in the custody of the VDOC, and continue to attempt to establish facilities for communications; to communicate with people inside and outside of the prison without readily available disability aids, until and unless VDOC

named defendants and their agents are ordered by this Honorable Court to make modifications to their policies, practices, procedures, and mores pursuant to the First Amendment of the Virginia Constitution.

VII. PRAYER FOR RELIEF

241. WHEREFORE, Plaintiffs respectfully request:

242. This Honorable Court determine that this action may proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b);

243. That this Honorable Court appoint the undersigned a class pursuant to Federal Rule of Civil Procedure 23(g);

244. This Honorable Court adjudge and decree that defendants, by the organization, systems, policies, practices, mores, and conditions which have been emphatically described, have violated and continue to violate Title II of the ADA, Section 504 of the Rehabilitation Act, the Virginians with Disabilities Act, section 2.2-3401 of the Code of Virginia, the Religious Land Use and Institutionalized Persons Act, and the Constitution of the United States and the Constitution of the Commonwealth of Virginia;

245. This Honorable Court enter declatory and injunctive relief against the defendants and in favor of the Plaintiffs and the class as it deems appropriate to remedy past violations of the laws of the United States and the Commonwealth of Virginia and to prevent future violations of the same;

246. A judgement be entered against the defendants in favor of the Plaintiffs under Section 504 of the Rehabilitation Act and the Code of Virginia 51.5-40 and 46 and 42 U.S.C. 1983 in an amount to be determined at trial;

247. That judgement be entered against the defendants in favor of the Plaintiffs and their Class

for the costs of litigation including reasonable attorney fees under Code of Virginia 51.5-46,

248. The Honorable Court retain jurisdiction of this matter until the defendants demonstrate that they have fully complied with the orders of this Honorable Court, and that there is reasonable assurance that the defendants will continue to comply in the future absent continuing jurisdiction; and

249. This Honorable Court award Plaintiffs and the Class any further relief the Court deems appropriate.

IX. JURY TRIAL DEMANDED

250. Plaintiffs, by their counsel and pursuant to Federal Rule of Civil Procedure 38(b), hereby demand a trial by jury on all claims so triable in this action.

DATED this 18th day of December, 2017

Respectfully submitted,

___/s/_____

Counsel for Plaintiffs

David A. Richardson, #1058541

John Edgar,   #1103580

Jeff A. Smith, #1116165

Thomas Melnyczyn, #1007916

John A. Hawkins. #1006167

Eyvind Odinsson, #1210152