UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



FILED
NOV - 8 2018
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

DAVID A. RICHARDSON,
 PLAINTIFF

V.

HAROLD CLARKE, et Al.,
 Defendants

Civil Action No. 3:18-cv-00033

Court Ordered Amended Complaint

V. CASE No.

JURY TRIAL DEMANDED

Harold Clarke, Director, VIRGINIA Department of Corrections ("VDOC"). Rose DURBIN, Agency Management Lead Analyst, VDOC, EDDIE L. PEARSON, LEAD WARDEN, Greensville Correctional Center ("Greensville") LANE TALBOTT, ADA. Compliance, Greensville Correctional Center, Virginia Department of Corrections Defendants.

Plaintiff Action Complaint
For Declaratory And Injunctive Relief and Damages

1. PRELIMINARY STATEMENT

1. This is a plaintiff lawsuit based upon a systematic and deliberate refusal on the part of the defendants in concert with contract providers to comply with State and Federal Laws enacted and standing to protect the health, safety,

1

And rights of the Plaintiff, who is a disabled Prisoner secured under the custody, care, control and protective supervision of the Virginia Department of Corrections ("VADOC")

2. The Agencies, Organizations, and Departments named As Defendants in this case are; VIRGINIA DEPARTMENT OF Corrections, ("VDOC") Greensville Correctional Center ("Greensville"); The individual Named As defendants are employees of the state, Acting under Color of state Law in their official and their individual capacities ("Named defendants") These state Agency defendants And Named defendants (collectively, "defendants") have failed to comply with state And federal Laws, including but not Necessarily limited to: AMERICANS WITH DISABILITATION ACT, 42 U.S.C. 12131 et seq. The Rehabilitation Act U.S.C. 794 et seq. The Virginians with Disabilities Act, code of Virginia 51.5-40, And the code of Virginia 2.2-3491, The Religious Land Use And Institutionalized Persons Act of 2000, 42 U.S.C. 2000 cc et seq, And The Constitutions of Virginia and the United States,

3. Through policies, Customs, And practices, the defendants have discriminated, And continue to discriminate Against the disabled plaintiff who resides in the VDOC's Custody, and is under the VDOC's care, supervision, Custody, And control. They have done this by failing to provide Adequate And equal Access to disability Accommodations in a wide variety of settings, including But

2.

Not limited to communications, medical, educational, mental health, dietary, and religious

4. VDOC refuses to provide the plaintiff in its custody and control with adequate notifications of daily events, safety and emergency evacuation alert systems, visual and hearing accommodations, orthopedic, neurological, diabetic, and hypertension assistive disability devices. What disability devices the VDOC allows, the defendants or their contractors exact exorbitant surcharges, not limited to but including breathing machines, elevation devices, orthopedic cushions, shoes, insoles, and hearing aids to facilitate orders, abeyances, services privileges, and institutional activities.

5. The VDOC denies the disabled plaintiff in its custody equal access to communication devices to adequately fairly, and equitably communicate with individuals inside and outside of the prison; including but not limited to fully operational, consistent, videophones, voice over technologies, telephones equipped to facilitate communication with modern disability devices. equal in access to otherwise provided services given to abled bodied prisoners that would eliminate discrimination i.e. electronic technologies, ebooks captioned education material, and equal access to email.

3.

6. The VDOC denies the disabled Plaintiff equal access to print, audio, video, educational, religious, recreational, and community media/broadcast communications on a fair and equitable basis with individuals who are not disabled.

7. The VDOC denies the medically disabled plaintiff suffering from visual, orthopedic, skeletal, ambulatory, asthmatic, allergenic, gastroephageal, gastrointestinal, pancreatic, hypertensive disabilities and disorders care that is medically ordered, or consistent with medical procedures, diets and accommodations for the Plaintiff disability needs.

8. As a direct result of the defendants discriminatory policies, practices, and lack of procedural care and safeguards for the disabled plaintiff under the VDOCs custody, care and supervison:
A. The Plaintiff has been, and continue to be, unable to effectively communicate his needs, desires, and concerns to contract health care providers on and off site.
B. The Plaintiff has been, and continue to be, excluded from VDOC work, therapeutic, religious, and rehabilitative programming or provided abridged participation.
C. The Plaintiff has been, and continue to be, unable to participate in worship or religious services, diets, and pratices consistent with his sincerely held faith practices.

4

D. The Plaintiff has been, and continue to be, subject to disciplinary action, classification hearings, removal from religious diets, and disciplinary infractions that are due to misunderstandings and miscommunication with staff because of his disabilities.

E. The Plaintiff has been and continue to be, unable to receive and respond appropriately to prison wide count procedures, safety announcements, evacuations, and other orders and expectations of staff that contribute to a hostile, antagonistic and embittered reciprocation.

F. The plaintiff has missed, and continue to miss, meals, appointments, exercise periods, classes, and other daily activities and opportunities as a direct result of his disability limitations.

G. The Plaintiff has been, and continue to be, prevented from contacting family, friends, legal representatives, and various social contacts outside of the prison because of lack of disability accommodations.

H. The plaintiff has been, and continue to be, subjected to neurological, physical, mental, and psychological pain suffering as the result of the refusal to accommodate his disability needs.

9. VDOC compounds its discriminatory practices by refusing to provide a direct, clearly delineated policy and pathway for the classification of the plaintiff in VDOC's custody. There is no consistent process adhered to under VDOC guidelines. Similarly, the plaintiff has been excluded from advantageous institutional

settings, special housing areas, and units with disability aids. Better equipped facilities, where disabled prisoners enjoy greater freedoms, better disability accommodations, enhanced employment opportunities, and more rehabilitative programming accessibility than those allowed to the plaintiff with similar disability needs are regularly arbitrarily refused.

10. The plaintiff with disabilities have been house with disruptive, violent, disciplinary problematic prisoners who have both assaultive and other behavioral documented anomalies. Despite repeated complaints and confrontations that place the disabled plaintiff at substantial risk, and despite staff assurances that such prisoners would be, at very least, screened in accordance with existing policies, so as not to place the disabled plaintiff with high risk predatory prisoners and gang members.

11. Prison staff routinely open cells so that the Deaf plaintiff is at risk for assaultive and intrusive attack without due diligence as to the state (sleeping or awake) of the disabled plaintiff. There are no alerts on these manually operated doors, which staff closes without any notice, and staff have refused the plaintiff friendly locks and keys to secure his property despite repeated requests.

12. The Plaintiff seeks declatory, injunctive, punitive and nominal relief for harms suffered and for continuing harms suffered and for continuing harms under the defendants and defendants contractors discriminatory policies and practices.

13. The defendant discriminatory policies are compounded by the fact that they have been cognizant of their responsibilities under the Americans with Disabilities Act for numerous years, and have in that time built at least five prisons, none of which were built in compliance with the Americans with Disabilities Act Architectural Guidelines.

## II. JURISDICTION

14. This Court has subject matter jurisdiction over this action pursuant to U.S.C. 1331 because this action arises under the Constitution and Laws of the United States, and pursuant to 28 U.S.C. 1343(A)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiffs civil rights

15. This court has jurisdiction to grant declatory relief pursuant to 28 U.S.C. 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

16. This court has jurisdiction to grant injunctive relief pursuant

to Rule 65 of the Federal Rule of civil Procedure.

## III VENUE

17. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391 (b) because some defendants reside in this district and because a substantial part of the events and omissions giving rise to Plaintiffs claim occured are in this district.

## IV Parties

### A. Plaintiff

18. The Plaintiff David Richardson has various disabilities under 42 U.S.C. 12102(2);

19. David Richardson is Deaf, and Legally Blind. He lost his hearing gradually since the age of fourteen. Mr. Richardson can speak English remarkably well, but relies upon a combination of lip reading and mainly self-taught ASL to understand others. In 1994 Mr. Richardson contracted Histoplasmosis while incarcerated at the Powhatan Correctional Center, and was found to have lesions from the fungal disease in his eyes.

Mr. Richardson has Poor Vision. He is Legally Blind, and has severe photosensitivity. As a result, Mr. Richardson wears darkly (85%) tint corrective and bifocal lenses. The corrective lenses fail to provide adequate correction to give Mr. Richardson 20/20 vision, or to ease the pain incurred by light sensitivity. He was originally prescribed cover-up glasses, but the glasses allowed by the Virginia Department of Corrections are made by prisoners and no cover-up glasses were available. Mr. Richardson has serious allergies that have caused episodes of allergy induced asthma and fluid on his lungs. An attending physician ordered Mr. Richardson a single cell because of his need to be in a environment as free as possible from scented products, dust, skin particles and particulates including prayer oils and other reactive allergens. Mr. Richardson takes ten prescriptions daily, a total of twenty-three pills. Three of these prescriptions taken daily are for allergy symptoms, and he must use an inhaler twice a day. Mr. Richardson was prescribed these allergy medications by an otolaryngologist at the Virginia Commonwealth University, Medical College of Virginia Hospital after extensive examinations, including laryngoscopy, and lung study. The cause of Mr. Richardson's allergies was diagnosed as seasonal and environmental; without avoidance and treatment, Mr. Richardson has experienced episodes of fluid on his lungs. Mr. Richardson

is Allergic to many enviromental Allergens, including but not limited to scented soaps shampoos, conditioners, dust pollen, and most cleaning products As well As Aspite Metal Free Sealer Floor Finish, And many other chemical Agents employed by the VDOC daily. Mr. Richardson has had serious reactions to these products requiring steroid breathing treatments, As well As the periodic treatment with steroid prednisone to relieve symptomatic responces. Mr Richardson has had gastroesphageal reflux disease since he was fifteen. A number of gastroenterdogist have made various recommendations because of four hospitalizations for pancreatitis, First diagnosed as reactions to hypertension medications, And continuing gastroesophageal reflux related attacks, and abdominal spasms. Mr Richardson is on long term Nexium treatment. and can eat no more than six ounces at a time, and must wait several hours between courses. Mr. Richardson has had poor tolerances to prescription remedies for his gastrointestinal reflux disease, including Allergic reactions to various prescription treatments. The Severity has in several instances induced vomiting and severe nausea. For Approximately ten years Mr. Richardson has eaten in his cell, consuming meals six to eight times a day to stem reflux, choking, and the regurgitation of food. Mr. Richardson has numerous Anxiety Attacks, often on a daily basis, And was first ordered to eat in his room because of anxiety, where Mr Richardson lost

10.

Consciousness and was cut and injured in an unconscious fall. Mr. Richardson has Peyronies Disease, and was provided a medical mattress and pain medications at Powhatan Correctional Center. These injuries cause pain, limited mobility, as well as sleep deprivation. Mr Richardson has heel spurs and a neuroma; an orthopedist recommended surgery that was denied. Mr. Richardson has sought further recommended testing and treatment for polyps in his colon, anal pain, abdominal pain, sleep disorders, anxiety disorder, hearing and sight disorders, and accommodations without success. Mr. Richardson suffers from hypertension which cause cardiovascular, neurologic, renal, and retinal problems. Mr Richardson has been placed on 5 different medications to treat hypertension but was not warned of the numerous side effects from the medication. Mr Richardson is allergic to Novicane. Repeated request for alternate treatment for 9 cavities, 1 extraction and 1 overhang have gone untreated. Mr Richardson cant eat cold or hot food. Mr Richardson has made repeated request for treatment without Novicane but has not succeeded.

Mr Richardson is Legally Blind. And when the lights are blinked on then off by staff in the Pod on occasion to make announcements, the blinking lights cause him to trip on stairs or bump or trip over unknown objects Mr Richardson was asked to

Remove his Religious head covering that he wears for sevely held religious belief in the Dinning Area which violates the Religious Land use And Institutionalized Persons Act And his constitutional Rights both state And Federal.

## B. Defendants

### i. State Agency Defendants

20. Virginia Department of Corrections ("VDOC") is the Commonwealth Agency responsible for the supervision And custody of over 39,000 incarcerated individuals And nearly 60,000 individuals under court-ordered supervision.

21. Greensville Correctional Center ("Greensville) is A Maximum-Security VDOC Facility in Jarrett, Virginia,

### ii. Defendants Sued in Their Individual And official Capacities

22. Mr. Harold Clarke is the Director of the VDOC. He is Aware of VDOC's policies And practices regarding disabled prisoners.

23. Ms. Rose Durbin is the VDOC ADA Coordinator And Agency Management Lead Analyst. VDOC Division of Operations, And is responsible for ensuring that individuals

in VDOC's Division of Operations, and is responsible for ensuring that individuals in VDOC's custody have interpreters for offsite medical appointments. She is aware of VDOC's policies and practices regarding Deaf and hard of hearing individuals and she is aware of written complaint by the disabled plaintiff about the violation of his rights.

24. Mr. Eddie L. Pearson, at all time relevant to the events described herein, was the Lead Warden of Greensville Correctional Center. As Warden, Mr. Pearson was the Legal custodian of the plaintiff incarcerated at Greensville Correctional Center. On information and belief, he was aware of the VDOC's policies and practices with regard to the disabled plaintiff, and aware of specific written complaints by the disabled plaintiff and the continuing violation of the disable plaintiff rights.

25. Ms. Lane Talbott is the Institutional ADA Coordinator at Greensville Correctional Center. As the Institutional ADA Coordinator, Ms. Talbott is the legal custodian of the disabled plaintiff, his programs, property allowances, and disability accommodations while incarcerated at the Greensville Correctional Center. On information and belief, she is aware of the VDOC's policies and practices with regard to disabled prisoners, is aware of specific written complaints by the disabled plaintiff and the continuing violation of the disabled prisoners rights.

13.

26. All named defendants are sued in their official and individual capacities. At all relevant times, all defendants were acting under color of state law, pursuant to their authority as officials, agents, contractual agents, or employees of the Commonwealth of Virginia; within the scope of their employment as representatives of public entities, as defined in 42 U.S.C. 12131 (1); as representatives of a "department, agency, special purpose district or other instrumentality of a state" under 29 U.S.C. 794; and as representatives of "state agencies" under Code of Virginia 51.5-40 and Code of Virginia 2.2-3401

## V. Statement of Facts.

27. The VDOC has at least three times been sued by disabled Deaf prisoners who were previously incarcerated at Powhatan Correctional Center. In 2002, Otis Hill sued due to lack of any sign language interpreter services for VDOC's mandatory pre-release life skills course, and in 2004 Wesley Chase sued VDOC over lack of access to educational programs. To this day, however, VDOC still refuses to provide sign language interpreters for a number of educational, religious, medical programs and services, mental health services, and other programs and due process hearings, programs, and contracted medical appointments, programs and additional essential program providers in the VDOC.

28. To this day VDOC has not implemented substantive functional safety notification policies and systems at its facilities, while the VDOC policy states the VDOC provides interpreters for announcements, the VDOC is utilizing prisoners for daily notifications of activities which number in the hundreds; the system lacks functionality.

29. Prisoners assigned for notifications routinely are not notified by staff to make these announcements; prisoners making announcements must often depend upon an unintelligible and outdated public address system; these prisoners have been instructed they are not to work after 5:30 pm, leaving notifications from then until 11:30 pm (1:00 AM on weekends) nonexistent. Often the prisoners assigned to notifications are on the telephone, email kiosk, watching television, using the toilet, at appointments, meals, at family visits, or involved in other daily living and personal activities and fail to properly and adequately notify the plaintiff.

30. Since Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988) and Pennsylvania Department of Corrections v. Yesky, 524 U.S. 206, 118 S. Ct. 1952 (1988) the VDOC has built and opened at least four major maximum or maximum/medium security prisons, none of which were built to comply with the Americans with Disabilities Architectural Guidelines (ADAAG). None of these institutions has any safety, security, or other

Accommodations required by private or public entities for disabled individuals. Greensville has no emergency exit signs, yet it houses individuals who are nearly blind and legally blind.

31. The VDOC was also sued by a hard of hearing woman at Fluvanna Correctional Center ("Fluvanna") after she was repeatedly disciplined for missing announcements she could not hear. To this day, however, the VDOC has not implemented substantive alerts to accommodate the deaf, hard of hearing, visually impaired, and other disabilities. The VDOC continues to discipline prisoners for failing to respond to activities for which there is no adequate alerts.

32. Hill v. Virginia Department of Corrections, Chancery No. HS-948-5 (Us. Vir. Ct. (Richmond) 2009): otis Hill, a deaf man incarcerated at Powhatan, sued VDOC under the Virginians with Disabilities Act, Code of Virginia 8.01-216.14.11, who was incarcerated in 1997, repeatedly "attempted to enroll in programs given at or by VDOC facilities, including anger management, substance abuse, and job training programs" through his nearly five years in prison. Hill's request for sign language interpreters to enable him to participate in these classes and his resulting grievances were denied

In 2002, Hill was informed that he would be required to take a mandatory life skills class prior to his release. Hill once again requested a sign language interpreter. VDOC employees to Hill that "we may not be ready for you" and instead informed him that they would "waive" the requirement that he participate in the pre-release life skills course. Hill, who continued to attend classes w. that an interpreter, eventually reached a settlement with the VDOC. Under the terms of the settlement, VDOC agreed to provide two course instructors and a "qualified, certified sign language interpreter" to meet with Hill who by this time had been released from prison, and provide with all 54 hours of his life skills course instruction

33. Chase v. Baskerville, 508 F. Supp. 2d 492 (E.D. Va. 2007). Aff'd 305 Fed Apex. 135 (4th Cir 2008). In 2004, just two years after VDOC settles with Hill, Wesley Chase filed a pro se lawsuit against Powhatan. And VDOC employees for their failure to provide him with a sign language interpreter for the functional literacy class which he was enrolled at Powhatan. Some of the defendants sued by Chase, including

Sandra Parker, Principal of VC Education program at Powhatan, and Sharon Trimmer, Director of Special Education and Gifted Education at VC Education are no longer working at Powhatan, but limited programming objectives with interpreters continue. Alton Baskerville, was transferred to another institution in the VDOC system. Chase has since been released. Still VDOC has refused to provide full and equal program objectives for the disabled.

34. Sorrells v. Wheeler, No 3:08-CV-00039 (W.D. VS 2009): Jannott Sorrells, a hard of hearing woman incarcerated at Fluvanna, was repeatedly disciplined for missing morning count. She took to wearing prison daytime clothes to bed so that when she was awakened late by others who lived in her cellblock, she would not be disciplined for wearing her night clothes during count. Although at different times over a three year period VDOC personnel promised in writing to provide basic accommodations to Ms. Sorrell, such as awakening her five minutes before count, they failed to follow through on these premises and even went so far as to subject Ms. Sorrell to disciplinary hearings after the fact. Ms Sorrells suit was settled 1 March 2009.

35. The VDOC is aware of its obligations under state and federal laws. In 2010, the Minnis V. Johnson case No. 1:10-CV-96-TSE-TRJ, the civil rights disability claims resulted in a settlement that the state has never complied with, despite having stipulated to this Honorable Court that the VDOC not only complied, but that they would continue to comply with the settlement in the Minnis case. The following are some examples of the failure to comply:

A. The Deaf Plaintiff in the custody of the VDOC have not attained full and equal enjoyment of goods, services, facilities, advantages, privileges and accommodations

B. Stipulations that the VDOC would employ ADA Coordinators to oversee disability rights issues at each institution resulted in a "promotion from the rank" implementation and the individuals had no, or at best very limited disability training, education, or prior disability experience in their background, just assigned additional duties

C. Contact information for the VDOC ADA Coordinator is pro forma. Attempts to communicate on disability matters are met with recordings and responses from a "Correspondence Secretary"

D. Meetings with the warden or assistant warden have be altered significantly because of the transfer

of most of the Deaf Community from Powhatan Correctional Center to Greensville Correctional Center (A significantly larger prison complex with a convoluted bureaucracy) has resulted in meetings being little more than opportunities for mid-level administrator to rollback previous concessions and utilize the meetings to threaten and advance defense postures with statements like, "This isn't Powhatan".

e. Greensville Correctional Center regularly post, publishes, and (more recently) shows videos that lack accommodation for the deaf and disabled. These video presentations are not captioned.

F. Deaf prisoners housed at alternate facilities for safety or security purposes have had to relinquish or been denied their rights as required by the ADA and the Minniz agreement.

G. Greensville has ceased posting the schedule showing the availability of Qualified Interpreters.

H. Qualified Interpreters are being routinely denied at medical programs and services where they were previously provided.

1. The Deaf plaintiff is being denied, restricted from and in some cases removed from participation in religious meals, diets, and otherwise offered religious accommodation because of their failure

20.

to attend services where no interpreter is available.

J. Interpreters are not being provided at contract offsite medical providers.

K. Greensville Correctional Center has changed and altered the previous property allowances and procedures for obtaining property for the deaf plaintiff, stating: That was what the administrator at Powhatan Correctional Center allowed, we have a different administration here. When in reality the process and allowances were approved both systematically and otherwise by the departments A.D.A Coordinator.

L. There is no longer a disability notice on medical files that the plaintiff is deaf and requires an interpreter.

M. The plaintiff is no longer permitted to receive recommendations from outside disability specialized vendors.

N. Employees and contract providers refuse to utilize written notes in their contacts and consultations.

O. No VRI has ever been used when an interpreter is unavailable, and staff routinely inform the plaintiff that they cannot talk with them without an interpreter.

P. The plaintiff is routinely missing announcements, alarms, and prison wide events.

Q. There is no voice over technology available and the conferencing equipment has never recommended voiceover

21.

technology.

r. Audio-Visual Media at Greensville does not have open or closed captioning.

s. Training of new employees has lapsed and is not routinely and annually applied.

t. Employees are not being advised in the proper use of Qualified Interpreters.

u. There is not now, and there was never monitoring of the treatment of the plaintiff, nor the implementation of the settlement as stipulated by the section on Monitoring and Compliance.

v. Damages were not equitably paid, and a deaf prisoner at Greensville died several years after the settlement without receiving settlement.

36. The VDOC and various other defendants as well as the defendants' various contractors have not remedied their past pattern and practice of discrimination and continue to discriminate against the disabled plaintiff who is Deaf, Legally Blind with severe illnesses. The plaintiff has few if any disability aids. This pattern and practice has resulted in disability-based discrimination in distinct areas of custody, security and care, delineated as follow.

A. Inadequate access to sign language interpreters, Video Remote Interpreter ("VRI"), Computer-Assisted Real-time transcription ("CART"), oral interpreters, large print, magnification enhancements devices, and other auxiliary aids where necessary for the welfare, safety, and communications need of the disabled plaintiff.

b. A total lack of privacy for the Deaf Plaintiff while utilizing Interpreter services during interviews that contain confidental Medical Interviews PREA (Prison Rape Elimination Act) Sexual Assault interviews, Annual Review treat Formulations, institutional orientation or other details that should not ordinarily be made public to incidental staff or other prisoners

C. Inadequate visual prison-wide emergency alerts, lighted exit signs complying with state and federal regulations, including but not limited to individual cell notifications, door opening alert systems, and automated communications systems

d. Accurate daily-living program and activity or mass-movement notifications consistent in quality, substance, and nature with audial or visual disseminated information provided to the plaintiff who with regard to programming objectives, alerts, medical appointments, outside activities, religious programming, emergency

23

drills, and the operation of electronic doors

e. Medical Accommodations. Medical care and procedures, dental care, device distribution, and other constitutionally protected rights and activities that substantially accommodate documented medical infirmities and disabilities

f. Inadequate access to visual accommodation devices and services for the Legal Blind plaintiff

g. No access to disability aids to provide adequate living and accommodation of healthy sleep patterns, and other disability accommodations consistent with disability needs

h. Failure to provide equal access to privileges, media, communication, periodicals, literature and assistive learning devices.

i. Overturning, overruling, reversing, and at times, outright ignoring medical orders by expert medical practitioners without consultation or review

j. Improper denial of interpreters at contracted medical appointments

k. Failure to provide disability accommodations at state contracted religious services and activities

l. Improper security level assignment and or/assignment that are inconsistent with incentive based programming of the disabled plaintiff because of discriminatory classification practices.

M. Failure to protect the disabled plaintiff under custody of VDOC's custody, At Greensville Correctional by Not providing A secure environment, Key Locks And Locks with sightless access, cell security, Screening procedures of housing Assignments, And group cell door operation without supervisory oversight that puts the disabled plaintiff at risk for theft and attack.

A. Failure to provide interpreter Services

37. For the deaf plaintiff who is able to rely on American Sign Language ("ASL") As their primary form of communication, use of A qualified ASL interpreter is Necessary to ensure effective communication between the plaintiff and an individual who does not use ASL to communicate

38. A qualified sign language interpreter is Necessary because ASL is A complete And very complex language, relying on signs constructed of hand signals And other gestures And body movements, incorporating facial expressions And postures. It is a language foreign to Any other language including English. ASL has its own distinct vocabulary, rules of grammar,

25.

syntax, etymology, phonology and principles as well as philosophical linguistics

39. Written language is different from ASL, and most individuals deaf from birth, who did not acquire English in the traditional way do not comprehend written language. Even those schooled in the once taught "manually coded English" have not utilized these skills in their community and have a difficult time reading or writing traditional English.

40. Lipreading or speechreading is often misconstrued with regard to deaf and the hearing disabled. A study concluded that even the best speechreader in a one to one situation only understand twenty six percent of what was said, and that even the upper intelligent deaf individual could understand only five percent of speechreading. Certain letters like T, D, Z, S, and N are all very similar, and look nearly identical. One complex word can throw off the meaning of an entire context. Lipreading is very complex, and fraught with difficulties for a person who has never spoken, and is difficult even for a late deaf individual. For deaf who lost their hearing slowly, lipreading can be useful, but

widespread assumptions as to the efficacy of lipreading amongst the general public are generally inaccurate and misrepresented. For instance many VDOC wardens, ADA Coordinators, UNA Managers, Counselors, and security personnel tell staff "If you look directly at them and speak slowly they can understand what you are saying." These assumptions are patently false, and propagated by under educated, or uneducated individuals, who are operating solely upon assumption. Generally, lipreading is less effective than writing and should not be utilized unless it is the disabled plaintiffs choice.

41. The VDOC lacks any sort of CART and has made little or no accommodation for the disability needs of the Plaintiff that was moved from Powhatan Correctional Center to Greensville Correctional Center in 2014.

42. The VDOC has curtailed many of the disability aids and interpreter services for programs and services that were generated by the Minnis v. Johnson settlement, put into regular practice at Powhatan, citing a lack of willingness on the part of the administrators at Greensville Correctional Center. These actions, which include the VDOC move

27

Of only A portion of the protected plaintiff resulted in violations to his civil rights and to specific clauses of the Defendants promises concessions

1. M. Vernon and E. Mindel. They Grow in Silence: The Deaf child And His Family (Silver Springs, MD,: National Association of the Deaf, 1971). p 96 Richardson

43. The VDOC has refused to Allow Accommodation of the Legally Blind plaintiff and has refused to make written directives, Commissary list, pamphlets, rules and regulations, And other printed materials available in a medium which the plaintiff can assimilate to equally avail himself of the goods, services, facilities, privileges, Advantages, and Accommodations

44. The VDOC has, At Greensville Correctional Center, refused to provide caregivers trained in communication techiques, guides for the Legally Blind plaintiff and other caregivers compatible with disseminating disability needs of the disabled plaintiff, while employing such caregiver At other facilities.

28

45. The VDOC has employed Sign Language interpreters, but has failed to utilize them in ways that give notification to the deaf plaintiff on an ongoing and regular basis.

46. The VDOC, by and through and through their contracted medical provider, has refused to provide recommended disability items, medical care, prosthetics, and follow up consultation with interpreters based on the reasoning that the disability accommodation considered by other defendants to be "comfort items" and should be retracted or rescinded.

47. Interpreters employed by the VDOC often sit in an office with a counselor reading novels and other material while activities, medical programs, and programs generally have no interpreter services.

B. Medical Services, Accommodations, and general Disability Aids

48. The VDOC has an unalienable responsibility to provide medical care for the plaintiff in their

custody. This includes general practitions care, contracted medical testing and diagnostic care, specialty and emergency care, medicine distribution, dental and mental health services

49. The Plaintiff requires diverse service to communicate effectively with medical providers

50. Mr Richardson has for example, repeatedly requested an interpreter be present at his medicine pickup that take place with him standing, outside attempting to lipread through a small tinted window. Often Mr Richardson is unable to understand or communicate effectively as to various problems associated with why he has not received medicines, refills, and other problems. Because of the necessity for frequent changes and unforeseen delays, Mr Richardson has a number of times been completely without allergy, asthma, pancreate, and hypotension medications. Mr Richardson has been told that the interpreter is at another prisoners disposal at that time. The medical provider, under the supervisor of Nurse Elizabeth Shaw, has refused to accommodate Mr Richardson for self med pickup at an alternate time and in a manner that accommodates

his disability needs. Mr Richardson went to the dentist clinic at Greensville in March of 2016, and during consultation was told that it was a good thing that he brought an interpreter with him because they didn't know that he was deaf. On another occasion at an optometrist appointment when Mr. Richardson wrote that he needed an interpreter, a security officer asked why he hadn't brought one with him. Mr Richardson was permitted an interpreter under the Minnis Agreement, and had an interpreter at every medical appointment, including the self med program and pill window.

51. When the Plaintiff was in the medical Department at Greensville Correctional Center he requested a "VRI" and the Nurse didn't know what they was

52, The Plaintiff is being denied from the medical Department at Greensville Correctional Center a white cane that was ordered by VCU Eye clinic

53. The Plaintiff is being denied a Reasonable Accommodation of a Larger television for his Legal Blindness which is needed to make out the Images on the Screen when watching Religious/Educational Programs.

31

54. Dr. Vincent Gore is the Lead Physician at Greensville CC. Dr. Gore, at request of Security and referral by Nurse Elizabeth Shaw, routinely reverses medical orders by an attending physician without consultation of any kind with the patient. Mr. Richardson was permitted a single cell because of his light-sensitivity, severe allergies, and critically chronic digestive problems. The order was reversed and subsequently required intervention by ADA Coordinator Barry Marano in order to get Warden Pearson to intercede and supersede Dr. Gore's order to provide the disability accommodation.

55. In addition Mr. Richardson has repeatedly requested a medical mattress (removed from him when transferred to Greensville) because of painful orthopedic conditions in his neck, back, and hip. Mr. Richardson also suffers from Peyronie's Disease. Peyronie's Disease is a painful condition of the penis, which was possibly caused and certainly exacerbated by injury incurred because of two inches of batting on undergirding of a steel bed. Because of this disease, and Mr. Richardson's erections at night while sleeping, he experiences excruciating pain, this pain is enhanced and further exacerbated by the defendants taking the disability accommodation of a medical mattress.

32.

56. The UDOC is aware of the disability needs of the plaintiff, but refuse lawful accommodations. Staff have routinely disregarded request for interpreter services for programs, Kairos religious service, due process hearings, and various other religious and programming services.

57. The Disabled Plaintiff is often unable to adequately explain his condition to prison personnel, or comprehend what is taking place medically or otherwise in many circumstances; personnel often yell at the disabled plaintiff and tell him to read their lips. This practice often compromises medical and other confidential information. Staff erroneously inform other staff members and the public in a variety of settings that if they look directly at the deaf plaintiff and speak loudly they will be understood.

58. Often staff attempt to communicate with the deaf plaintiff by writing using a medium too difficult to grasp, or writing too small to be legible. Mr Richardson have had to rely upon other prisoners, who are often manipulative and unreliable, to read, fill out commissary order forms, write emails, and interpret rules, notices, and memoranda for them, only to subsequently discover that the service and

33.

Information is deficient or incorrect

59. When the disabled plaintiff attend medical appointments of site there are no provisions contractually to provide disabled accommodations. In many instances the disabled plaintiff is being subjected to complex medical procedures without any consultation. These appointments almost always require the patient sign documents that explain a procedure that the disabled plaintiff cannot see, read, or understand. Mr. Richardson recently had a colonoscopy and the sign language interpreter had to leave for another appointment before Mr Richardsons procedure started. The waivers were such that he could not read them, or even see where he had to sign.

60. Because of inadequate oversight there are often times when no interpreter is available; Unit Counselor Smith, when Mr. Richardson complained he had no interpreter for a medical appointment, told him he should have refused treatment. Multiple appointments for treatment and care have been delayed or rescheduled because no interpreter was available.

34.

61. The VDOC continue to use waist chains and the black box to shackle the plaintiff at off site medical appointments. These restraints make communicating in sign language and writing virtually impossible. While security staff remove restraints for procedures (leaving on leg irons) they often will not remove them for communication purposes, or use readily available alternative restraints.

62. Mr. Richardson has repeatedly raised the issue of privacy in all communications. Mr. Richardson had to learn sign language on his own, and speaks rudimentary sign language at best. The Minnis settlement agreement stipulated a prisoner who became deaf while incarcerated (as did Mr. Richardson), that the prisoner would be provided sign language instruction, when instruction was offered to the best of Mr. Richardsons knowledge and belief, the instructor had no credentials or a teaching certificate required by law in Virginia. Two weeks into instruction Unit Manager Robertson stipulated that Mr Richardson could either go to his self med pick up, or to sign language class, but not both. The only self med pickup day an interpreter was available was Wednesday,

And it is held (as are many private consultations at Greensville) infront of many other prisoners, some who are very fluent in sign language. Unlike speaking, sign language can be read and understood from a great distance. Mr. Richardson made multiple request to Nurse Elizabeth Shaw citing these problems, but Nurse Shaw refused any alternate accommodation. Unit Manager Robertson later told Mr. Richardson that he would no longer receive an interpreter for the self-med program because of an additional conflict with the interpreters schedule

63. Medical providers and VDOC staff that facilitate medical consultations, procedures, and distribution of medicines without proper disability accommodation violate the patients rights. Medical procedures that are not private, do not include OAM interpreters, or require complex medical waivers and communications where an accommodation is necessary, but not provided to facilitate the comprehension of the materials, violates the patients rights under the American with Disabilities Act. Furthermore, it is a violation for any medical institution or medical provider to fail to supply adequate interpreter services as stipulated by the Code of Virginia 2.2-3401, as well as the Constitution of the United

36.

States And Virginia

C. Educational, Mental Health And Rehabilitation
Programs and services

64. The VDOC has Mental health Services And
programs it provides department wide including
At Greensville Correctional Center. In addition
to the mental health services there are other
programs; Counseling Services, Thinking for a change;
Anger Management; Substance Abuse; Sex offender
Programming; and educational classes.

65. VDOC Also provides educational classes of
various kinds system wide; different Institutions
offer a variety of various Instruction. Code of
Virginia 22.1-340

66. VDOC Also offers academic functional literacy
classes for prisoners testing below an eight grade level,
And have A variety of tools to identify and to work
with prisoners who have learning disabilities Code of
Virginia 22.1-344.1

67. In order to participate in educational objectives,

rehabilitation programs, and mental health services, the disabled plaintiff needs equipment as well as interpreters to receive equitable treatment.

68. Since arriving at Greensville the deaf plaintiff has systematically been discriminated in his attempts to work, receive educational programming, and have effective access to mental health and counseling services. This denial includes their refusal to provide adequate interpreter services and privacy during interviews where interpreters are utilized

69. Mr. Richardson has in the past admittedly been emotionally, physically, and sexualy abused. During various times during intake, while seeking counseling, and in attempting to get treatment Mr Richardson has utilized an interpreter. The areas adjacent to the offices and interview rooms are open to other prisoners who have effective understanding of sign language, who are not deaf, but have either been provided sign language instruction by the VDOC, or learned it by other means. This has seriously compromised the privacy issues of Mr Richardsons treatment. On Feb 22, 2017, while seeking counseling Mr. Richardson sought a limited counseling

38.

session in which he desired to relate previous incidents of Abuse, but asked that there be no interpreter present in order to protect his privacy. Counselor Smith informed Mr. Richardson that Unit Manager Robertson had instructed Counselor Smith that she was not to talk to prisoner Richardson without an interpreter.

70. The Plaintiff is being denied Assistance Reading (LawLib) and writing

D. Work and Vocational Educational Programs

71. The VDOC has various work programs including training, Apprenticeship and VC Enterprise At the Greensville Facility

72. The current practice of the VC Enterprise work Areas is that they do not Ask for or utilize interpreters.

73. At a Monthly meeting for the Deaf, Administrators have made it clear that no interpreters would be Available for the volunteer participation in the dog training program.

74. In several instances VDOC has supplied interpreters for re-entry programming, while refusing to have adequate services for interpreting services at medical appointments or other essential services. There is little and often no planning and monitoring of the daily need for interpreters, or an out and out refusal to schedule multiple interpreters where needed.

75. The VDOC has not provided work, vocational, and educational areas with adequate notification and architectural design features that accommodate disabilities

76. VDOCs refusal to provide adequate interpreters for work, vocational, and educational programs as well as making additional programming and architectural design features to accommodate disabilities needs violates the rights of the disabled under the U.S. and Virginia Constitutions, the Americans with Disabilities Act. It clearly violates obligations to provide sign language interpreters under Code of Virginia 2.2-3401

E. Religious Programming and Services

77. The VDOC contracts religious for the prisoners at Greensville Correctional Center, and at various institutions throughout the state. Chaplains provide counseling, programming, and coordination of these religious activities through the Chaplaincy Service of Virginia.

78. The Disabled plaintiff is Deaf and Legally Blind he needs interpreters and accommodations to participate in these religious activities.

79. The VDOC employs a sign up system to participate in religious programming. There are quarterly sign up periods posted throughout the facilities the Legally Blind and Deaf plaintiff may not be able to see or understand

80. The VDOC is aware that the disabled plaintiff need disability accommodations and disability aids to participate in religious programming.

81. Mr. Richardson practices a religious faith that is multi-denominational in observances and practices. This sincerely held religious belief incorporates practices from the Jewish, Catholic, Buddhist, and Islamic traditions, ceremonies, prayers and fasting.

Mr Richardson has made the VDOC Aware of
these beliefs by his participation with these
practices for more than thirty (30) years

82. The current VDOC policy of Not Allowing
Adherent of particular Faith groups to practice
with practitioners of other faith groups, while
Allowing some faith groups And individuals in
those groups to actively participate in more than
one group, is a practice that discriminates Against
Mr. Richardson's Sincerely held religious faith.

83. Currently VDOC policy does not provide Access
to interpreters for state sponsored religious programming
And services. At one time a volunteer interpreter
occasionally came to interpret for Protestant Service,
Mr Richardson has repeatedly requested to be included
in All Aspects of his sincerely held interfaith
religious beliefs, most importantly including Accommodation
for dietary religious observances. The VDOC has
intentionally And purposely discontinued A Diet
Consistent with the Kosher standards that the
Plaintiff has participated And observed consistently
for years. There is currently No substantial
Kosher diet consistent with standards promulgated

42

by the acceptable dietary observances prepared
and served according to the requirements of
the Jewish Law. In addition the diet is substantial
in meeting nutritional values for recommended daily
allowances as promulgated by the National Academy
of Sciences. The defendants have denied the
Plaintiff participation in practices, observances,
and holy days that dictate religious diets and
accommodations. In addition the Plaintiff has not
been permitted to fully participate in religious
accommodations offered to other prisoners solely
because of his disability. There has been a deliberate
failure on the part of the defendants to provide
him with access and notice of those accommodations,
activities, and services.

84. The Plaintiff is repeatedly threatened with
disciplinary action for wearing religious head coverings.
The Plaintiff has been forbidden to wear his
religious head covering in violation of the Religious
Land Use Act and Institutionalized persons Act
and my Constitutional Rights, Both state and federal,
The VDOC has no penological interest in forbidding
the plaintiff to wear a Kufi head covering in certain
areas. The plaintiff does not possess the ability

to read or to understand the policy and practice of the prohibition of his religious head coverings.

85. The disabled plaintiff failure to have adequate accommodations, a free exercise of religious practice, has created harm, is a continuing harm, and violates his First Amendment right to the exercise of religious freedoms. The VDOCs refusal to enact a policy that provides for the free exercise of religion, and accommodate the disabled plaintiff in doing so serves no governmental and security interest. The policies current in place are not the least restrictive means to serve or to advance a legitimate government interest. VDOC has therefore failed to accommodate the disabled plaintiff in violation of the Virginia and United States Constitution, the Americans with Disabilities Act, the Virginians with Disabilities Act, and the Religious Land-use and Institutionalized Persons Act of 2000, as well of the Code of Virginia 2.2.-3401

E. Communication, Assistance, and Facilitation of Discourse with VDOC Staff, Medical Practioners And General Service Employees

44

86. VDOC has a legal obligation to create a system for communication that is readily understood by the disabled plaintiff in its custody and care

87. The VDOC has a responsibility to ensure the the disabled plaintiff enjoy the same rights, privileges, and ability to communicate as other prisoners under its care and supervision.

88. The VDOC has a mandate to allow the disabled plaintiff to actively and fully participate in the grievance process; commissary availability and communications; dietary programs; access for application to jobs, programs, and other service considerations; and to do so in a fair and systemic way that provides for equal access as well as accommodations that facilitate such access

89. Staff at Greensville routinely refuse to communicate with the disabled plaintiff in writing, or by utilizing interpreters available nearly every business day, often interpreters are sitting in offices out of sight and out of areas where the plaintiff is in need of their service and expertise. The areas where interpreters are

Obviously needed, where the disabled plaintiff
need them to communicate with staff, to
understand notifications, discuss property,
and commissary transactions, are void of
services. Instead of being synchronized by
the Institutional ADA Coordinator, and available
in these areas, the interpreters are most often
found sitting in an administrative office reading
a book.

90. Staff as well as contracted professionals often
refuse to accommodate the disabled plaintiff
Mr Richardson in a medium conducive to his
particular disability needs

91. Staff refuse to participate in writing request,
complaints and grievances, or in responding to
these items, that the plaintiff does not feel
comfortable having other prisoners complete for
him, or that might compromise his safety
when sensitive information therein is known
and processed by other prisoners

92. Staff refuse to make sufficiently large
print memoranda, commissary lists, commissary

order forms, orientation materials, and other communications available to the visually impaired plaintiff. Mr Richardson has repeatedly requested large print materials and been refused accommodation of sufficient size to read.

93. Unit Manager Robertson has employed prisoners to communicate security, custody, emergency, and control commands that are otherwise issued only by staff to the disabled plaintiff. The prisoners making these notifications cannot understand the AUAM commands on the public address system. Many notifications are to small to be visibly viable, or in color formats very hard to read. Often notices are wrong, placed in inverse order, or standby notices are given an hour or more before the activity; senior staff have told Mr. Richardson that standby should be no more than three to five minutes in length.

94. The staff coordinating movement at Greensville routinely employ a three (3) minute moratorium on the movement to meals, pill lines, and other constitutionally protected services.

These constitutionally protected activities are forfeit if the disabled plaintiff has failed to get to the unit door within three (3) minutes of the audible notice.

95. Unit Manager Robertson has employed the dangerous practice of turning off and on the unit lights for notification purposes. Mr. Richardson has repeatedly asked that strobes be positioned in the ceiling of the unit for notification. There are no in-cell notifications for activities, emergencies, fires or any services. The plaintiff has complained repeatedly of missing meals, medication dispensing, as well as outside exercise periods because of his visual and other disability limitations. The turning off and on of the units lights has created a danger for visually impaired plaintiff. Mr. Richardson has tripped and nearly fallen a number of times when the lights were switched off and on.

96. On more than one occasion Greensville staff have refused to communicate with the plaintiff. Staff have yelled at him, humiliated him and screamed "Read my lips" on more than one occasion. Mr. Richardson has attempted to explain

48

to staff that they haven't understood him, and has the staff repeatedly tell other staff, as well as prisoners "I know he can hear" and "He can hear when he wants to." Staff often say: "Hes not deaf." Seasoned staff routinely make these kind of statements to staff in training, which only serves to create further misunderstanding and communication problems for the plaintiff. The plaintiff is continually defending his disability and disability needs.

97. Despite repeated efforts and information as to the very real shortcomings in communications alerts, and announcements, the VDOC has staunchly refused to install a notification system that will the disabled plaintiff to have full and unfettered access to the facility services, advantages and safe accommodations in conformance with the American with Disabilities Act Architectural Guidelines and the Code of Federal Regulations.

98. Institutional living is primarily comprised of aural announcements and oral communication systems for wake up, meals, medical services, outdoor activities, exercise, work call, program activities,

Lockup times, standing counts, drills, emergency evacuations, shakedowns and searches, and many other daily announcements of varied content. These Notifications are not just Important, but often vital in receiving services and behavioral compliance. Auditory announcements may number in the hundreds per day. In addition there are audible declarations to standby, and pronouncements for last call

99. The Plaintiff disabilities make comprehension of activities under the current system untenable, and the plaintiff has been placed at a great disadvantage, as well in danger

100. Prisoners at Greensville, upon hearing an audible announcement must come to their cell door (if they can even understand the announcement) and try to determine what was announced (on a largely inaudible intercom) by peering through a five-inch-wide by twenty-four-inch-high window in an otherwise solid door. In order to exit their cell a prisoner must then press a call button. A single officer, in a central booth, will then hopefully open one of the approximately one hundred and seventy (170) doors under their sole control, to allow that prisoner to exit the cell. From that

Announcement the prisoner must exit the Living Area within three minutes. This remains true no matter it was the prisoner was doing when the Announcement was made; dressing, using the toilet or any other activity. There is generally a last call announcement by the one officer in the central booth. Half of the Notifications listed and posted by prisoner workers do not have a last call to select. The entire system is more form than substance.

101. Mr. Richardson has missed meals, medications, and many other activities.

102. No Notification system that the VDOC has employed has worked. Mr. Richardson was well satisfied with vibrating text pagers once employed, but notifications to the pagers were implemented offsite at VDOC headquarters. After an extended hospital stay, Mr. Richardson returned to find other disabled prisoners had decided didn't like the pagers, so they had been deactivated. When the ADA Coordinator asked for Mr. Richardson's pager to be reactivated with an appropriate schedule, the tech representative said, "for one inmate", and ignored the request.

103. The VDOC's failure to provide means of alerts to the disabled plaintiff in its custody for daily events, programs, activities, safety notices, and other general activity alerts have resulted in harm to the plaintiff. Failures to remedy this lack of notification puts the disabled plaintiff at risk of serious harm, loss, and has consequently resulted in losses that violate his rights under the U.S. Constitution, the Virginia Constitution, the Americans with Disabilities Act, the Virginias with Disabilities Act, The Religious Land Use and Institutionalized Persons Act of 2000, and the Code of Virginia 2.2-3401.

F. Deliberate Indifference to Medical and Disability Needs:

104. The plaintiff had a D.V.R approved for a year but the order has not been processed. A Digital Video Recorder is needed to record Religious and Educational television programs in order to play back multiple times. Due to the plaintiff disabilities the program is played back multiple times in order for him to comprehend the content of the programs,

52

This will give the plaintiff the same opportunities available to non-disabled individuals. The VDOC uses technology that converts the incoming digital T.V. signal to Analog. When the plaintiff gets his approved D.V.R he will not be able to record his Religious and Educational programs. All D.V.R now made receive only Digital signals. This denies the plaintiff service to available programming. Denying the plaintiff access to Religious and Educational shows violates the Religious LAND USE AND Institutionalized persons Act.

105. The plaintiff had glasses, white cane and referrals to the Un Institute of the Blind Approved from the Vision Center at V.C.U. hospital over a year ago but still haven't recieved these items, creating a denial of Access to the courts.

106. The Plaintiff suffers from disabilities of Asthma AND Seasonal and environmental Allergies, that are prohibitive in Normal life functions. including Anesthesia used in dental procedures. The plaintiff has been refused dental care for

53

9 cavities, broken teeth, and extreme pain and suffering in violation of the eighth Amendment to the United States Constitution

G. Inadequate Access to Communication Systems and Equitable Media Devices and Content

107. The UDCC provides individual able prisoners in their custody a variety of communication and media devices to utilize for communications with family, friends, associates, lawyers and other persons as they so desire outside of the prison. The UDCC also has provided email service and media devices that include audio and visual media content, but this content has no disability functionality.

108. The disabled plaintiff cannot use a standard telephone for communicating. In order to use TTD or TTY there must be like equipment installed or available to the person receiving the call. Mr Richardson has no family or friends with TTY equipment. This type of equipment is antiquated, and most of the individuals Mr Richardson would call do not have this outdated equipment. The UDCC has made no provisions to assist Mr. Richardson,

54

And provides Conferencing equipment only as a platform for prisoners proficient in ASL (American Sign Language)

109. Mr Richardson has repeatedly asked to use the voiceover telephone that was available at Powhatan Correctional Center, and for two years has been told there is no cord. There are no voiceover telephones Available. The TTY equipment is not designed for voiceover use.

110. The conferencing equipment that was supposed to be videophone technology, that VDOC committed to making voiceover capable in the Minnis V. Johnson (page 16.3, Videophones, paragraph 2) settlement has never materialized. The conferencing equipment utilized has never supported voiceover or real-time captioning', systems that are available in local regional Jails. The VDOC has never made videophones available as they agreed to do.

111. The Current TDD/TTY service available at Greensville is poorly positioned, hard to read, and is often inoperable because of disrepair and background noise. Because of the positioning, and the model

TTD/TTY currently being used, voiceover is very difficult and nearly impossible to use under even optimal noise conditions, and was not designed, and has not been positioned for voiceover use. The present location is in a room where eighty four prisoners play games and cards, watch television, exercise, and the TTD/TTY cannot be used with crowd background noise.

112. Previously a CapTel voiceover telephone was located with the conferencing equipment, in a seperate (quite) room with access limited to disabled prisoners who were on a list determined by their disability needs. The current system is in a telephone bank, and the TDDs are on telephones that are open and operable as normal telephones. Many hearing impaired and other prisoner are utilizing the system that have no need for it. The conferencing equipment is free, and there is no comparable communication for the hearing and visual impaired disability needs. The technology exists, but the VDOC refuses to make it available on a equal and non-discriminatory basis.

113. Mr. Richardson has requested multiple times that he be allowed to use the videophones with the video

Relay Service (VRS) and special equipment he has purchased at his own expense, and that he be able to utilize special headphones, or there be a CART (Computer-Assisted Real-Time Transcription) set up so he can understand the interpreters using services that meet his disability needs. The VDOC committed to working with the provider (purple) to provide a service to facilitate Mr. Richardsons disability needs, but results never materialized. Other prisoners utilize the conferencing equipment daily from 8:00 AM until 11:00 PM at no charge.

114. In addition to Mr Richardsons hearing disability, he has visual disabilities that include photosensitivity, and poor vision which cannot be corrected to 20/20 because of lesion from his contracting Histoplasmosis at Powhatan Correctional Center in 1994, possible side effects from prescription drugs and degenerative eye disease with Optic Neuritis. Mr Richardson is Legally Blind.

115. Mr Richardson has tried to use the VRS (video Relay Service) available on the video conferencing equipment, but cannot adequately see to utilize the conferencing because of his vision disabilities,

And his Inmate ASL (American Sign Language) skills.

116. VDOC has contracted services with Jpay. Jpay is a media content company that provides services nationwide to prisoners and their families. Mr Richardson has repeatedly made request of Jpay media electronically through the Jpay media grievance procedure that they make their media content disability accessible. Mr Richardson has requested bigger screens for his media device, a big button app for email composition and print media comparable to the content for hearing and non-disabled customers. Mr Richardson has requested print copies of his emails, and Jpay responded they are not approved by the VDOC. Mr. Richardson has requested large print visual material comparable to the audio materials to no avail. Jpay has failed to provide any disability aids, and won't even change their pointer color to aid in Mr. Richardsons ability to see it when utilizing the Kiosk to facilitate transactions with Jpay media. Mr Richardson has repeatedly requested bigger screens or an eBook for email and media services without success.

117. VDOC and Jpay has denied Mr. Richardson request as a matter of policy, and remained unresponsive with the media provider for disability accommodations. The VDOC has made no contractual attempts to remedy the discriminatory pratices of Jpay Media.

118. The VDOC, GTL, and Jpay have failed to provide adequate means for the disabled plaintiff to communicate and enjoy the privileges associated with the media accessibility and content that has been provided to non-disabled incarcerated prisoners. These failures have resulted in harm, and will certainly cause continuing and future harm entailing such discriminating factors that clearly violate the plaintiff rights availed to him by the Constitution of Virginia, the U.S. Constitution, the Americans with Disabilities Act, the Virginians with Disabilities Act. And as Jpay also provide religious content, the Religious Land Use and Institutionalized Persons Act of 2000, as well as the Code of Virginia 2.2-3401

H. Disability Aids and Disability Accommodations

119. The VDOC has consistently and systematically failed to provide, prescribe, and allow the disabled plaintiff in its custody, disability aids, devices, and accommodations consistent with his needs. This includes accommodations free from exorbitant surcharges. Devices consistent with his disabilities, which allow him to function in a manner logically coherent with aspects of every day institutional life, as is accorded to prisoner without disabilities.

120. The VDOC has repeatedly and capriciously disallowed the plaintiff bluetooth devices, while permitting them to other prisoner at Greensville and Powhatan Correctional Centers. These devices are the industry standard.

121. Mr Richardson had an inline amplifier that he was permitted to purchase to mitigate his disability when listening to music. Upon arrival at Greensville the intake officer told William Jarrett, Warden Greensville, they did not know what the device was Mr Richardson (in the presence of ADA Coordinator Marano) explained what the device was, and ADA Coordinator Marano argued Mr Richardson should be allowed the amplifier and

MANy other of his previously permitted property, AND disability items, AND Aids, Mr Good responded that he would review the items with defendant Pearson, Mr Richardson was denied several hundred dollars of his personally purchased disability Allowances from Powhatan Correctional Center. Mr Marano Maintained he would continue to try to get Mr. Richardson his personal property, but to No Avail.

122. The VDOC has Now restricted disability Aids, Accommodations, And purchases to the Keefe Corporation; Keefe is A price gouging prison Commissary Supplier with No disability Allowances, or experience.

123 The VDOCs failure to provide the disabled plaintiff in its Custody Accommodations that facilitate his Ability to function in dAily events, programs, educational opportunities, Activities, safety And general Activity Alerts As All prisoners, And void of exorbitant surcharges (copays) has resulted in specific hardship And harm. Failure to remedy the copays, Surcharges, AND disparities has put the disabled plaintiff At risk of serious hardship, harm, loss, And has Consequently resulted in different losses that violate his rights under

the Virginia Constitution, the U.S. Constitution, the Americans with Disabilities Act, the Religious Land Use And Institutionalized Persons Act of 2000, C.F.R. 35.160 (b)(1), 28 C.F.R. 35.104, 28 C.F.R. 35.130 (f), 28 C.F.R 35.160 (a), And the Code of Virginia 51.5-40 As well As Code of Virginia 2.2-3491

## I. Improper Classification of Disabled Prisoners

124. VDOC had previously utilized A classification system that assigned prisoners based upon their treatment needs, severity of crimes, And their behavior patterns while incarcerated, The exception to this was the Classification of All Deaf prisoners, As a result of the Minnis settlement Agreement which stipulated that All deaf prisoners would be assigned to Powhatan Correctional Center. Deaf prisoners housed elsewhere were to be entitled to All the benefits of the Minnis Settlement. The VDOC failed to Adhere to this Agreement by:

A. The VDOC violated the Agreement by dividing the Deaf Community, And moving A Segment of that group to Greensville on October

27, 2014. While the plaintiff would be timed banned from bringing a complaint, Mr Richardson sought to reinstate the Minnis case, the VDOC ADA Administrator Marano has told Mr Richardson that he (Barry Marano and the state) have committed to the Honorable Judge Ellis III that it is the VDOC's intention to continue to follow the Minnis settlement. That is patently false, and has been false since the plaintiff move to Greensville Correctional Center

125. The VDOC classification process suddenly dissevered this limited group of prisoners based upon their disability needs. Partially closing Powhatan Correctional Center in 2014 led not only the cleaving of the deaf community itself (A number of deaf prisoners were left behind to work in key VC Enterprise work assignments) but a significant rollback of the privileges, work assignments, services, auxiliary aids, including but not limited to communications, medical, educational, mental health, dietary and religious accommodations. The VDOC only made these classifications determinations based solely of the decision to close Powhatan Correctional

Center for budgetary reason. One of the most significant losses was that the ADA Coordinator, Mr. Barry Marano, was reassigned to VDOC Headquarters

126. VDOC has made no work, educational, or vocational programs available for the disabled plaintiff on the same basis as they have made programming objectives for the able bodied prisoners at Greensville Correctional Center. The disabled plaintiff has special needs, and the decision to close Powhatan Correctional Center, and the transfer took place in approximately three weeks was rife with violations of the ADA, state and federal laws as well as the Virginia and U.S. Constitutions. Stephanie Robertson, the Unit Manager at Greensville Correctional Center, told the arriving disabled prisoners on October 27, 2014, that she was given four day notice. The staff at Greensville had no experience and no training to work with, communicate with, and house disabled prisoners. Greensville Correctional Center had not moved the prisoners from the cells where the disabled prisoners were to be housed, and there was significant hostility, not only among the prisoners who had to move,

but the disabled prisoner were told they wouldn't be housed in a living Area to themselves by Mr. Marano. In reality more than a dozen Greensville prisoners would be housed with the disabled prisoners. In addition, many property items Allowed At Powhatan Correctional Center, including disability items, locks to secure property, And many other property items were confiscated And destroyed because they were disallowed At Greensville.

127. The VDOC has made No Accommodations For the disabled plaintiff in the classrooms throughout the VDOC, or At Greensville Correctional Center upon his Arrival

128. Deaf individuals Are classified At Greensville Correctional Center, but the VDOC has instituted No provisional educational, Vocational, or other program objective for the Deaf plaintiff who is Also legally Blind, the Purple Communications has reportedly utilized interpreters who Are Not qualified.

129. Greensville Correctional Center has denied interpreter services previously Allowed As routine

65

At Powhatan Correctional Center rather than employ additional interpreters

130. Mr Richardson has repeatedly requested an interpreter both on and off site for medical programs, consultations, and procedures. Mr. Richardson has repeatedly been denied interpreter service for the Self Medication program. The self medication program objectives require communication about changes in medications, possible side effects from prescription drugs, changes in prescriptions changes in prescription strength, renewals, missing prescriptions, and other considerations. Mr Richardson has been summarily been denied interpreters for medical needs, programs, and services

VII. CLAIMS FOR RELIEF

A. Count I

Discrimination with regard to a Disability that Violates the American with Disabilities Act

131. As included by reference the plaintiffs reassert every claim above as being fully set forth herein.

132. Congress enacted 42 U.S.C. 1201 (b)(1) on July 12, 1990, to mandate "the elimination of discrimination against individuals with disabilities" Title II of the ADA states "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by any such entity" 42 U.S.C. 12132

133. The Plaintiff has disabilities with the meaning and as defined by the ADA under U.S.C. 12131(2)

134. Claims under the ADA are consequently brought against Harold Clarke, Rose Durbin, Eddie L. Pearson, Lane Talbott, Collectively "Named defendants") in their official capacities, and the Virginia Department of Corrections ("VDOC") Correctional Enterprises ("VC Enterprises") the Virginia Department of Correctional Education ("VC Education")

135. The ADA has been in force and applicable in the United States at all times relevant to this action and the plaintiff had the right to be free

67

from discrimination from the defendants As
disabled persons 42 U.S.C 12132

136. Effective communication as Regulated by the U.S.
Department of Justice ("DOJ") implementing Title
II is clearly an essential part of the nondiscrimination
mandate. 28 C.F.R. 35.160

137. Title II regulation states any "public entity
shall take appropriate steps to ensure that commun-
ications with applicants, participants, and members of
their public with disabilities are effective As
communications with others. 28 C.F.R 35.160(a).

138. Title III mandates under law that the continuing
state agency named defendants (collectively "defendants")
And their departments, subsidiaries, instrumentalities,
contractual providers, failure to protect and provide
the disabled the same access to opportunities, services,
facilities, advantages, benefits, activities, programs,
privileges, and accommodations is discriminatory and
violates 28 C.F.R 36.104.

139. The Plaintiff inability to communicate, participate,
in, and receive effective accommodation to assist him

68

in Normal life Activities violates his public Accommodation rights under the ADA.

140. The inability of the plaintiff to effectively communicate and fully participate with educational, mental health, employment, rehabilitative programming, daily life Activities, sleep, routine notifications, memoranda, safety alerts, and family and associate communications with persons inside and outside of the prison as the Non-disabled violates his rights under the ADA.

141. To ensure not only effective communication, but overall Access for the disabled plaintiff in An institutional setting (living environment) facilitated by the government, where the prisoners have No Alternative choice of residence, means "A public entity shall furnish appropriate Auxiliary Aids and services where necessary to Afford An individual with a disability an equal opportunity to participate in, and enjoy the benefits of, A service program, or Activity conducted by A public entity." The VDOC is charging A Surcharge For disability items covered under terms of insurance, and calling these Accommodations items subject to A copay 28 C.F.R 35.160 (b)(1).

142. Auxiliary Aids include, but are not limited to "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C 12103, such as computer-aided transcription services, assistive listening systems, closed captioning decoders, open and closed captioning, TDDs, videotext displays, vioccovo devices, and written materials, both handwritten and texts, 28 C.F.R. 35.104.

143. Additionally, the "public entity may not place a surcharge on any particular individual with a disability or any group of individuals with disabilities to cover their cost of measures, such as their provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment by the Act or this part." 28 C.F.R. 35.130(f)

144. Defendants have placed, in violation of the ADA, statutorily prohibited unconstitutional burdens on the plaintiff solely because of his disabilities. They have done this by failing to provide effective disability accommodations for the plaintiff who has a physical or mental impairment that substantially limits one or multiple major life functions, and by failing to adequately ensure access to auxiliary aids by the disabled

plaintiff that is in the VDOC's custody, control, security, and care or otherwise under the supervision of the VDOC. Clarke, Durbin ("VDOC Named defendants") and VDOC have also accomplished this by applying an unreasonable lack of access and a heavy surcharge for the disabled plaintiff who need disability accommodation, and need such as is required to no only provide him with equitable and reasonable access to VDOC's services, privileges, facilities, programs, and advantages, but also to ensure nondiscrimination as mandated by the ADA.

145. The VDOC has not only denied disability accommodations, but they have sought to, prevented, and restricted expert psychological and medical providers from determining and prescribing the plaintiff auxiliary aids and the services necessary to address his disability needs. These conditions of failure and denial are continuing, ongoing, and daily practices of the defendants who are not only assessing surcharges, labeling disability aids as "comfort items" as reasoning for denial, but who have actively and purposely sought to shut down pathways for the disabled plaintiff to obtain reasonable disability accommodations

146. To ensure disability aids and accommodations,

71

And in determining what type is necessaried "A public entity shall give primary consideration to the request of the individual with disabilities". The VDOC has actively denied and rescinded disability Aids 28 C.F.R. 160 (b)(2).

147. On information and belief, the failing to allow effective disability and axillary Aids and services, benefits, activities, programs, and privileges are the polices, regular practices, and regular customs and mores of the defendants.

148. Defendants failure to provide appropriate auxiliary disability aids, or to facilitate a pathway for the provision of disability accommodations has subjected to the plaintiff to discrimination on the basis of his disabilities in violation of rights under the ADA. that include, but are not limited to the following:

a. Inadequate access to diets consistent with disability needs;

b. Inadequate access to visual Aids;

c. Inadequate access to sleep Aids;

d. Inadequate access to communication devices;

e. Inadequate access to pediatric accommodations;

f. Inadequate access to prison wide meals

g. Inadequate means to protect themselves;

h. Inadequate means to protect their property;

i. Improper institutional setting and assignment;

j. Inadequate sign language and interpreter services;

k. Unlawful surcharges on disability devices; and

l. Inadequate access to accommodate disability needs in accordance with the Architectural Barriers Act of 1968

149. Further, the VDOC and VDOC named defendants discriminate against the plaintiff solely on the basis of his disability, and refuse to equally and equitably apply classification to the disabled plaintiff, instead assigning him to a facility inconsistent and regardless of his disability needs and regardless of the nature of his disability. VDOC buildings covered under the U.S. Architectural and Transportation Barriers Compliance Board (Access Board) must be accessible to disabled people, and the building current housing the disabled plaintiff fall far short of these mandates

150. The VDOC and the VDOC named defendants have failed to define, develop, and make available consistent policy safeguards and opportunities for the disabled plaintiff as available to the non-disable individual prisoners.

151. The proximate result of the defendants failure and the basic violations against the plaintiff rights under the ADA has caused the plaintiff to suffer from discrimination, unequal treatment, and an institutional exclusion (which includes being denied by the defendants the services, benefits, activities, programs, privileges, and human rights), promulgated under the laws of the United States, including financial loss, the loss of dignity, frustration, humiliation, emotional, psychological, and physical pain and suffering, anxiety, trauma, embarrassment, the unrequited loss of rights and privileges, including unnecessary disciplinary measure, and severe and unmitigated injuries to their health.

B. COUNT II

Discrimination based upon a disability in violation of the Rehabilitation Act (29 U.S.C. 794 et seq)

152. Plaintiff reallege and incorporate by reference every allegation above as if fully set forth herein.

153. The Rehabilitation Act is to ensure no "qualified individual with a disability in the United States...

shall, solely by reason of disability, be excluded
from the participation in, be denied their benefits
of, or be subjected to discrimination under any
program or activity receiving federal financial Assistance."
29 U.S.C. 794 (a)

154. The plaintiff is a qualified individual with a
disability within the meaning of the Rehabilitation
Act, 29 U.S.C. 705 (20)

155. Defendants receive federal financial Assistance
within the meaning of 29 U.S.C. 794(a)

156. Operations across a wide spectrum in the VDOC,
VC Enterprises, VC Education, and departments,
Agencies, instrumentalities, and contractors, including
Greensville, are and operate " program(s) or activities]"
within the meaning of 29 U.S.C. 794(b)(1)(A)-(B) and
or (b)(2)(B).

157. At all times relevant to this action, the
Rehabilitation Act was in full force and effect
in the United States and plaintiff had the
right not to be subjected to discrimination by the
defendants on the basis of their disability 29 U.S.C 794(a)

158. The Department of Justice regulation implementing the Rehabilitation Act has clarified requirements for Federal financial recipients, including correctional facilities stating a "recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skill where a refusal to make such provision would discriminatorily impair or exclude the persons in the program receiving federal financial assistance." 28 C.F.R. 42.503(f)

159. Appropriate auxiliary aid include, but are not limited to "brailed and taped material, qualified interpreters, readers, and telephonic devices". 28 C.F.R. 42.503 (f)

160. The defendants continue to discriminate and impair the Plaintiff right and ability to communicate effectively with medical personnel, prison staff, and individuals outside of prison, and have excluded Plaintiff from educational, vocational, employment, religious, and prison wide announcements and alerts. This discriminatory treatment has been accomplished by a failure to provide appropriate aids and accommodations in accordance with the Rehabilitation Act,

76

161. The defendant's failure to provide appropriate Auxiliary and disability Aids and services continued to this day and this is discriminatory treatment that denies the plaintiff access to VDOCs services, privileges, facilities, programs, and advantages, and also fails to ensure nondiscrimination and appropriate aids and accommodations as are mandated by the Rehabilitation Act.

162 Defendant's failure to provide Auxiliary Aids and services has subjected the plaintiff to discriminatory treatment that includes but is not limited to the following:

   a. Inadequate access to visual educational aids consistent with disability needs;

   b. Inadequate access to written materials for educational purpose;

   c. Inadequate access to captioned educational aids;

   d. Inadequate access to disability equipped communication devices;

   e. Inadequate access to podiatric accommodations in the educational setting;

   f. Inadequate access to prison wide, and in cell visual alerts for educational activity notification;

   g. Inadequate alerts in educational and vocational sites;

h. Inadequate access to educational technology that connects to existing modern disability devices;

i. No vocational and educational disability equipped institutional setting and assignment planning;

j. Inadequate sign language and interpreter services for program and educational purposes;

k. Unlawful surcharges, on, with, or for the auxiliary disability devices; and

l. Inadequate access to vendors to accommodate disability needs.

163. Further, the VDOC and VDOC named defendants discriminate against the plaintiff, solely on the basis of his disability, and refuse to equally and equitably apply classification to the disabled plaintiff, instead assigning him to facilities inconsistent and regardless of his disability needs, and regardless of the nature of his disability.

164. Defendants systemic failure to comply with the Rehabilitation Act has resulted in harm to the plaintiff, and will continue to harm the plaintiff until and unless the defendants area ordered by this Court to make permanent modifications to their practices, procedures, planning and policies pursuant to the Rehabilitation Act.

## C. Count III

Violation of the Virginians with Disabilities Act
(Code of Virginia 51.5-40)

165. The Plaintiff reallege and incorporate by reference
every allegation above as if fully set forth herein

166. The Virginians with Disabilities Act Stipulates no
"qualified person with a disability shall, on the basis
of disability, be excluded from participation in, be
denied the benefits of, or be subjected to discrimination
under any program or activity receiving state financial
assistance or under any program or activity conducted
by or on behalf of any state agency" Code of Virginia
51.5-40.

167. VDOC, VC Enterprises, VC Education, and
Greensville receive state financial assistance
within the meaning of the Code of Virginia 51.540.

168. The plaintiff is a qualified individual with
disabilities within the meaning and definition
of the Code of Virginia 51.5-40.

169. Operations across a wide spectrum in the VDOC, VC Enterprises, VC Education, and departments, Agencies, instrumentalities, and contractors, including Greensville, are and operate "program[s] or Activit[ies]" within the meaning of Code of Virginia 51.5-40.

170. At all times relevant to this action, the Virginians with Disabilities Act was in full force and effect in the United States and the plaintiff has the right to be subjected to discrimination by the defendants on the basis of the plaintiff disability. Code of Virginia 51.5-40.

171. Acting under the color of state law the defendants have subjected the plaintiff to discrimination solely on the basis of his disability, in violation of his rights under the Virginians with Disabilities Act. The defendants have done this by failing to provide disability aids, accommodations, and auxiliary aids and services in the form of visual aids, interpreter services, and adequate visual, audio, and effective communication aids

172. The defendants failure to provide effective communication aids and disability accommodation

for the plaintiff with hearing, visual, orthopedic, and other disabilities denies and is a continuing denial, solely on their basis of his disability, and the plaintiff have been denied the access to the defendants' services, benefits, activities, programs, and privileges on an equal basis as the access provided to non-disabled prisoners.

173. On information and belief, the failure to provide effective communication aids and other disability aids, and the failure to provide comparable access to services, benefits, activities, programs or privileges are policies, regular practices, and the customes and mores of the defendants. These practices are ongoing and continue to this date.

174. Defendants failure to provide appropriate auxiliary aids, notification devices, and services consistent with disability needs has subjected the plaintiff to discriminatory treatment that includes but is not limited to the following:
   a. Inadequate access to visual aids consistent with disability needs and the American with Disability Act Architectural Guidelines;
   b. Inadequate access to written materials for

notification and communication purposes)

c. Inadequate access to captioned administrative memoranda and informational aids;

d. Inadequate access to disability equipped telephones and communication devices;

e. Inadequate access to pediatric accommodations in the cells, dining, and housing unit settings;

f. Inadequate access to prison wide, and in cell visual alerts for program and activity notification;

g. Inadequate alerts in general institutional offices, school, gymnasium, dining, and other sites;

h. Inadequate access to modern technology that connects to existing modern hearing aids, visual aids, and disability devices;

i. No disability institutional planning objectives;

j. Inadequate sign language and interpreter services for program, religious, medical, notification, and other purposes;

k. No privacy protection in areas where confidential information is exchanged in the view of other prisoners who know and can interpret sign language.

l. Unlawful surcharges on, with, or for the auxiliary disability devices; and

m. Inadequate access to vendors to accommodate disability needs

82

175. Further, the VDOC and VDOC named defendants discriminate against the plaintiff, solely on the basis of his disabilites, and refuse to equally and equitably apply classification level privileges to the disabled plaintiff. These assignments are inconsistent with his disability needs, the nature of his disability, and the nature of the accommodations available at a particular institutional setting to me the plaintiff disability need.

176. Defendants systemic failure to comply with the Code of Virginia 51-5-40 has resulted in harm to the plaintiff, making the defendant liable for harms suffered. These harms to the plaintiff will continue to adversely affect the plaintiff until and unless the defendants are ordered by this court to make permanent modifications to their practices, procedures, planning and policies pursuant to the Code of Virginia 51.5-40

C. Count IV

Violation of the Code of Virginia 2.2-3401

177. The plaintiff reallege and incorporate by reference

83

every Allegation Above As if fully set forth herein

178 The Code of Virginia requires that "[W]henever
A deaf person Applies for or receives Any Licensee
Service, Assistance or other right or benefit
provides by A [ ] [state] Agency, the Agency shall
either request the Virginia Department of the Deaf
And Hard-of-Hearing to Appoint A qualified interpreter
for the deaf or Appoint such An interpreter from
A list of qualified interpreters Maintained by the
Department to Assist the deaf person in communicating
with Agency personnel" Code of Virginia 2.2-3401 (B)

179. VDOC, VC Enterprises, VC Education, And Green
sville Are state Agencies that provide Services,
Assistance And benefits to the plaintiff within the
Meaning of the Code of Virginia 2.2-3400. These
Services, Assistance, And benefits include but
Are Not limited to programs offered by the VDOC,
Apprenticeship courses And classes, VC Educational
classes, Medical Services offered by VDOC And
the VDOC's Medical contractors And providers,
religious Services of the Chaplaincy Services
of Virginia, GTL, Jpay, And Any other means Allotted
for external communications, And communication

with VDOC personnel.

180. The plaintiff has requested services, assistance, and benefits from the defendants and the defendants' service provider, including but not limited to the services, assistance, and benefits listed above and have that interpreters be provided in accordance with code of Virginia 2.2-3401(B)

181. The defendants through their policies and practices have consistently denied and failed to provide adequate sign language interpreters for the deaf plaintiff under VDOC security, custody, care, and supervision.

182. The VDOC's failure to provide the disabled plaintiff in its custody proper interpreter accommodations to facilitate his ability to function in daily events programs, educational opportunities, activities safety and general activity needs, as it provides to all other prisoners under its supervision, creates disparities, and has put the disabled plaintiff at risk of serious hardship and harm, thus violates his rights under the Virginia Constitution, the U.S. Constitution, the American with Disabilities Act,

the Religious Land Use and Institutionalized Persons Act of 2000, C.F.R 35.160(b)(1), 28 C.F.R. 35.104, 28 C.F.R 35.130(f), 28 C.F.R. 35.160(a), And the Code of Virginia 51.5-40, As well As Code of Virginia 2.2-3491

## E. Count V

Religious Land Use and Institutionalized Persons Act of 2000
"Substantial Burden on Religious Freedom"
(42 U.S.C. 2000cc et seq)

183. The plaintiff reallege and incorporate by reference every Allegation above as it fully set forth herein.

184. Government may not impose substantial burden on religious exercises of institutionalized even if the burden results from A rule of general Applicability. U.SC, 2000cc-1.

185. The plaintiff is "institutionalized persons" within the meaning of the Religious Land Use and Institutionalized persons Act of 2000cc-1.

186. VDOC Acting As A department, Agency, or instrumentality of the Commonwealth of Virginia, is A branch of the government as defined by the Religious Land Use And Institutionalized Persons Act of 2000 (RLUIPA) Religious Land Use And Institutionalized Person Act of 2000cc-5(4)

187. Claims under the RLUIPA Are brought against defendants Clarke And Pearson in their official capacity As employees of the VDOC.

188. VDOC And VDOC RLUIPA defendants And VDOC contract providers have deprived And continue to deprive the plaintiff of his right to the free exercise of religion, A right Secured by RLUIPA. The defendants have unlawfully imposed A substantial burden on the plaintiff religious exercise. The defendants have done this by failing to provide adequate means for the disabled plaintiff to effectively communicate At religious services, to have materials available to him in A medium that is suited to his dis-ability needs, And to be provided some manner with which to practice his religious rights. The substan-tial burden effects programs that receive federal financial aid.

87

F. Count VI

Violation of United States Constitution
Freedom from Cruel And Unusual Punishment:
Eighth And Fourteenth Amendments
(42 U.S.C. 1983)

189. The plaintiff reallege And incorporate by reference
every allegation above as if fully set forth herein

190. Under the Eighth And Fourteenth Amendments
of the United States Constitution, "[E]xcessive
bail shall not be required, nor excessive fine imposed,
nor cruel And unusual punishment inflicted" US Const.
Amend. VIII

191. The VDOC defendants have, in their individual
And official capacities, sought, deprived, And
continue to deprive the plaintiff of his right
to be free of cruel And unusual punishment
As secured by the Eighth Amendment of the
United States Constitution And made applicable
to the states by the Fourteenth Amendment.

192. The VDOC defendants have, in their individual

and official capacities, systematically deprived the plaintiff access to basic human rights and services, as well as access to vital information during his incarceration, including but not limited to his incarceration at Greensville Correctional Center. The named defendants and their agents have failed to notify the plaintiff of alerts, announcements, safety instructions, and activities and services, as well as access to information in services where dialog is an essential part of normal communications. In many instances VDOC and their agents, contractors, and instrumentalities have denied the disabled plaintiff access to fair and equitable essential services, information and accommodations. The behavior on the part of the defendants has not only placed the plaintiff at substantial risk in the past, but the defendants actions place the disabled plaintiff at risk of serious future harm,

193. VDOC defendants have direct and actual knowledge of the unconstitutional conditions to which the plaintiff was subjected to at numerous times and at multiple institutions through the VDOC, and continue to be subjected to at Greensville. The plaintiff has submitted

complaints to VDOC Staff requesting in good faith relief. The defendants have deliberately failed to take corrective action

194. The VDOC has actual knowledge of the substantial medical risks, and inadequate notifications within the VDOC, of the contractual medical providers, as well as the other various contract providers who render services and have asked the disabled plaintiff to medical procedural waivers and various other contracts and agreements without accommodations necessary to read and understand the information as presented. The defendants continue to implement these unconstitutional conditions and practices in direct and knowing violation of the Eight and Fourteenth Amendments to the United States Constitution.

195. VDOC named defendant's failure to comply with the Eight and Fourteenth Amendments of the United States Constitution has resulted in harm to the plaintiff and will continue to result in harm to the plaintiff, as the plaintiff will remain in the custody and under control of the VDOC

And will continue to attempt to avail himself
of medical treatment and other services until
and VDOC named defendants are ordered by
this Honorable Court to modify their policies
practices, procedures, and mores pursuant
to the Eight and Fourteenth Amendments of
the United States Constitution.

G. Count VII

Violation of the United States Constitution
Free Exercise of Religion;
First and Fourteenth Amendments
(42 U.S.C. 1983)

196. The plaintiff reallege and incorporate by
reference every allegation above as if fully set
forth herein.

197. Under the First and Fourteenth Amendments
of the United States Constitution, States,
" shall make no law respecting an establish-
ment of religion, or prohibiting their free
exercise thereof" U.S. Const. Amend. 1

91

198. VDOC in concert with the Chaplaincy Services of Virginia, in their individual and official capacities, deprived and continued to deprive the plaintiff of the free exercise of religion, as secured by the First Amendment of the United States Constitution and made applicable to the States by the Fourteenth Amendment, by discriminating against the plaintiff because of his disabilities, including but not limited to mode of speech, inability to see, and belief system and practices outside of mainstream religious doctrine. Practices and policies have substantially burdened the Plaintiff religious exercise.

199. VDOC and the Chaplaincy Services of Virginia, failure to comply with his First and Fourteenth Amendments of the United States Constitution has resulted in harm to the plaintiff and will continue to result in harm to the plaintiff as the plaintiff has and will remain in the custody of the VDOC and continue to attempt to participate in weekly worship services, religiously dietary needs, and religious doctrine, practices, and holy days until and unless VDOC

named defendants and the chaplaincy services of Virginia and their agents are ordered by this Honorable Court to make modifications to policies, practices, procedures, and mores pursuant to the First and Fourteenth Amendments of the United States Constitution

H. Count VIII

Violation of the United States Constitution
Free Speech: First and Fourteenth Amendments
(42 U.S.C 1983)

200. The plaintiff reallege and incorporate by reference every allegation above as if fully set forth herein.

201. Under the First and Fourteenth Amendments of the United States Constitution, States "shall make no law... abridging the freedom of speech." U.S. Const. Amend. I.

202. VDOC named defendants have, in their individual and official capacities, deprived and continue to deprive the plaintiff his freedom of speech, as secured by the First Amendment of the United States Constitution and made applicable to the States

by the Fourteenth Amendment, by preventing the plaintiff because of his disabilities, including but not limited to mode of speech, inability to see, Despite multiple complaints and request for accommodations that would enable communications, VDOC named defendants continue technological, And telecommunication devices that would give the disabled the plaintiff ability And the possibilities of communicating And receiving communications with people inside and outside of the prison,

203. VDOC named defendant's failure to comply with the First And Fourteenth Amendments of the United States Constitution has resulted in harm to the plaintiff And will continue to result in harm to the plaintiff. The Plaintiff have, will, And must remain in the Custody of the VDOC And continue to attempt to establish communications, And communicate with people inside And outside of the prison, until And unless VDOC Named defendants And their agents are ordered by this Honorable Court to make Modifications to their policies, practices, procedures, And Moves pursuant to the First And Fourteenth Amendments of the United States Constitution.

## 1. COUNT IX

Violation of the Constitution of Virginia
Free Exercise of Religion: Constitution of Virginia
Article 1, Section 16

204. The plaintiff reallege and incorporate by reference every allegation above as if fully set forth herein.

205. Under Article 1, Section 16 of the Constitution of Virginia. "All men are equally entitled to the free exercise of religion" and "No man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burdened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief"
Va. Const. Art. 1 Section 16.

206 VDOC in concert with their agents, the chaplaincy services of Virginia, in their individual and official capacities, deprived and continue to deprive the plaintiff of his free and equal exercise of religion, as secured by the First Amendment of the Virginia Constitution, Defendants have only provided volunteer

interpreters who come twice a month only to the Protestant services.

207. VDOC in concert with their Agents, the chaplaincy Services of Virginia, in their individual and official capacities, deprives and continue to deprive the plaintiff of his free and equal exercise of religion, as secured by Article 1, Section 16 of the Constitution of Virginia, by discriminating against the plaintiff because of his disabled condition and by substantial burdening his free and unencumbered religious exercise

208. VDOC named defendants and the VDOC in concert with their agents, the Chaplaincy Services of Virginia, in their individual and official capacities, failed to comply with the First Amendment, Article 1, Section 16 of the Virginia Constitution. This failure has resulted in harm to the plaintiff and will continue to result in harm to the plaintiff. The Plaintiff have, will, and must remain in the custody of the VDOC and continue to attempt to practice his sincerely held religious beliefs and convictions, until and unless VDOC named defendants and their agents are ordered by this Honorable Court to make modifications to their policies.

practices, procedures, and mores pursuant to the First Amendment of the Virginia Constitution.

## J. COUNT X

Violation of the Constitution of Virginia
Free Speech: Constitution of Virginia Article 1 Section 12

209 The Plaintiff reallege and incorporate by reference every allegations above as if fully set forth herein

210. Under the Constitution of Virginia "Any citizen may freely speak, write and publish his sentiments on all subjects" VA. Const. Art. 1 Section 12

211. The VDOC named defendants have, in their individual and official capacities, deprived and continue to deprive the plaintiff of his freedom of speech, as secured by the First Amendment of the Virginia Constitution, by preventing the plaintiff because of his disabilities, including but not limited to mode of speech and his inability to see to express himself freely. Despite multiple complaints and request for accommodations that would enable and facilitate communications. VDOC named defen-

dants continue to deny technological, and tele-communication devices that would give the disabled plaintiff the ability and the possibilities of communicating and receiving communications with people inside and outside of the prison freely, while allowing mediums for these communications to able prisoners

212. VDOC Named defendant's failure to comply with the First Amendment of the Virginia Constitution has resulted in harm to the plaintiffs, and will continue to result in harm to the Plaintiff. The Plaintiff have, will, and is compelled to remain in the custody of the VDOC, and continue to attempt to establish facilities for communications; to communicate with people inside and outside of the prison without readily available disability aids, until and unless VDOC Named defendants and their agents are ordered by this Honorable Court to make modifications to their policies, practices, procedures, and mores pursuant to the First Amendment of the Virginia Constitution.

# VII. PRAYER FOR RELIEF

213. WHEREFORE, The Plaintiff respectfully request:

214. That this Honorable Court Adjude And Decree that defendants, by the organization, Systems, polieres, practices, mores, And conditions which have been emphatically described, have violated And continue to violate Title II of the ADA, Section 504 of the Rehabilitation Act, the Virginians with Disabilities Act, Section 2.2-3401 of the Code of Virginia, The Religious Land Use And Institionalized Persons Act, And the Constitution of the United States and the Constitution of the Commonwealth of Virginia;

218. This Honorable Court enter declater And injunctive relief Against the defendants And in Favor of the Plaintiff As it deems appropriate to remedy past violations of the Laws of the United States And the Commonwealth of Virginia And to prevent Future violations of the same:

216. A Judgement be entered Against the defendants in favor of the Plaintiff under Section 504 of the Rehabilitation Act And the Code of Virginia 51.5-40 And 46 And 42 U.SC.1983 in An Amount to

99

be determined at trial;

217. That judgement be entered against the defendants in favor of the plaintiff for the cost of litigation, including reasonable attorney fees under Code of Virginia 51.5-46,

218 The Honorable Court retain jurisdiction of this matter until the defendants demonstrate that they have fully complied with the orders of this Honorable Court, and that there is reasonable assurance that the defendants will continue to comply in the future absent continuing jurisdiction; and

219 This Honorable Court award the plaintiff any further relief the court deem appropriate

## IX. JURY TRIAL DEMANDED

220 The plaintiff, by his counsel and pursuant to Federal Rule of Civil Procedure 38(b), hereby demand a trial by jury on all claims so triable in this action.

The Plaintiff cannot verify the veracity of this complaint. Previous filing with this Court include exhibits from Virginia Commonwealth University health systems that clearly demonstrate that the plaintiff is both legally blind and deaf. In a usum case and complaint the author would be noted, in this case the plaintiff was left with only two (2) choices 1. Allow the court to dismiss the action or 2. Pay another prisoner IN violation of the Department of Corrections policy, to have the complaint written. The plaintiff put forth the general outline verbally for transcription and has no veride for verification of the verbatim content (see enclosures)

The above is true and correct to the best of the plaintiff's belief and the plaintiff states this under full knowledge of the penalty of porjury,

DATED this 5th day of November 2018

Respectfully Submitted

_____ /s/ David C Richardson

Pro Se
Counsel for Plaintiffs





















David A. Richardson #1058854
Greensville Correctional Center
901 Corrections Way
Jarratt, Va 23870

First Class

Clerks Office
United States District Court
Eastern District of Virginia
701 East Broad Street, Suite 3000
Richmond, Virginia 23219-3528

RECEIVED
NOV - 8 2018
CLERK, U.S. DISTRICT COURT
RICHMOND, VA