**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DAVID A. RICHARDSON,

   Plaintiff,

v.            CASE NO. 3:18cv23

HAROLD W. CLARKE, *et al.*,

   Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

   Defendants Virginia Department of Corrections ("VDOC") and Tammy Williams, by counsel, submit the following Memorandum in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

**Introduction**

   Plaintiff David A. Richardson ("Plaintiff" or "Richardson"), an inmate in VDOC custody who is currently incarcerated at Deerfield Correctional Center ("Deerfield"), filed a Particularized Complaint (Dkt. No. 42) alleging a myriad of constitutional, federal, and state law claims.[1] Consistent with the issuance of this Court's Memorandum Opinion (Dkt. No. 69) and Order (Dkt. No. 70), the following claims and defendants remain:

- Claim 1: nWhile incarcerated at Deerfield, VDOC violated Richardson's rights under Title II of the Americans with Disabilities Act ("ADA").[2]

_____

[1] A more fulsome recitation of the procedural history is outlined in this Court's Memorandum Opinion at Dkt. No. 69.

[2] For the reasons outlined in the Memorandum Opinion (Dkt. No. 69), this Court has held that Richardson is entitled only to injunctive relief on this claim. Defendants do not further address Richardson's demand for damages under the ADA.

- Claim 2: While incarcerated at Deerfield, VDOC violated Richardson's rights under the Rehabilitation Act ("RA").

- Claim 3: While incarcerated at Deerfield, VDOC and Defendant Williams violated Richards's rights under the Virginians with Disabilities Act ("VDA").[3]

- Claim 5: While incarcerated at Deerfield, VDOC and Defendant Williams violated Richardson's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when they prevented him from wearing a religious head covering in certain areas of the prison.

- Claim 7: While incarcerated at Deerfield, VDOC and Defendant Williams violated Richardson's free exercise rights under the First Amendment when she prevented him from wearing a religious head covering in certain areas of the prison.

Defendants summarize their arguments in support of their motion for summary judgment as follows. In response to Claim 1 and Claim 2, Defendants submit that they have not discriminated against Richardson in violation of the ADA or the RA. Defendants and staff at Deerfield have bent over backwards trying to assist Richardson and make accommodations for him to communicate with staff at the prison as well as with persons outside the prison. Staff have created flash cards, offered the use of electronic devices, scheduled American Sign Language ("ASL") interpreters (both in person and via video), and made other attempts to facilitate

---

[3] Defendants conceded in their Partial Motion to Dismiss (Dkt. No. 47), that Richardson had stated disability claims under the RA and the ADA related to his alleged inability to communicate inside of the prison as well as with the public. Richardson's Particularized Complaint remained difficult to understand and was incredibly unclear in its attempt to lay out his disability claims. Defendants discerned these claims based on the factual allegations Richardson made and respond accordingly here. If this Court determines that the factual allegations support additional disability-related claims not addressed in this Memorandum, Defendants respectfully request this Court's permission to brief those claims in a supplemental filing.

Richardson's communications. Unfortunately, it seems that every time prison staff implement a solution to one of Richardson's purported disability issues, his needs suddenly shift and the accommodation that should have worked no longer does.

As for Claim 3, Richardson's Particularized Complaint fails to state a claim under the VDA because the VDA protects only *employees* from disability-related discrimination. Richardson fails to allege facts to support an employment discrimination claim and Claim 3 should be dismissed.

In response to Claim 5, Defendants submit that pursuant to RLUIPA, Richardson is not entitled to any money damages. The only relief available to him is injunctive in nature. As of December 1, 2020, the policy regarding religious head coverings will change to permit Richardson to wear his religious head covering in all areas of the prison, with very few exceptions. Because this policy is changing in his favor, Richardson will not be entitled to injunctive relief that orders Defendants to do what they have already done. As of December 1, 2020, this claim will be moot.

In response to Claim 7, Defendants submit that their restrictions on religious head coverings did not violate Richardson's First Amendment rights because any restrictions on his ability to wear his religious head covering were lawful pursuant to *Turner v. Safley*, 482 U.S. 78 (1987).

Additionally, Defendant VDOC submits that it is not a proper defendant in Richardson's First Amendment claim (Claim 7) because it is not a "person" for purposes of 42 U.S.C. § 1983. Accordingly, VDOC respectfully moves for dismissal from this claim.

To the extent Richardson seeks money damages for his First Amendment claim (Claim 7), Defendants are entitled to qualified immunity because no established case law in effect at the time of these allegations placed Defendants on notice that their conduct was unlawful.

Finally, the PLRA bars Richardson's claims for money damages because he has failed to establish that he suffered a sufficiently serious physical injury. At most, Richardson is entitled to nominal damages on any surviving First Amendment claims, to the extent this Court finds that Defendants are not entitled to qualified immunity on that claim.

### **Statement of Undisputed Material Facts**

#### *Facts Regarding Disability Accommodations for Richardson*

1. M. Blair is the Operations Manager at Deerfield.  Blair Aff. ¶ 1.

2. Deerfield staff have repeatedly attempted to accommodate Richardson's alleged disabilities. Blair Aff. ¶ 4.

3. Richardson alleges that he has vision and hearing problems, but the extent of his abilities seems to Blair to change frequently. Blair Aff. ¶ 5.

4. In order to facilitate Richardson's ability to communicate, staff at Deerfield have scheduled times for him to meet with an American Sign Language ("ASL") interpreter.  Those times are scheduled for every Monday and Wednesday[4] or as needed. Richardson typically uses the interpreters to communicate with staff for the entire six hours that they are present at the facility. Blair Aff. ¶ 6.

5. Richardson has been informed of these times and he knows when the ASL interpreters are at the facility and how to access them. Blair Aff. ¶ 7.

6. If Richardson has an urgent need for an interpreter outside of the regularly scheduled Monday / Wednesday time slots, one can be scheduled for him. Blair Aff. ¶ 8.

7. Recently, staff at Deerfield made arrangements for a video-based interpreter to assist Richardson at a medical appointment while in-person interpreters were not feasible due to the

---

[4] During the current COVID outbreak, Deerfield has suspended all visitors (including in-person interpreters) to the facility in order to reduce the risk of transmission.

risk of COVID spread at Deerfield. Blair Aff. ¶ 9.

8.  Video-based interpreter services was an accommodation Richardson had specifically proposed and requested be provided to him. Blair Aff. ¶ 10.

9.  After staff had arranged for the video interpreter service and after Richardson was present in the medical department, he stated that he could not see the video screen and could not see what the interpreter was signing to him. He insisted on an in-person interpreter. Blair Aff. ¶ 11.

10. When the video interpreter arrangement was not acceptable to Richardson, medical staff attempted another way to communicate with him and asked him to return to the medical unit later that week. Blair Aff. ¶ 12.

11. Initially, he refused to go to the appointment, but then decided to go. Blair Aff. ¶ 13.

12. When he arrived in the medical department, medical staff had set up a computer with a word processing document so that they could type messages to Richardson with a blue background and green font.  This is a format Richardson has previously stated he could read and view. Blair Aff. ¶ 14.

13. Medical staff hoped to be able to communicate with him via typing messages back and forth on the word processing document. Blair Aff. ¶ 15.

14. When presented with this option, Richardson responded that this would not work, and he could not read the messages on the screen. Blair Aff. ¶ 16.

15. Staff made a second attempt to communicate with Richardson in this manner and staff altered the settings on the computer to the same settings Richardson frequently uses on the law library computer. He then complained that he could still not read these messages. Blair Aff. ¶ 17.

16. On many occasions, however, Richardson and Blair are able to effectively communicate verbally. Blair Aff. ¶ 18.

17. Richardson speaks very clearly, and Blair can easily understand what he is saying. Blair Aff. ¶ 19.

18. He speaks to Blair and Blair speaks back to him and they are able to understand each other. Blair Aff. ¶ 20.

19. Staff in Richardson's housing area have also crafted flash cards in the blue / green color contrast he prefers. Blair Aff. ¶ 21.

20. These flash cards contain simple and common written communications so that Richardson can understand basic communications from staff. Blair Aff. ¶ 22.

21. Blair has also observed Richardson verbally communicate with other inmates without the use of an interpreter or flash cards. Blair Aff. ¶ 23.

22. Frequently, Richardson sends complaints to Deerfield staff regarding other inmates or perceived staff misconduct that he has observed in his housing unit. Blair Aff. ¶ 24.

23. Many of the things he reports indicate to Blair that Richardson can visually and aurally observe and understand what is going on around him, including alleged incidents that occur at a substantial distance. Blair Aff. ¶ 25.

24. For example, during one incident in which an inmate was involved in an altercation with another inmate, Richardson observed what was happening from a distance of approximately 15-20 feet and moved quickly in the direction of the inmate in order to help him. Blair Aff. ¶ 26.

25. Richardson currently resides in an assisted living setting. Blair Aff. ¶ 27.

26. This dormitory style housing area is designed for inmates who may need additional assistance with activities of daily living, including bathing, dressing, and toileting. Blair Aff. ¶ 28.

27. Nursing staff are available to assist inmates in this housing area with these needs. Blair Aff.

¶ 29.

28. For less personal needs – such as a change of sheets, or assistance ambulating within the housing unit – inmate assistants are available for all inmates housed in Richardson's living area. An inmate who needs the assistance of one of these inmate aides simply needs to ask for help with a task. Blair Aff. ¶ 30.

29. There are usually four inmate assistants in Richardson's housing area and these inmates are usually available during normal business hours, or approximately 8am to 4:30pm every day. Blair Aff. ¶ 31.

30. Inmate caregivers or assistants should not be assisting other inmates with personal needs such as bathing or toileting; this assistance should come from nurses or certified nursing assistants who are present in Richardson's housing area 24 hours per day, 7 days per week. Blair Aff. ¶ 32.

31. If an inmate needs additional or more consistent assistance with daily tasks, the doctors and nurses in the medical department at Deerfield may order that a trained inmate assistant be assigned specifically to that inmate. To the best of Blair's knowledge, the doctors and nurses at Deerfield have reviewed Richardson's requests for an inmate caregiver and determined that has no medical or disability-related need for such assistance at this time. Blair Aff. ¶ 33.

32. As for telephone access, regular telephones are available in Richardson's housing area. Blair Aff. ¶ 34.

33. TTY phones are also available for Richardson to use. Blair Aff. ¶ 35.

34. If necessary, he can sign up for a time to use a video phone to communicate with other people who can only communicate by ASL. Blair Aff. ¶ 36.

35. Deerfield recently purchased a magnifying device to assist Richardson to magnify documents posted in his housing area. This device cost approximately $1,600. Blair Aff. ¶ 37.

36. When it was provided to Richardson for his use, he claimed it did not work for him because of a lack of color contrast. Blair Aff. ¶ 38.

37. Deerfield is exploring additional options for a color contrasting magnification device. Blair Aff. ¶ 39.

38. However, the color contrast Richardson claims he needs is uncommon. From Blair's understanding the blue background / green text is a "low contrast" setting. Most people who need devices with a color contrast need a "high contrast" or "medium contrast" color combination. Blair Aff. ¶ 40.

39. To facilitate Richardson's communication and to make sure he and others with hearing impairments in his housing area understand what is required of them, Deerfield has installed a light to indicate when it is time for count.[5] This alerts hearing impaired inmates when it is count time. Blair Aff. ¶ 41.

40. A verbal announcement is also made when it is count time. .Blair Aff. ¶ 42.

41. Richardson also has access to a JPay player. This is a tablet device similar to an iPad that is designed for use in prison. Blair Aff. ¶ 43.

42. Richardson frequently uses his JPay player to send and receive secured messages. Secured messages function a lot like emails. Richardson can compose his message and send them to recipients who have registered for accounts on the JPay platform and who consent to receive his messages. Richardson can also receive messages on his JPay player. Blair Aff. ¶ 44.

43. It appears to Blair that Richardson frequently uses his JPay player to send messages to an associate outside of Deerfield who manages an email account on his behalf. Staff at

_____

[5] Count is a security procedure during which all inmates are physically observed and accounted for. Inmates must abide by facility instructions so that they can be physically counted during these times.

Deerfield and elsewhere in VDOC have received messages from Richardson's Gmail account (the address of which is davidarichardson1955@gmail.com). Many of these messages concern Richardson's alleged disability issues and other conditions he finds objectionable at Deerfield. It appears to Blair that these messages are forwarded by an associate on Richardson's behalf. Blair Aff. ¶ 45.

44. Since signing up for a JPay account in approximately 2015, Richardson has sent and/or received thousands of secured messages via the JPay secured messaging platform. Blair Aff. ¶ 46.

45. To the best of Blair's knowledge, Richardson does not need staff assistance to compose or read these messages. Blair Aff. ¶ 47.

46. A JPay device also allows an inmate to play games, read some electronic publications, and listen to music. Blair Aff. ¶ 48.

47. In some of his JPay messages, Richardson mentions listening to music on his JPay device. Music on the JPay device plays via personal headphones much like someone in the community would listen to music from their smart phone. Blair Aff. ¶ 49.

48. In some of his JPay messages, Richardson mentions watching television programs from prison. Blair Aff. ¶ 50.

49. Deerfield has also made other accommodations to attempt to assist Richardson with communication. Blair Aff. ¶ 51.

50. When he complained that he could not use the typewriters to compose his legal documents, he was permitted to use the law library computers for this purpose.[6] This is an exception to

---

[6] Due to the current COVID outbreak, no inmates are currently permitted to physically visit the law library at Deerfield. As circumstances change and it becomes safe to permit inmates to leave their housing areas more frequently, physical access to the law library will be restored.

VDOC policy, which generally does not permit inmates to use the computers for this purpose. Blair Aff. ¶ 52.

51. When Richardson reported that he could not adequately read the computer screen, staff adjusted the contrast settings to a blue background with green font that he claimed made written items legible for him. Blair Aff. ¶ 53.

52. When Richardson complained that he could not access forms – such as request forms and grievances – these forms were made available to him to access on the law library computer. Blair Aff. ¶ 54.

53. The standards of the American Correctional Association ("ACA") were also loaded onto the law library computer at Richardson's request. Blair Aff. ¶ 55.

54. VDOC policies have also been loaded onto the law library computer at Richardson's request. Blair Aff. ¶ 56.

55. Many of Richardson's legal documents – including filings for this case – are loaded onto the law library computer for him to review. Blair Aff. ¶ 57.

56. The LexisNexis legal research software on the law library computer has also been configured to present in a blue / green contrast that Richardson says he can read. Blair Aff. ¶ 58.

57. Deerfield has also attempted to use blue / green contrast sheets of translucent material to assist Richardson in his ability to read printed materials. He has stated that this does not work for him. Blair Aff. ¶ 59.

58. Deerfield also has an UbiDuo device to facilitate communication with those who are hard of hearing. This device looks like two tablets that are connected to each other. One person types into their tablet and the other person can read what is being communicated on the other tablet. The tablets facilitate written communication back and forth between the users.

Blair Aff. ¶ 60.

59. This device cannot be set in the blue / green contrast Richardson prefers, and he has stated that the UbiDuo will not work for him. Blair Aff. ¶ 61.

60. Deerfield also has a SARA device. The SARA is a machine that can read printed text out loud for someone who cannot read for themselves, either due to literacy issues or a disability. The user places a piece of printed material on the machine and the machine reads the material out loud. The user can slow down or speed up the pace of the reading and the volume can be increased as needed. Blair Aff. ¶ 62.

61. Though Richardson frequently communicates verbally with staff and other inmates, he has stated that the SARA machine will not assist him in reading printed materials because he is hard of hearing. Blair Aff. ¶ 62.

*Facts Regarding the Religious Head Covering Practices at Deerfield*

62. T. Williams is the Warden at Deerfield. Williams Aff. ¶ 1.

63. Currently, VDOC OP 802.1, Offender Property, states that it is at the discretion of the facility to determine the times, locations, and circumstances in which personal clothing may be worn. This includes religious head coverings. A copy of relevant portions of OP 802.1 is attached as Enclosure A. Williams Aff. ¶ 4.

64. Williams understands that Richardson claims that it is his sincere religious belief that he wear his kufi, a religious head covering, in all areas of Deerfield. Williams Aff. ¶ 5.

65. Currently at Deerfield and pursuant to Williams's direction, inmates may wear religious head coverings – such as kufis – in the same manner as non-religious head coverings. Williams Aff. ¶ 6.

66. Inmates may wear religious head coverings in their housing units or outside of their housing units. Williams Aff. ¶ 7.

67. Once an inmate enters certain areas of the prison (such as the dining hall, the visiting room, the administrative building, and designated program locations), he must remove his head covering. This includes religious head coverings. Williams Aff. ¶ 8.

68. Staff also must remove any head coverings when they enter these areas of the facility. Williams Aff. ¶ 9.

69. Inmates may wear their religious head coverings during an approved religious activity regardless of the location. These activities and locations are specified in the Deerfield Activity Schedule, which is available to inmates. Williams Aff. ¶ 10.

70. The reasons for this decision are multi-fold. Williams Aff. ¶ 11.

71. First, head coverings can be used to conceal contraband, including notes, drugs, or small weapons, such as razors. Requiring inmates to remove their head coverings prior to entering certain buildings reduces the risk that contraband could be hidden inside of a head covering. Williams Aff. ¶ 12.

72. Second, head coverings can obscure a person's identity. While this is less of a concern when an inmate is in his designated housing area, it becomes much more difficult to identify people on video surveillance systems when they are in large rooms or mixing with other inmates from other housing areas, such as during meal times or when inmates are visiting administrative buildings. If inmates or staff are wearing hats inside of a building with a high volume of diverse traffic (meaning many inmates, staff, or visitors) it becomes more difficult for security staff to identify someone from a distance or on a surveillance system. Williams Aff. ¶ 13.

73. Third, many inmates have ties to security threat groups or "gangs" while incarcerated. These groups will frequently attempt to identify themselves to other members of their group by dressing in a distinctive manner, such as by wearing a head covering or a specific

type of garment in a particular way. Inmates have used religious objects and religious affiliations to disguise their unlawful activity that is not religious in nature. Restrictions on the times and places that inmates may wear head coverings reduces the risk that inmates will attempt to identify themselves as being affiliated with these groups when they are co-mingling with inmates from other housing units. Williams Aff. ¶ 14.

74. Williams understands that Richardson wants to wear his religious head covering when he visits the law library and other areas of the prison. Williams Aff. ¶ 15.

75. While it may not seem like a burden to allow only Richardson to wear a head covering as an accommodation, it is Williams's experience that once Richardson is permitted to do so, other inmates will also demand permission to wear head coverings. This would lead to many inmates wearing items that could obscure their identities. Additionally, it would be possible for inmates, once inside of a building, to swap head coverings to intentionally make it more difficult to identify them or track their movements from a distance or via a video surveillance system. Williams Aff. ¶ 16.

76. If Richardson wanted to seek a special accommodation from VDOC to wear his religious head covering outside of the times and locations prescribed, he should have submitted a request to VDOC's Faith Review Committee ("FRC").

77. This is the proper process for an inmate who seeks a religious accommodation. Williams Aff. ¶ 18.

78. Any requests from an inmate who wants a particular accommodation first come through Williams's office. Williams Aff. ¶ 19.

79. To the best of Williams's knowledge, Richardson never submitted a request to the FRC to ask for permission to wear his religious head covering in addition to the times he is already permitted to do so. Williams Aff. ¶ 20.

80. On October 22, 2020, VDOC Chief of Corrections Operations A. David Robinson issued a memorandum on this exact issue and alerted staff and inmates of a forthcoming change in the religious head covering policy that would be effective throughout VDOC, not just at Deerfield. Williams Aff. ¶ 21.

81. A copy of that memorandum is attached as Enclosure B. Williams Aff. ¶ 22.

82. Pursuant to that memorandum, effective December 1, 2020, inmates may wear religious and state-issued head coverings anywhere inside the facility, but must remove the head covering at the request of security staff. Williams Aff. ¶ 23.

83. There are some other requirements for religious head coverings outlined in the memorandum, but Williams understand those requirements are not at issue in Richardson's case. Williams Aff. ¶ 24.

84. Effective December 1, 2020 at Deerfield, in compliance with this memorandum, there will no longer be a restriction on Richardson's ability to wear his religious head covering in all areas of the facility, subject to removal of the head covering at the specific request of security staff and other provisions of the memorandum. Williams Aff. ¶ 25.

### **Standard of Review**

A motion for summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The party opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988). The court should view the evidence and reasonable inferences drawn there from in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. When, based on the evidence presented, a fair-minded jury could not reasonably find for the plaintiff, summary judgment is appropriate. *See id.* at 252; *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942–43 (4th Cir. 1992).

## Legal Argument

### I.      The ADA and the RA

To state a claim under either Title II of the ADA or the RA in the context Richardson describes, a plaintiff "must allege that (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public services, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability." *Spencer v. Early*, 278 F. App'x 254, 261 (4th Cir. 2008) (quotation omitted); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). The RA has a heightened causation standard and requires that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in . . . any program or activity receiving Federal financial assistance." 28 U.S.C. § 794(a) (emphasis added).[7] The requirement that the discrimination be "solely by reason of" a plaintiff's disability is "significantly dissimilar" from the causation requirement of the ADA. *Constantine*, 411 F.3d at 498 n.17 (additional citations omitted). This heightened causation standard

---

[7] A "program or activity" is defined as all of the operations of "a department, agency . . . or other instrumentality of a State or of a local government" or an "entity of such State or local government that distributes such assistance." 28 U.S.C. § 794(b)(1)(A), (B). For purposes of this Motion to Dismiss, Defendants do not contest that state prisons and the services they provide are included in this definition.

requires a RA plaintiff to establish that he was excluded from a covered program "solely by reason of his disability" rather than the more lenient standard under the ADA, by which a plaintiff must show only that the disability was a "motivating factor." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461-62 (4th Cir. 2012).

"States are obligated to make 'reasonable modifications' to enable the disabled person to receive the services or participate in programs or activities." *Miller v. Hinton*, 288 Fed. App'x 901, 902 (4th Cir. 2008). A "reasonable modification," however, "does not require the public entity to employ any and all means to make services available to persons with disabilities." *Id*. "Rather, the public entity is obligated to make those modifications that do not 'fundamentally alter the nature of the service or activity of the public entity or impose an undue burden.'" *Id*. (internal citations omitted).

Here, Richardson has not been excluded from any program or service at Deerfield on the basis of his disability. Instead, staff at Deerfield have gone to great lengths to assist Richardson in participating in programs and services at Deerfield in any way that they can. They have made multiple and varied modifications to their communication systems and services in order to attempt to accommodate Richardson. For example, staff at Deerfield have scheduled times for Richardson to meet with an ASL interpreter. Blair Aff. ¶ 6. When a COVID outbreak required that in-person visits be suspended, Deerfield arranged for a video-based ASL interpreter service to assist Richardson at a medical appointment; this was an accommodation that Richardson specifically requested. Blair Aff. ¶¶ 9-10. After this had been arranged, Richardson claimed he could no longer see the video screen, despite his repeated use of the law library computers to type and read his documents. *Compare* Blair Aff. ¶ 11 *with* Blair Aff. ¶¶ 52-58. In this particular incident with the medical team, the staff attempted yet another method of communication and attempted to type messages on a computer screen using a blue / green contrast that Richardson had previously

reported he could see. Blair Aff. ¶¶ 14-17; 53. This, too, Richardson claimed, was not sufficient. Blair Aff. ¶ 17. Instead, he demanded an in-person interpreter.

In addition to these specific modifications, Deerfield has made multiple other attempts to facilitate Richardson's communications. They have created flash cards in a color contrast Richardson prefers. Blair Aff. ¶ 21. They have housed him in an assisted living unit where he has assistance with tasks, if he needs it, and closer access to and monitoring by nursing staff. Blair Aff. ¶¶ 27, 30, 32. He has access to a regular telephone, TTY machine, and video phone. Blair Aff. ¶¶ 34, 35, 36. He also uses a JPay tablet device to send and receive secured messages – or emails – to his associates, which he apparently has done thousands of times without staff assistance. Blair Aff. ¶¶ 43-46. Richardson watches television programs at Deerfield. Blair Aff. ¶ 50. Richardson listens to music on his JPay device. Blair Aff. ¶ 49.  Blair frequently communicates verbally with Richardson without issue (Blair Aff. ¶¶ 18-20. Despite his obvious abilities, staff have nevertheless accommodated Richardson's complaints that he cannot read and write for himself, and have permitted him to use the law library computer to compose and read documents (including VDOC policies, ACA standards, VDOC forms, and some of his legal documents for this case) when he complained that other options did not work for him. Blair Aff. ¶¶ 52-57. Finally, medical staff at Deerfield have evaluated him and his requests for more assistance from an inmate caregiver, and have determined he has no medical need for this type of assistance at this time. Blair Aff. ¶ 33.

Given all of the above accommodations staff at Deerfield have implemented to assist Richardson, it is unclear what else VDOC could possibly do to accommodate his ever-shifting ability to communicate. Though VDOC does not have to adopt "any and all" means of accommodating Richardson, they are extremely close to having done so. Richardson is not being denied access to any prison program or service based on his disability, and he is certainly not *intentionally* denied this access *solely on the basis of his disability*, as required to prove a RA

17

claim. Deerfield staff are not mind-readers, but whenever Richardson has requested an accommodation or stated that he needs assistance, staff have worked with him to craft a solution. Unfortunately, once a solution is in place, Richardson's needs seem to shift and what should have worked no longer does. Neither Williams nor VDOC has violated Richardson's rights under the RA or the ADA. They have shown that they are willing to accommodate him and remain so, despite the fact that his disabilities seem to come and go. Defendants are entitled to summary judgment on Richardson's RA and ADA claims.

## II.     The VDA

Richardson's VDA claim fails because he has failed to allege Defendant Williams or VDOC discriminated against him on the basis of his disabilities in the context of employment or a workplace promotion. His VDA claim should be dismissed.

In *Yates v. Volunteer Health Care Systems, Inc.*, 783 F. Supp. 1002 (W.D. Va. 1992), the court held that the VDA "prohibits discrimination against otherwise qualified persons with disabilities *by employers*.'" (emphasis added). Indeed, the Virginia code provision itself states, "[n]o *employer* shall discriminate in employment or promotion practices against an otherwise qualified person with a disability solely because of such disability." Va. Code § 51.5-41 (emphasis added). Richardson fails to allege that VDOC or Defendant Williams has discriminated against him in the context of any employment. Most of Richardson's Particularized Complaint deals with his alleged inability to communicate with medical professionals or persons inside or outside of the prison for personal or medical purposes, not for purposes of employment. Without even an allegation that Richardson applied for a job or promotion and was denied it on the basis of his disability, he has failed to state any sort of claim under the VDA.

Moreover, to the extent Richardson asks this Court to order injunctive relief requiring the defendants to comply with the VDA, this Court may not do so. The Court may not order a state to

comply with state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). To the extent any demand for injunctive relief survives under Richardson's VDA claims, this Court is without the authority to issue such relief.

Finally, if this Court grants the motion for summary judgment on Richardson's other claims, Defendants respectfully ask that it decline to exercise supplemental jurisdiction over Richardson's state law VDA claim. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."); *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 642 (4th Cir. 2016) (affirming a district court's decision declining to exercise supplemental jurisdiction once the plaintiff's federal claims had been dismissed). Courts "enjoy wide latitude in determining whether or not to retain jurisdiction when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (citing *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993)). If the Court grants Defendants' Motion for Summary Judgment as to all of the federal claims, Defendants respectfully asks this Court to decline to exercise supplemental jurisdiction over the remaining state law VDA claim (Claim 3), and to dismiss that claim without prejudice.

### III.     The First Amendment and RLUIPA

The standards for a First Amendment claim and a RLUIPA claim are similar but not identical. The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment or religion, or prohibiting the free exercise thereof." U.S. Const. amend I.; *Cruz v. Beto*, 405 U.S. 319, 322 (1977). Inmates retain the protections of the First Amendment, including their right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482

U.S. 342, 348 (1987). "In order to state a claim for violation of rights secured by the Free Exercise Clause, an inmate, as a threshold matter, must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017).[8]

Pursuant to RLUIPA, "when a prison substantially burdens an inmate's exercise of religion, the prison must demonstrate that imposing the burden serves a compelling government interest and does so by the least restrictive means." *Lovelace v. Lee*, 472 F.3d 174, 182 (4th Cir. 2006). To establish either a First Amendment or RLUIPA claim, an inmate "bears the initial burden to demonstrate that the prison's policy exacts a substantial burden on religious exercise." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2016). "[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (internal quotations and citations omitted).[9] Such a burden can be initially established by pleading facts to show a plaintiff was forced to "choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other." *Lovelace*, 472 F.3d at 187.

---

[8] For purposes of this motion for summary judgment only, Defendants do not contest Richardson's allegation that he holds a sincere religious belief that he wear a kufi. Such an issue of credibility is more appropriately addressed during cross examination at trial, and Defendants respectfully reserve their right to explore this topic if and when that opportunity presents itself.

[9] However, "[n]o substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult or inconvenient, but does not pressure the adherent to violate [his] religious beliefs or abandon one of the precepts of [his] religion." *Rountree v. Clarke*, No. 7:11CV572, 2015 WL 1021286, at *7 (W.D. Va. Mar. 9, 2015) (citing *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007); *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007)); *accord Wilson v. McPeak*, No. 7:15cv175, 2016 U.S. Dist. LEXIS 19443, at *12-13 (W.D. Va. Feb. 18, 2016). "'[A]t a minimum the substantial burden test requires that a . . . plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice.'"

Under the First Amendment, "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt v. Hobbs*, 135 S. Ct 853, 859 (2015) (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)).

Additionally, both the First Amendment and RLUIPA "require a showing of 'conscious or intentional interference' with plaintiff's rights." *Wall v. Wade*, 741 F.3d 492, 500 n.11 (4th Cir. 2014) (quoting *Lovelace*, 472 F.3d at 201). A showing of intentional conduct is required because "allowing negligence suits to proceed under RLUIPA would undermine [due] deference by exposing prison officials to an unduly high level of judicial scrutiny." *Lovelace*, 472 F.3d at 194.

### A. Richardson's RLUIPA Claim Will be Moot

As of December 1, 2020, Richardson's RLUIPA claim will be moot because VDOC has enacted a statewide policy change permitting exactly the relief Richardson seeks: to wit, the ability to wear his religious head covering in all areas of his facility. Because RLUIPA permits only injunctive relief, once this policy is amended, Richardson's RLUIPA claim will be moot.

Regarding mootness and jurisdiction, the United States Supreme Court has held:

> The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy. . . a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them. Its judgments must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts . . . The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.

*Preiser v. Newkirk*, 422 U.S. 395, 401-02 (1975) (additional citations and quotation marks omitted). Moreover, when defending a claim pursuant to RLUIPA, Defendants retain their Eleventh Amendment immunity from suit for money damages. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011). The only relief available in a RLUIPA case must be injunctive in nature. If the Court

cannot grant the relief requested because there are no grounds upon which to do so, then the claim is moot and should be dismissed. This is so even though the issue of mootness came about due to a change in policy.

In *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541 (4th Cir. 2010), an anti-abortion advocacy group brought a facial challenge to a university's policy regarding the use of its facilities for planned on-campus demonstrations. During the pendency of the litigation, however, the university amended its policy to cure the challenges to the policy. Once the university's policy was amended, the group's facial challenge to the policy was moot. This was so because, "[w]hen a facially overbroad regulation is subsequently narrowed within constitutional boundaries, the inherent threat of content-based discrimination becomes null." *Id*. at 550. Because the religious head covering policy will soon change and permit Richardson to wear his kufi throughout the facility, his facial challenge to a policy that will soon be non-existent, his claim on this issue will be moot.

A similar mootness issue was raised in *McLean v. City of Alexandria*, when an Alexandria resident brought a First Amendment facial challenge to a city ordinance restricting his ability to advertise his car for sale while the car was parked on city streets. *McLean v. City of Alexandria*, 106 F. Supp. 3d 736 (E.D. Va. 2015). After the plaintiff had filed suit, the city council repealed the ordinance. While the court determined that the plaintiff's *as-applied* challenge to the old version of the ordinance was not moot, it determined that the *facial* challenge to the ordinance was. The court dismissed the plaintiff's request for injunctive relief and his facial challenge to the ordinance. *Id*. at 738. The Court should do the same in this case.

While Richardson's First Amendment challenge to VDOC's policy regarding religious head covering restrictions remains one for the Court to evaluate and determine damages based on alleged past wrongdoing (if appropriate), Richardson's challenge to the policy on its face will be moot. The

policy will no longer in effect as of December 1, 2020 and this Court will be unable to award injunctive relief to "fix" a policy that is no longer in existence. Richardson's Claim 5 challenging the religious head covering policy at Deerfield will be moot and subject to dismissal.

Even if the Court determines the RLUIPA claim regarding religious head coverings is not moot, the Prison Litigation Reform Act ("PLRA") precludes the issuance of injunctive relief in this case. The PLRA states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to *correct* the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to *correct* the violation of the Federal right, and is the least intrusive means necessary to *correct* the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a) (emphasis added).

Here, there will soon be nothing for the Court to "correct." The policy on its face will no longer restrict Richardson's ability to wear his religious head covering at Deerfield. Given the PLRA's requirement that injunctive relief be narrowly drawn and "extend no further than necessary to *correct*" a violation of a right, the logical conclusion that follows is that if there is no current "violation" of a right to correct, then injunctive relief is not appropriate.[10]

This provision "reduces the federal courts' oversight role by limiting the courts' authority to award prospective relief in cases challenging conditions at prison facilities . . . ." *Para-Professional Law Clinic at SCI-Graterford v. Beard*, 334 F.3d 301, 303 (3d Cir. 2003); *see also Miller v. French*, 530 U.S. 327, 328 (2000) ("[C]urbing the equitable discretion of district courts was one of the PLRA's principal objectives."); *Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("It is clear that Congress intended to revive the hands-off doctrine," the former "rule of judicial quiescence"

---

[10] Defendants adopt the same argument to Richardson's requests for injunctive relief under the RA and the ADA.

that the federal judiciary not be involved with the problems of state-run prisons). The PLRA further ensures that "court orders do not remain in place on the basis of a claim that a current condition that does not violate prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior violation of federal rights." *Para-Professional*, 334 F.3d at 304-05. When enacting this substantial limitation on the equitable power of the federal courts, Congress reasoned that, "'[i]f an unlawful practice resumes or if a prisoner is in imminent danger of a constitutional violation, the prisoner has prompt and complete remedies through a new action filed in State or Federal court and preliminary injunctive relief.'" *Id.* at 305 (quoting H.R. Conf. Rep. No. 105-405, at 133 (1997)).

For these reasons, when there is no ongoing constitutional violation, injunctive relief is not "necessary" to "correct" that non-existent violation, and such relief is thereby foreclosed under the plain language of the statute.[11]  As the Third Circuit has observed, "the fact that [a state official] may be poised to [change a policy] and, thus, at least potentially to again violate federal rights, does not make the injunction necessary to correct a current and ongoing violation." *Id.* at 305.  This interpretation "comports with . . . Congress' 'ambient intent' in enacting the PLRA, namely, 'to truncate the federal judiciary's involvement in prison administration.'" *Id.* (quoting *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997)); *see also Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000) (noting that the appropriate focus is upon whether the relief "*currently* complies with the need-narrowness-intrusiveness requirements, given the nature of the *current* violations" (emphases in original)).

Even outside of the PLRA, an injunction is not appropriate in this case. "The purpose of an

---

[11] *See Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002) (noting that, for prospective relief to issue under the PLRA, the plaintiff must establish "the existence of a constitutional 'violation' in need of correction," and, "in the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation").

injunction is to prevent future violations" of law. *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). While a past wrong is not required to support a claim for an injunction, the "moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, *something more than the mere possibility* which serves to keep the case alive." *Id.* Additionally, "[b]efore a court grants a permanent injunction, the court must first find necessity – a danger of future violations." *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 347 (4th Cir. 2001). There must be a "real threat of future violation" before a court should enter an injunction. *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952). And importantly, an injunction "may not be used for punishment or reparations for . . . past violations." *Belk*, 269 F.3d at 347 (additional citations and quotations omitted).[12] Here, to the extent this Court determined that a violation of the law occurred regarding Richardson's ability to wear his kufi outside of his housing unit, any such violation occurred in the past. There is no evidence before the Court that Richardson is at risk of *future* harm, particularly when the policy he complains about is being changed to his benefit. There is no need for injunctive relief in this case, and indeed, the evidence does not support such relief.[13]

     B. *Defendants' Past Restrictions on Religious Head Coverings Passes Muster under* Tuner

     Defendants' restrictions on the wearing of head coverings – both religious and non-religious – furthered a legitimate penological interest and satisfies the factors outlined in *Turner*. See *Turner*

---

[12] *See also Parkman v. Univ. of S.C.*, 44 F. App'x 606, 622 (4th Cir. 2002) ("As a plaintiff seeking injunctive relief, [the plaintiff] had the stiff burden of showing that he was currently under imminent threat of suffering further harm in the absence of the injunctive relief that he sought."); *Belk v. Charlotte-Mecklenburg Bd. of Ed.*, 269 F.3d 305, 347 (4th Cir. 2001) ("Before a court grants a permanent injunction, the court must first find necessity—a danger of future violations."); *Bloodgood v Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986) ("An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action.").

[13] Again, the same line of argument applies to Richardson's request for injunctive relief under the RA and the ADA. With all that VDOC has done for Richardson so far, there is no evidence of a risk that they will stop accommodating him or begin violating his rights in the future.

*v. Safley*, 482 U.S. 78 (1987). Factors relevant in determining the reasonableness of a regulation in this situation include: (1) the connection between the regulation and a legitimate, neutral government purpose, (2) the existence of alternative means of exercising the right, (3) the impact accommodation of the right would have on guards, other inmates, and prison resources, and (4) the absence of "obvious, easy alternatives" to the regulation. *Turner*, 482 U.S. at 89-91. Defendants address the Turner factors in turn.

      *i.     Legitimate, Neutral Government Purpose*

"Promoting the inmates' safety and health is a legitimate concern." *Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015) (citing *McRae v. Johnson*, 261 Fed. App'x 554, 558 (4th Cir. 2008) (additional citations and quotations omitted)). The purpose of the current practice regarding head coverings is intended to prevent the concealment of contraband, prevent inmates from obscuring their identities, and prevent inmates from signaling their association with a security threat group, or "gang." Williams Aff. ¶¶ 12-14. Clearly, this part of the *Turner* analysis weighs in favor of Defendants.

      *ii.     Existence of Alternative Means of Exercising the Right*

Next, the Court must consider whether Richardson retains other means of exercising his First Amendment right to wear his religious head covering. Under the soon-to-be-modified effective policy at issue in this case, Richardson retained the right to wear his religious head covering in many areas of the prison, and specifically during religious services. He simply was not permitted to wear a religious head covering – or any head covering – in certain areas of the prison. He was still permitted to wear it during religious services. Williams Aff. ¶ 10. He was still permitted to wear it in his housing unit or outside. Williams Aff. ¶ 7. He simply had to remove it upon entering limited areas of the prison, including the dining hall, the visiting room, and the administration building. Williams Aff. ¶¶ 8-9. In light of relevant Supreme Court case law on the

existence of alternative means of exercising a religious right, these alternative opportunities suffice under the First Amendment.

In *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003), the Supreme Court evaluated alternative means for inmates to communicate with people who were not permitted to personally visit the plaintiff's prison facility. While the prison did not permit these individuals to physically visit the plaintiff, there were nevertheless alternative means for the offenders to exercise their rights to communicate with these individuals. Offenders could use the telephone or write letters. *Id*. Per the Supreme Court, it did not matter whether these alternative means were not as good as "the real thing." Indeed, the court held that alternatives "need not be ideal." Instead. "they need only be available." *Id*.  Here, Richardson had available to him alternative means of wearing his kufi in his housing unit or during religious services, but simply not in the administrative buildings or at meal times.

Similarly, in *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989), the United States Supreme court addressed what "alternative means" of exercising a religious right could look like. The court wrote specifically that "'the right' in question must be viewed sensibly and expansively." *Id*. The "alternative means" analysis does not require a "like for like" exchange of available alternatives. Instead, in the context of one specific religious practice – to wit, attending a Jumu'ah religious ceremony – an alternative means of exercising that right was available to an inmate plaintiff who had the ability to attend *other* Muslim religious ceremonies, though not Jumu'ah specifically. *Id.* at 418. The *Thornburgh* court went on to hold that an inmate's First Amendment right to receive and read publications was sufficient under *Turner* so long as he had the ability to receive, send, or read a "broad range of publications" and not just the specific ones he was denied. *Id*. at 418.  Here, the fact that Richardson had and still has the ability to wear his religious head covering with only minimal restrictions indicates that this factor weighs in Defendants' favor.

27

iii.    *Impact on Officers, Other Inmates, and Prison Resources*

"Responsible prison officials must be permitted to take reasonable steps to forestall[] a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977). "The informed discretion of prison officials that there is potential danger may be sufficient for limiting rights even though this showing might be unimpressive if . . . submitted as justification for governmental restriction of personal [rights of] members of the general public." *Id.* at 132 n.9. Williams has outlined the many "potential dangers" of permitting inmates to wear religious head coverings wherever and whenever they would like. With the increased risk of contraband and "gang" affiliation comes the correlated increased risk of harm to inmates and staff if Richardson and others are permitted to wear religious head coverings whenever they choose. While this danger may never materialize, it is reasonable and permissible for Williams to take steps to forestall the risks of these threats by limiting an inmate's ability to wear an item that increases these risks. This factor weighs in favor of Defendants.

iv.    *Absence of Obvious, Easy Alternatives*

When considering the "obvious, easy alternatives" prong of the *Turner* analysis, the Supreme Court has held that "when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response.'" *Thornburgh*, 490 U.S. at 419. Indeed, in that case the court considered whether prison officials' fears were reasonable when they claimed that tearing out objectionable pages of a prohibited publication (and providing the remaining parts) was not a feasible approach in a First Amendment case because doing so would create more discontent. *Id*. This fear – coupled with the

"administrative inconvenience" it would pose supported the district court's decision that prison officials were not required to adopt such an alternative. Here, under current VDOC policy, Williams had the discretion to set rules and restrictions regarding an inmate's ability to wear a religious head covering at Deerfield. Williams implemented the rules that she did for the reasons outlined in her affidavit. While she had the discretion to implement less restrictive alternatives, she also had "reasonably founded fears" of the impact of such a decision. Her response was not exaggerated and it did not prohibit any and all religious head coverings. It was a reasonable response and this factor weighs in favor of Defendants.

Because all of the *Turner* factors weigh in favor of Defendants, Richardson's First Amendment claim regarding the wearing of religious head coverings must fail; Defendants are entitled to summary judgment in their favor.

### IV.     *VDOC is not a Proper Defendant Pursuant to 42 U.S.C. § 1983*

To the extent Richardson brings his civil rights claim pursuant to 42 U.S.C. § 1983 against VDOC, such a claim is improper because VDOC is not a "person" for purposes of § 1983 claims. *See, e.g., Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); *Yost v. Young*, 892 F.2d 75, 1989 WL 152515, at *1 (4th Cir. Dec. 7, 1989); *Rhea v. Va. Dep't of Corr*., 2002 WL 31398734, at *1 (W.D. Va. Oct. 23, 2002). Accordingly, VDOC respectfully asks that Claim 7 be dismissed for failure to state a claim against VDOC.

### V.     *Defendants are Entitled to Qualified Immunity*

Even if this Court rejects Defendants' above arguments addressing Richardson's First Amendment Free Exercise claim for damages regarding his religious head covering, Defendants are nevertheless entitled to qualified immunity because there are no allegations of conduct that violate clearly established statutory or constitutional rights of which a reasonable prison official should have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Qualified immunity involves a two-step inquiry: whether a constitutional or statutory right would have been violated on the alleged facts; and whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194 (2001). The court has the discretion to proceed directly to the second step of the analysis after assuming, without deciding, that a constitutional violation occurred. *Pearson v. Callahan*, 555 U.S. 223 (2009).

In evaluating the second prong "[a] right is clearly established if the contours of the right are sufficiently clear so that a reasonable [official] would have understood, under the circumstances at hand, that his behavior violated the right." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007)). To put it another way, "existing precedent must have placed the statutory or constitutional question . . . 'beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. When the right at issue is appropriately defined, there is insufficient case law from the Fourth Circuit or the Supreme Court that would have put Williams on notice that she was violating the First Amendment.

   i.    *Defining the Rights at Issue*

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)(quoting *al-Kidd*, 563 U.S. at 742 ). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "It is critical to define the rights being examined at the appropriate level of specificity." *Wilson v. Layne*, 141 F.3d 111, 122 (4th Cir. 1998) (citing *DiMeglio v. Haines,* 45 F.3d 790, 803–04 (4th Cir. 1995), *aff'd*, 526 U.S. 603 (1999)).   For "[i]f the right is defined too broadly, it will always be found to have been clearly established." *Id.* Thus, in determining whether a right is clearly established, "a court does not need to find 'a case directly on point, but existing precedent must

30

have placed the statutory or constitutional question beyond debate.'" *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 741). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202.

The relevant right at issue here is whether Richardson had  a First Amendment right to exercise his religious belief that he wear a head covering throughout all areas of his prison. While it is undisputed that inmates have a constitutional right to exercise their religious beliefs in a broad and general sense, prior court opinions addressing religious exercise rights did not sufficiently define the rights at issue in this case. This is so despite the understood holding that clearly established law "includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Wall v. Wade*, 741 F.3d 492, 502-03 (4th Cir. 2014).

To define the rights at issue here more broadly as one of a general right to practice one's religion "would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Context matters, particularly when navigating a novel legal landscape. *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 554 (4th Cir. 2010). Accordingly, addressing qualified immunity on the facts of this case requires a more nuanced approach and the definition of the right at issue should align with the facts and circumstances presented in the case.

There is no prevailing Fourth Circuit or United State Supreme Court case law holding that inmates are entitled to wear religious head coverings throughout their prison facility. Accordingly, to the extent Richardson seeks damages on this claim, Defendant Williams is entitled to qualified immunity.

ii.     *Reasonable Responses are Entitled to Qualified Immunity*

Having defined the right at issue (and assuming without conceding that the rights at issue were clearly established), the Court must next determine whether a government official's actions were reasonable. In making this determination, "context matters." *Rock for Life-UMBC*, 411 Fed. App'x at 554. In *Rock for Life*, an anti-abortion advocacy group brought a facial challenge to a university's policy regarding the use of its facilities for an on-campus demonstrations. Ultimately, university officials did not allow the demonstration to take place because they feared the demonstration might incite violence. The Fourth Circuit noted that it was clearly established at the time of the university defendants' decisions regarding the plaintiff's challenge to their demonstration policies that the defendants could not impose a "heckler's veto" on a group's demonstration simply because they feared the demonstration may offend an intended audience. *Id*. at 554. However, the court's inquiry into qualified immunity and this particular issue "[was] not meant to be performed in the abstract." *Id*. In this case, the court considered the specific context of the "heckler's veto" and how such an issue arose in the case in the first place. In *Rock for Life*, it was the plaintiffs who first raised the issue of possible violence related to its proposed demonstrations, not the defendant university. Instead of providing a security presence at the event, the defendant university decided not to allow the event to take place as requested. While the Fourth Circuit acknowledged that this decision was legally incorrect in hindsight, the court also noted that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [government] conduct." *Id.* (quoting *Saucier*, 533 U.S. at 205). The university defendants were entitled to qualified immunity despite the fact that prevailing case law on the issue at hand should have instructed them to act otherwise.

In order to deny Defendant Williams qualified immunity, the Court must conclude that her actions were plainly unconstitutional, despite a lack of case law alerting anyone that this was so.

*Even if* Williams was ultimately wrong, her actions were nevertheless reasonable. In an attempt to balance an inmate's right to religious exercise with a prison's legitimate concerns for security and safety, she adopted a policy that met both of these needs. Her policy was imminently reasonable and clearly not intended to harm Richardson in some way.

Finally, "[t]he doctrine of qualified immunity contemplates that law enforcement officials will make the occasional mistake in judgment." *White v. Downs*, 112 F.3d 512, 1997 WL 210858, at * 6 (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). "A reasonable but mistaken conclusion" that some action is constitutional "is tolerable because 'officials should not err always on the side of caution' for fear of being sued." *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). A qualified immunity analysis "must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). Defendants "will not be denied qualified immunity for making a mistake, so long as that mistake is reasonable given the circumstances." *White*, 1997 WL 210858, at * 6.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Rock for Life*, 411 Fed. App'x at 555 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Here, Defendant Williams acted in conformity with the applicable law, and as not "plainly incompetent" and did not knowingly violate the law. Defendant Williams is entitled to qualified immunity as to Richarson's First Amendment claim (Claim 7), to the extent he seeks to hold her liable for monetary damages in her individual capacity. She is accordingly entitled to the defense of qualified immunity and an order of judgment in her favor on this claim.

## VI.    The PLRA Bars Richardson's Claims for Money Damages

Richardson has failed to allege a sufficiently serious physical injury that occurred as a result of Defendants' conduct and is therefore not entitled to compensatory or punitive money damages. Congress enacted the Prison Litigation Reform Act ("PLRA") to address a "sharp rise" in prisoner

33

litigation in federal courts. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). A part of the PLRA designed to help courts focus on serious and meritorious prisoner claims is the PLRA's prohibition of claims for emotional injury without a prior showing of a physical injury. *Id.*; *see also* 42 U.S.C. § 1997e(e).[14] Most district courts in this circuit to address this requirement have found that this provision of the PLRA requires more than a mere *de minimis* injury. *See, e.g., Scott v. Carnell*, No. 5:15cv12525, 2016 WL 8722861, at *4 (S.D. W. Va. Jan. 29, 2016) (holding that the PLRA's requirement that an inmate plaintiff allege a physical injury required more than a *de minimis* injury, and finding that allegations of sleeplessness, emotional distress, anxiety, nausea, headaches, etc. after an officer's verbal abuse and harassment were insufficient); *McCoy v. Bazzle*, No. 4:08cv2930, 2009 WL 3169963, at *3 (D.S.C. Sep. 28, 2009) (adopting and applying the Fifth Circuit's holding that under the PLRA, the physical injury had to be more than *de minimis* but need not be significant, and holding that an allegation that an officer touched the plaintiff's buttocks was *de minimis* and failed to satisfy the PLRA's physical injury requirement); *Calderon v. Foster*, No. 5:05cv696, 2007 WL 1010383, at *8 (S.D. W. Va. Mar. 30, 2007) (finding that physical pain alone is a *de minimis* injury that may be characterized as a mental or emotional injury). Richardson has alleged no physical injury that occurred as a result of the defendants' actions and is therefore not entitled to compensatory or punitive damages.

## Conclusion

For the reasons outlined herein, Defendants respectfully ask this Court to enter summary judgment in their favor.

Respectfully submitted,

VIRGINIA DEPARTMENT OF CORRECTIONS

---

[14] 42 U.S.C. §1997e(e) states: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."

("VDOC") and TAMMY WILLIAMS

By:           s/Laura Maughan
            Laura Maughan, VSB #87798
            Assistant Attorney General
            Office of the Attorney General
            Criminal Justice & Public Safety Division
            202 North 9th Street
            Richmond, Virginia 23219
            (804) 786-0030
            (804) 786-4239 (Fax)
            Email:  lmaughan@oag.state.va.us

## CERFIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing ("NEF") to the following: n/a.

I also hereby certify that I have sent the document, postage prepaid, to the following non-CM/ECF user:

David A. Richardson, #1058541
Deerfield Correctional Center
21360 Deerfield Drive
Capron, Virginia 23829

            s/Laura Maughan
            Laura Maughan, VSB #87798
            Assistant Attorney General