**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DAVID A. RICHARDSON,      )
                                )
     Plaintiff,         )
v.                          )     Civil Action No. 3:18CV23–HEH
                                )
HAROLD CLARKE, *et al.*,     )
                                )
     Defendants.     )

**<u>MEMORANDUM ORDER</u>**
**(Denying Motion for Appointment of Counsel)**

David A. Richardson, a Virginia inmate proceeding *pro se*, brings this action. Richardson is hearing and vision impaired. Richardson raises a number of claims under, *inter alia*, the Americans with Disabilities Act, the Rehabilitation Act, and 42 U.S.C. § 1983.[1]

## I. The Matters Before the Court

On September 16, 2020, Richardson filed a document titled, PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION REQUEST; PLAINTIFF'S MOTION FOR PRODUCTION OF DOCUMENTS; PLAINTIFF'S REQUEST THE COURT TOLL FURTHER PROCEEDINGS AND PLAINTIFF'S REQUIREMENTS; DECLARATION AND MEMORANDUM OF LAW IN SUPPORT ("Request for Injunction," ECF Nos. 76–78). In his Request for Injunction, Richardson asserted, *inter alia*, that as of September 9, 2020, Defendants had failed to provide him with a copy of

---

[1] The Court corrects the capitalization and punctuation in the quotations from the parties' submissions.

the Court's August 17, 2020, Memorandum Opinion in a format that he could read. (Request for Injunction 2.)  Richardson requested "that the Court order Defendants . . . to provide all documents in this matter to Plaintiff in a medium that he can read . . . and respond to accordingly, and that until such time, any requirements upon the Plaintiff be tolled."  (*Id.* at 5.)

On November 5, 2020, Defendants filed a Motion for Summary Judgment.  (ECF No. 82.)  In response, on December 10, 2020, Richardson filed a MOTION FOR APPOINTMENT OF COUNSEL BRIEF AND AFFIDAVIT IN SUPPORT ("Motion for Appointment of Counsel," ECF No. 89).  In that document, Richardson swears that he had "no alternative" but to dictate the document "with the assistance of another prisoner." (*Id.* at 1.)  Richardson contends that he is "unable to read or write the document because of disabilities limitations."  (*Id.*)  Richardson contends that his vision has deteriorated to the point where "lighted screens tak[e] on an extremely out-of-focus and indecipherable kaleiodoscopic appearance."  (*Id.* at 2.)  Richardson insists that his complete inability to review documents on paper or a computer screen warrants the appointment of counsel.

The Court ordered Defendants to respond to the above motions by Richardson. Defendants responded.  Relevant to the matters before the Court, Defendants have provided multiple affidavits from M. Blair ("Blair"), the Operations Manager at Deerfield Correctional Center ("DCC") ("1st Blair Aff.," ECF No. 58–1), ("2nd Blair Aff.," ECF No. 83–2), and ("3rd Blair Aff.," ECF No. 91–2); and a video of Richardson using a computer kiosk in his housing unit.  Additionally, Blair included in his 3rd Affidavit

2

copies of numerous computer messages that Richardson composed during the course of this litigation, including several composed after Richardson swore that he was unable to view documents on a computer screen and unable to respond to Defendants' Motion for Summary Judgment.   On March 1, 2021, Richardson filed a LEGAL UPDATE, REBUTTAL BRIEF AND AFFIDAVIT IN SUPPORT.  (ECF No. 92.)

Ordinarily, counsel is appointed in civil rights cases because the complexity of the legal issues exceeds the legal sophistication of the *pro se* plaintiff.  That is not the case here.  Richardson's submissions reflect that he has the legal and intellectual acumen to litigate this matter.  The question here is whether Richardson's hearing and visual impairments, even with the extensive accommodations provided by Defendants, prevent him from litigating this matter on his own.

## II.  Relevant Evidence Regarding Richardson's Disabilities and the Accommodations Provided

Richardson has severe vision and hearing problems.[2]  (*See, e.g.*, ECF No. 89–1, at 1–13.)  The extent of Richardson's alleged vision and hearing problems changes frequently.  (2nd Blair Aff. ¶ 5.)  For example, staff at DCC "made a video-based interpreter available to assist Richardson at a medical appointment while in-person interpreters were not feasible due to the risk of COVID spread at Deerfield." (*Id.* ¶ 9.) "Video-based interpreter services was an accommodation Richardson had specifically proposed and requested." (*Id.* ¶ 10.)  Nevertheless, when Richardson arrived for the

---

[2] In his Particularized Complaint, Richardson stated that he is "only able to read green letters on a blue background."  (ECF No. 42 ¶ 4.)

appointment, "he stated that he could not see the video screen and could not see what the interpreter was signing to him.  He insisted on an in-person interpreter."  (*Id.* ¶ 11.)

When the above arrangement did not work, medical staff at DCC made other efforts to communicate with Richardson.  (*Id.* ¶ 12.)  Specifically, medical staff "set up a computer with a word processing document so that they could type messages to Richardson with a blue background and a green font.  This is a format Richardson has previously stated he could read and view."  (*Id.* ¶ 14.)  The staff hoped that they could type messages back and forth with Richardson.  (*Id.* ¶ 15.)  "When presented with this option, Richardson responded that this would not work and he could not read the messages on the screen."  (*Id.* ¶ 16.)  Even when medical "staff altered the setting on the computer to the same setting Richardson frequently uses on the law library computer," Richardson asserted that he still could not read the messages.  (*Id.* ¶ 17.)

Blair notes that Richardson and he are "able to effectively communicate verbally." (*Id.* ¶ 18.)  Richardson speaks clearly and when Blair speaks back to Richardson, "they both understand each other.  (*Id.* ¶¶ 19–20.)

## A.  Accommodations for Permitting Richardson to Review and Compose Legal Materials

When Richardson "complained that he could not use the typewriters to compose his legal documents, he was permitted to use the law library computers for this purpose.  This is an exception to VDOC policy, which generally does not permit inmates to use the computers for this purpose."  (3rd Blair Aff. ¶ 52 (footnote omitted).)  Subsequently,

4

"[w]hen Richardson reported that he could not adequately read the computer screen, staff adjusted the contrast settings to a blue background with green font that he claimed made written items legible for him." (*Id.* ¶ 53.)  Additionally, DCC staff loaded the following items onto the law library computer so that Richardson could view them in the blue background with green font that Richardson prefers:  VDOC grievances and request forms; the standards for the American Correctional Association, VDOC policies, and Richardson's legal documents, including all the filings for this case. (*Id.* ¶¶ 54–57.) Specifically, at Richardson's request, Blair had counsel for Defendants email him "electronic PDF copies of any pleadings, letters or other communications addressed to Richardson regarding" this case. (1st Blair Aff. ¶ 5.)  Blair and other staff would then load the documents onto a computer where the contrast could be adjusted to Richardson's desired preferences. (*Id.* ¶¶ 7, 8.)  "Richardson consented to this arrangement." (*Id.* ¶ 9.) "The LexisNexis legal research software on the law library computer has also been configured to present in a blue/green contrast that Richardson says he can read." (2nd Blair Aff. ¶ 58.)

Defendants have provided Richardson unique accommodations to ensure that Richardson could keep abreast of the current litigation.

> Even when physical access to the law library was restricted for other inmates in March 2020 due to COVID concerns, Richardson remained able to visit the law library in person so that he could read and compose his legal documents.
> Richardson's special access continued from March 2020 until an acute outbreak of COVID occurred at Deerfield on or about September 21, 2020. At this time, in order to mitigate the spread of COVID, Richardson was no

5

longer able to visit the law library in person.  According to Deerfield's records, the last time Richardson was physically in the law library was September 9, 2020.

(3rd Blair Aff. ¶¶ 9–10.)  "[W]hen Richardson's physical access to the law library was restricted due to the COVID outbreak, staff at Deerfield . . . offered to read or compose Richardson's documents for him." (*Id.* ¶ 29.)  Richardson, however, "does not want Deerfield staff to assist him with composing his legal documents . . . ." (*Id.* ¶ 33.)  On November 11, 2020, staff at DCC "offered Richardson the ability to resume his previous access to the law library computers because circumstances surrounding the COVID outbreak had improved [and] this accommodation was once again safe." (*Id.* ¶ 12.)

B.      **Richardson's Claims of Recent Deterioration in His Vision**

On or about October 27, 2020, Richardson reported to the DCC staff that he suffered "a sudden and severe deterioration in his vision abilities which allegedly rendered him unable to view documents presented on a computer screen." (3rd Blair Aff. ¶ 11.)  In light of Richardson's contention that his vision had deteriorated, DCC staff scheduled Richardson for a visit with an ophthalmologist on December 9, 2020. (*Id.* ¶ 13.)  "Richardson refused to attend the scheduled off-site appointment." (*Id.* ¶ 14.)

On November 16, 2020, Richardson sent counsel for Defendants an email, via an associate, wherein he stated,

> **Due to the progressive nature of my eye disease it is no longer possible for me to see (recognize) any object on a lighted screen and monitor, nor can I read printed documents of any color.** I have extreme photophobia . . . . Lighted objects appear as if gazing into kaleidoscope.  I

6

am unable to recognize anything except vague shapes under these conditions. . . .

. . . .

I have been pleading for someone to assist me in writing to the Court for two months. You have sent me a vast number of legal documents I have no ability to read and/or respond to. I had to plead for assistance from another offender in writing this communication, and while I am able to type on a tactile keyboard, I am unable to read what is typed. . . .

I am asking you to notify the Court of the above . . . . I am also asking that you request the VDOC accommodate my disability needs so that I have access to the Court.

(ECF No. 91–1, at 1 (emphasis added).)

On December 10, 2020, Richardson filed his Motion for Appointment of Counsel with the Court. (ECF No. 89.) In that document, Richardson swears that he had "no alternative," but to dictate the document "with the assistance of another prisoner." (*Id.* at 1.) Richardson contends that he is "unable to read or write the document because of disabilities limitations." (*Id.*) Richardson contends that his vision has deteriorated to the point where "lighted screens tak[e] on an extremely out-of-focus and indecipherable kaleiodoscopic appearance." (*Id.* at 2.)

Richardson explains that,

Accommodations the plaintiff previously requested from the Virginia Department of Corrections (via computer) are no longer a viable remedy for the plaintiff's disability needs for reading, researching, document preparation, or for response in the above cited case. The plaintiff is unable to read without assistance of agents of the defendants; VDOC officials must read written materials to an interpreter, who then relays the information by sign language to the plaintiff. On 11–16–2020, it required more than an hour for Counselor Walton to read four pages to the plaintiff. The plaintiff has not been able to

read the Court's memorandum in response to the defendant's motion to dismiss of August 17, 2020, or any of the subsequent documents filed.

(*Id.* at 2.)

### C.   Evidence that Tends to Show that Richardson Is Capable of Reading a Computer Screen and Composing Documents on a Computer Screen

"Despite his claims that he could no longer read a computer screen as of approximately October 27, 2020, Richardson continued to send and receive JPay secured messages, which are much like email messages." (3rd Blair Aff. ¶ 16.) "The JPay secured messaging system is accessible both on an inmate's individual device (commonly referred to as a JPay Player or a JP5) and a computer kiosk (commonly referred to as 'the kiosk') in the housing unit." (*Id.* ¶ 25.)

> The kiosk contains a computer monitor and a keyboard with a track ball to compose messages and navigate the JPay system. Inmates can also download or upload messages that they have previously composed on their JP5 player, which is much like a tablet or smart phone someone in the community would use.

(*Id.* ¶ 17.) "[I]t is not possible to alter the color contrast on the JP5 player and the kiosk to a blue/green combination that Richardson states he needs." (*Id.* ¶ 25.) "Since January 2020, Richardson has sent and/or received 577 secured messages using the JPay system." (*Id.* ¶ 28.)

On January 28, 2021, Blair observed Richardson using the kiosk in his housing unit and provided video of the same to the Court. (*Id.* ¶ 18; 3rd Blair Aff. Video Attachment ("Video").) In that video, Richardson appears to read and count the lines on the kiosk screen while talking to another inmate. (Video.) Contrary to Richardson's

8

recent representations that images on a computer screen are indecipherable to him, the video depicts that Richardson clearly is able to distinguish different lines of text on a computer screen. (*Id.*) No American Sign Language ("ASL") interpreter is present to assist Richardson with his conversation with the other inmate. (*Id.*; 3rd Blair Aff. ¶ 23.) "While he is using the kiosk and reviewing the computer screen, Richardson is not using his tinted glasses that are prescribed based on his complaints of photosensitivity." (3rd Blair Aff. ¶ 24.)

On January 20, 2021, Ms. Shaw, a correctional official and an ASL interpreter, assisted Richardson with drafting complaints and other prison forms. (*Id.* ¶ 30.)

> When Ms. Shaw assisted Richardson, he brought her his JP5 player where he had already typed out his complaints into a 'drafts' feature of the player. Ms. Shaw re-read the complaints from the JP5 player to Richardson and the interpreter. Richardson then typed the complaint contents onto a computer himself. . . . Richardson does not have an external keyboard for his JP5 player, though one has been ordered for him. . . . [I]n order to type information into the drafts feature of the player, one has to touch the on-screen keyboard much like one would type information into a text message or a notes application on a smart phone.

(*Id.* ¶¶ 30–32.)

On January 25, 2021, Richardson composed on the kiosk a well-written, lengthy letter that was several hundred words long. (*Id.* ¶ 27(f).) In that letter, Richardson describes to a friend, *inter alia*, his efforts at convincing the Virginia Parole Board his disabilities would not be an impediment to his successful, independent living if he was released. (*Id.*) Richardson writes:

9

You know I lost my hearing beginning when I was fourteen. Over the years, I have learned to read lips often better than I sign, or better than what I understand of sign language. I speak English, not ASL. I can get by in most circumstances without the aid of an interpreter if I have to do so. In technical and medical situations that is just not practical and wise so I always ask for an interpreter. Then I have the advantage of several ways of interpreting what is being said to me and I generally understand everything. I have noticed, however, that my speech is not feeling as good as it once did; not as clear.

I am about out of time again. I am awaiting a keyboard (accommodation) to use with my table player, but it is slow in coming, so I have to sit at a kiosk and type on a keyboard that I have that works here, but not on the tablet. Supposedly, the other one was sent last week, but maybe it is coming by mule train.

(*Id.*)

Richardson's prior JPay messages reflect that he enjoys listening to music and watching television programs. Additionally, these messages reflect Richardson's belief that if he can have counsel appointed to represent him, he can force Defendants to settle the action.

### D.   Additional Communication Accommodations Provided at DCC

Deerfield also has an UbiDuo device to facilitate communication with those who are hard of hearing. This device looks like two tablets that are connected to each other. One person types into their tablet and the other person can read what is being communicated on the other tablet. The tablets facilitate written communication back and forth between the users. This device cannot be set in the blue/green contrast Richardson prefers, and he has stated that the UbiDuo will not work for him.

Deerfield also has a SARA device. The SARA is a machine that can read printed text out loud for someone who cannot read for themselves, either due to literacy issues or a disability. The user places a piece of printed material on the machine and the machine reads the material out loud. The user can slow down or speed up the pace of the reading and the volume can be increased as needed.

Though Richardson frequently communicates verbally with staff and other inmates, he has stated that the SARA machine will not assist him in reading printed materials because he is hard of hearing.

(2nd Blair Aff. ¶¶ 60–63.)

"In order to facilitate Richardson's ability to communicate, staff at Deerfield have scheduled time for him to meet with an American Sign Language ('ASL') interpreter." (*Id.* ¶ 6.) The interpreters were scheduled for every Monday and Wednesday or as needed. (*Id.*) Richardson typically uses the interpreters for the entire four and a half hours they are at DCC. (3rd Blair Aff. ¶ 6.)[3] However, "since Richardson alleged that his eyesight has deteriorated[, in October of 2020,] the time the interpreters spend with Richardson has increased, and sometimes they are at Deerfield for longer periods." (*Id.* ¶ 6.) "If Richardson has an urgent need for an interpreter outside of the regularly scheduled Monday/Wednesday time slots, one can be scheduled for him." (2nd Blair Aff. ¶ 8.)

### III.  Analysis

Appointment of counsel for a civil rights action is warranted where a plaintiff presents "exceptional circumstances." *Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where "a pro se litigant has a colorable claim but lacks the capacity to present it." *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citation omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296,

---

[3] At times during the COVID outbreak, DCC "suspended all visitors (including in-person interpreters) to the facility in order to reduce the risk of transmission." (2nd Blair Aff. 2 n.1.)

298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). As this Court previously has noted, Richardson's pleadings and other submissions reflect that he has legal and intellectual acumen to ably present his case.

Richardson insists that his visual and auditory impairments deprive him of the capacity to adequately present his case. Richardson's prior well-written submissions refute that assertion. Richardson insists a recent deterioration in his vision alters that conclusion. Richardson, however, refused to attend a scheduled appointment with an ophthalmologist to confirm that alleged deterioration or obtain further treatment. Moreover, the evidence before the Court rather conclusively demonstrates that Richardson is exaggerating the extent of his current impairment in order to manipulate the Court into appointing him counsel.

In November of 2020, Richardson represented to counsel for Defendants and the Court that: "Due to the progressive nature of my eye disease it is no longer possible for me **to see (recognize) any object on a lighted screen** and monitor, nor can I read printed documents of any color." (ECF No. 91–1, at 1 (emphasis added).) The video submitted by Defendants clearly reflects that Richardson is able to discern individual lines of text on a computer screen, even without the green/blue contrast he insists he needs. Additionally, Richardson's numerous, lengthy JPay messages reflect that he remains able to compose documents, legal and otherwise, on a computer. Because Defendants have provided Richardson with adequate accommodations and Richardson fails to demonstrate

12

that he lacks the capacity to litigate his case, the Request for Injunction (ECF Nos. 76–78) and Motion for Appointment of Counsel (ECF No. 89) are DENIED.

In closing, the Court notes that "the assistance of a pro bono lawyer in civil litigation is a privilege." *Cartwright v. Silver Cross Hosp.*, 962 F.3d 933, 937 (7th Cir. 2020) (citing *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007)). "The valuable help of volunteer lawyers is a limited resource. It need not and should not be squandered on parties" whose very request for counsel reflects a lack of candor regarding the need for appointing counsel. *Dupree v. Hardy*, 859 F.3d 458, 462–63 (7th Cir. 2017).

The Clerk of the Court is DIRECTED to send a copy of the Memorandum Order to Richardson and counsel of record.

It is so ORDERED.

                                                  /s/

Date: **March 5, 2021**

Richmond, Virginia

                                      Henry E. Hudson

                                      Senior United States District Judge

13