## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DAVID A. RICHARDSON,                    )
                                        )
      Plaintiff,                    )
v.                                      )    Civil Action No. 3:18CV23–HEH
                                        )
HAROLD CLARKE, *et al.*,                )
                                        )
      Defendants.                   )

## MEMORANDUM OPINION
### (Granting Defendants' Motion for Summary Judgment)

This matter is proceeding on David A. Richardson's Particularized Complaint (ECF No. 42). By Memorandum Opinion and Order entered on August 17, 2020, the Court dismissed a number of Richardson's claims.[1] (ECF Nos. 69, 70.) The following claims remain before the Court:

Claim 1      While incarcerated at Deerfield Correctional Center ("DCC"), the Virginia Department of Corrections ("VDOC") violated Richardson's rights under Title II of the Americans with Disabilities Act. The VDOC's failure to provide Richardson with reasonable accommodations for his hearing and visual impairments has prevented Richardson from communicating with medical personnel or participating in "educational, mental health, employment, and probation and conditional release programs, learn of daily-life and safety alert notifications, and communicate with individuals outside of prison." (ECF No. 42 ¶ 32.)

Claim 2      While incarcerated at DCC, the VDOC violated Richardson's rights under the Rehabilitation Act. The VDOC's failure to provide Richardson with reasonable accommodations for his hearing and visual impairments has prevented Richardson from communicating with medical personnel or participating in "educational, mental

---

[1] The Court corrects the capitalization, punctuation, and spelling the quotations from the parties' submissions. The Court omits the paragraph numbering and alters the paragraph spacing in the quotations from the parties' submissions to promote readability.

health, employment, and probation and conditional release programs, learn of daily-life and safety alert notifications, and communicate with individuals outside of prison." (*Id.*)

Claim 3    While incarcerated at DCC, the VDOC and Defendant Williams violated Richardson's rights under the Virginians with Disabilities Act.

Claim 5    While incarcerated at DCC, the VDOC and Defendant Williams violated Richardson's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when they prevented him from wearing a religious head covering in certain areas of the prison.

Claim 7    While incarcerated at DCC, the VDOC and Defendant Williams violated Richardson's free exercise rights under the First Amendment when they prevented him from wearing a religious head covering in certain areas of the prison.

The matter is before the Court on the Motion for Summary Judgment filed by the VDOC and Warden Williams. For the reasons stated below, the Motion for Summary Judgment will be granted.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly

be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit:  the affidavit of Warden Williams ("Williams Aff.," ECF No. 83–1); multiple affidavits from

M. Blair, the Operations Manager at DCC ("Blair") ("1st Blair Aff.," ECF No. 58–1),

("2nd Blair Aff.," ECF No. 83–2), and ("3rd Blair Aff.," ECF No. 91–2); and other

documents that the Court cites to by the CM/ECF designation.  Additionally, Defendants

submitted a video of Richardson using a computer kiosk in his housing unit.  In response,

Richardson submitted his own declarations.  (ECF Nos. 89, 92.)[2]

Furthermore, "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).[3]  "On the other hand, where

---

[2] By Memorandum Order entered on November 28, 2018, the Court informed Richardson:

> . . . [T]he Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury.  Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matter stated therein. *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 28, at 1–2.)  Accordingly, the Court declines to consider as evidence Richardson's Memoranda that are sworn to under penalty of perjury.  (*See, e.g.*, ECF No. 73.)

[3] In *Scott*,

> the Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380–81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail.  Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

*Harris v. Pittman*, 927 F.3d 266, 275–76 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1550 (2020).

plaintiff's testimony is only partially contradicted by audio and video recordings, 'that does not permit the district court to discredit his entire version of the events.'" *Toner v. Vill. of Elkton*, 547 F. App'x 720, 724 (6th Cir. 2013) (quoting *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011)).

In light of the foregoing submissions and principles, the following facts control this Court's disposition of the Motion for Summary Judgment.

## II. RECITATION OF RELEVANT FACTS

Richardson has severe vision and hearing problems. (*See, e.g.*, ECF No. 89–1, at 1–13.) The extent of Richardson's alleged vision and hearing problems changes frequently. (2nd Blair Aff. ¶ 5.) Blair notes that Richardson and he are "able to effectively communicate verbally." (*Id.* ¶ 18.) Richardson speaks clearly and when Blair speaks back to Richardson, they "are able to understand each other." (*Id.* ¶¶ 19–20.) As described below, the staff at DCC have made extensive efforts to accommodate Richardson's disabilities. (*Id.* ¶¶ 6–63.)

### A. American Sign Language Interpreters

"In order to facilitate Richardson's ability to communicate, staff at Deerfield have scheduled time for him to meet with an American Sign Language ('ASL') interpreter." (*Id.* ¶ 6.) The interpreters were scheduled for every Monday and Wednesday or as needed. (*Id.*) Richardson typically uses the interpreters for the entire four and a half

hours they are at DCC.  (3rd Blair Aff. ¶ 6.)[4]  However, "since Richardson alleged that his eyesight has deteriorated[, in October of 2020,] the time the interpreters spend with Richardson has increased, and sometimes they are at Deerfield for longer periods." (*Id.*) "If Richardson has an urgent need for an interpreter outside of the regularly scheduled Monday/Wednesday time slots, one can be scheduled for him." (2nd Blair Aff. ¶ 8.)

### B.    Accommodations at Medical Appointments

Additionally, staff at DCC "made a video-based interpreter available to assist Richardson at a medical appointment while in-person in interpreters were not feasible due to the risk of COVID spread at Deerfield." (*Id.* ¶ 9.)  "Video-based interpreter services was an accommodation Richardson had specifically proposed and requested." (*Id.* ¶ 10.) Nevertheless, when Richardson arrived for the appointment, "he stated that he could not see the video screen and could not see what the interpreter was signing to him.  He insisted on an in-person interpreter." (*Id.* ¶ 11.)

When the above arrangement did not work, medical staff at DCC made other efforts to communicate with Richardson. (*Id.* ¶ 12.)  Specifically, medical staff "set up a computer with a word processing document so that they could type messages to Richardson with a blue background and a green font.  This is a format Richardson has previously stated he could read and view." (*Id.* ¶ 14.)  The staff hoped that they could type messages back and forth with Richardson. (*Id.* ¶ 15.)  "When presented with this

---

[4] At times during the COVID outbreak, DCC "suspended all visitors (including in-person interpreters) to the facility in order to reduce the risk of transmission." (2nd Blair Aff. 2 n.1.)

option, Richardson responded that this would not work and he could not read the

messages on the screen." (*Id.* ¶ 16.)  Even when medical "staff altered the setting on the

computer to the same setting Richardson frequently uses on the law library computer,"

Richardson asserted that he still could not read the messages.  (*Id.* ¶ 17.)

## C.    Accommodations in Richardson's Housing Area

"Richardson currently resides in an assisted living setting."  (*Id.* ¶ 27.)  Blair

explains,

> This dormitory style housing area is designed for inmates who may
> need additional assistance with activities of daily living, including bathing,
> dressing, and toileting.  Nursing staff are available to assist inmates in this
> housing area with these needs.  For less personal needs — such as a change
> of sheets, or assistance ambulating within the housing unit — inmate
> assistants are available for all inmates housed in Richardson's living area.
> An inmate who needs the assistance of one of these inmate aides simply
> needs to ask for help with a task. . . .  Inmate caregivers or assistants should
> not be assisting other inmates with personal needs such as bathing or
> toileting; this assistance should come from nurses or certified nursing
> assistants who are present in Richardson's housing area 24 hours per day, 7
> days per week.
>        If an inmate needs additional or more consistent assistance with daily
> tasks, the doctors and nurses in the medical department at Deerfield may
> order that a trained inmate assistant be assigned specifically to that inmate.
> To the best of my knowledge, the doctors and nurses at Deerfield have
> reviewed Richardson's requests for an inmate caregiver and determined that
> [he] has no medical or disability-related need for such assistance at this time.

(*Id.* ¶¶ 28–33.)

DCC staff "recently purchased a magnifying device to assist Richardson to

magnify documents posted in his housing area.  The device cost approximately $1,600.

When it was provided to Richardson for his use, he claimed it did not work for him

because of a lack of color contrast." (*Id.* ¶¶ 37–38.) "[T]he color contrast Richardson claims he needs is uncommon. . . . [T]he blue background/green text is a 'low contrast' setting. Most people who need devices with a color contrast need a 'high contrast' or 'medium contrast' color combination." (*Id.* ¶ 40.) DCC staff are currently "exploring additional options for a color contrasting magnification device." (*Id.* ¶ 39.)

Staff in Richardson's housing areas made flash cards in the blue/green color contrast Richardson prefers. (*Id.* ¶ 21.) "These flash cards contain simple and common written communications so that Richardson can understand basic communications from staff." (*Id.* ¶ 22.)

"To facilitate Richardson's communication and to make sure he and others with hearing impairments in his housing area understand what is required of them, Deerfield has installed a light to indicate when it is time for count. This alerts the hearing impaired when it is count time." (*Id.* ¶ 41 (footnote omitted).) Additionally, staff also verbally announce when it is count time. (*Id.* ¶ 42.)

## D.   Accommodations for Permitting Richardson to Review and Compose Legal Materials

When Richardson "complained that he could not use the typewriters to compose his legal documents, he was permitted to use the law library computers for this purpose. This is an exception to VDOC policy, which generally does not permit inmates to use the computers for this purpose." (*Id.* ¶ 52 (footnote omitted).) Subsequently, "[w]hen Richardson reported that he could not adequately read the computer screen, staff adjusted

8

the contrast settings to a blue background with green font that he claimed made written items legible for him." (*Id.* ¶ 53.) Additionally, DCC staff loaded the following items onto the law library computer so that Richardson could view them in the blue background with green font that Richardson prefers:  VDOC grievances and request forms; the standards for the American Correctional Association, VDOC policies, and Richardson's legal documents, including the filings for this case. (*Id.* ¶¶ 54–57.) Specifically, at Richardson's request, Blair had counsel for Defendants email him "electronic PDF copies of any pleadings, letters or other communications addressed to Richardson regarding" this case. (1st Blair Aff. ¶ 5.) Blair and other staff would then load the documents onto a computer where the contrast could be adjusted to Richardson's desired preferences. (*Id.* ¶¶ 7, 8.) Richardson consented to this arrangement. (*Id.* ¶ 9.) "The LexisNexis legal research software on the law library computer has also been configured to present in a blue/green contrast that Richardson says he can read." (2nd Blair Aff. ¶ 58.)

Defendants have provided Richardson unique accommodations to ensure that Richardson could keep abreast of the current litigation.

> Even when physical access to the law library was restricted for other inmates in March 2020 due to COVID concerns, Richardson remained able to visit the law library in person so that he could read and compose his legal documents.
> Richardson's special access continued from March 2020 until an acute outbreak of COVID occurred at Deerfield on or about September 21, 2020. At this time, in order to mitigate the spread of COVID, Richardson was no longer able to visit the law library in person.  According to Deerfield's records, the last time Richardson was physically in the law library was September 9, 2020.

9

(3rd Blair Aff. ¶¶ 9–10.) "[W]hen Richardson's physical access to the law library was restricted due to the COVID outbreak, staff at Deerfield . . . offered to read or compose Richardson's documents for him." (*Id.* ¶ 29.) Richardson, however, "does not want Deerfield staff to assist him with composing his legal documents . . . ." (*Id.* ¶ 33.) On November 11, 2020, staff at DCC "offered Richardson the ability to resume his previous access to the law library computers because circumstances surrounding the COVID outbreak had improved [and] this accommodation was once again safe." (*Id.* ¶ 12.)

### E.    Richardson's Claims of Recent Deterioration in His Vision

On or about October 27, 2020, Richardson reported to the DCC staff that he suffered "a sudden and severe deterioration in his vision abilities which allegedly rendered him unable to view documents presented on a computer screen." (3rd Blair Aff. ¶ 11.) In light of Richardson's contention that his vision had deteriorated, DCC staff scheduled Richardson for a visit with an ophthalmologist on December 9, 2020. (*Id.* ¶ 13.) "Richardson refused to attend the scheduled off-site appointment." (*Id.* ¶ 14.)

On December 10, 2020, Richardson filed a "MOTION FOR APPOINTMENT OF COUNSEL AND BRIEF AND AFFIDAVIT IN SUPPORT." (ECF No. 89.) In that document, Richardson swears that he had "no alternative" but to dictate the document "with the assistance of another prisoner." (*Id.* at 1.) Richardson contends that he is "unable to read or write the document because of disabilities limitations." (*Id.*) Richardson contends that his vision has deteriorated to the point where "lighted screens

tak[e] on an extremely out-of-focus and indecipherable kaleiodoscopic appearance." (*Id.*

at 2.)

Richardson explains that,

> Accommodations the plaintiff previously requested from the Virginia
> Department of Corrections (via computer) are no longer a viable remedy for
> the plaintiff's disability needs in reading, researching, document preparation,
> or for response in the above cited case. The plaintiff is unable to read without
> assistance of agents of the defendants; VDOC officials must read written
> materials to an interpreter, who then relays the information by sign language
> to the plaintiff. On 11–16–2020, it required more than an hour for Counselor
> Walton to read four pages to the plaintiff. The plaintiff has not been able to
> read the Court's memorandum in response to the defendant's motion to
> dismiss of August 17, 2020, or any of the subsequent documents filed.

(*Id.* at 2.)

### F.   Evidence that Tends to Show that Richardson Is Capable of Reading a Computer Screen and Composing Documents on a Computer Screen

"Despite his claims that he could no longer read a computer screen as of

approximately October 27, 2020, Richardson continued to send and receive JPay secured

messages, which are much like email messages." (3rd Blair Aff. ¶ 16.) "The JPay

secured messaging system is accessible both on an inmate's individual device (commonly

referred to as a JPay Player or a JP5) and a computer kiosk (commonly referred to as 'the

kiosk') in the housing unit." (*Id.* ¶ 25.)

> The kiosk contains a computer monitor and a keyboard with a track ball to
> compose messages and navigate the JPay system. Inmates can also
> download or upload messages that they have previously composed on their
> JP5 player, which is much like a tablet or smart phone someone in the
> community would use.

11

(*Id.* ¶ 17.) "[I]t is not possible to alter the color contrast on the JP5 player and the kiosk to a blue/green combination that Richardson states he needs." (*Id.* ¶ 25.) "Since January 2020, Richardson has sent and/or received 577 secured messages using the JPay system." (*Id.* ¶ 28.)

On January 28, 2021, Blair observed Richardson using the kiosk in his housing unit and provided video of the same to the Court. (*Id.* ¶ 18; 3rd Blair Aff. Video Attachment ("Video").) In that video, Richardson appears to read and count the lines on the kiosk screen while talking to another inmate.[5] (Video.) Contrary to Richardson's recent representations that images on a computer screen are indecipherable to him, the video depicts that Richardson is able to distinguish different lines of text on a computer screen. (*Id.*) No ASL interpreter is present to assist Richardson with this conversation. (*Id.*; 3rd Blair Aff. ¶ 23.) "While he is using the kiosk and reviewing the computer screen, Richardson is not using his tinted glasses that are prescribed based on his complaints of photosensitivity." (3rd Blair Aff. ¶ 24.)

On January 20, 2021, Ms. Shaw, a correctional official and an ASL interpreter, assisted Richardson with drafting complaints and other prison forms. (*Id.* ¶ 30.)

> When Ms. Shaw assisted Richardson, he brought her his JP5 player where he had already typed out his complaints into a 'drafts' feature of the player. Ms. Shaw re-read the complaints from the JP5 player to Richardson and the interpreter. Richardson then typed the complaint contents onto a computer himself. . . . Richardson does not have an external keyboard for his JP5 player, though one has been ordered for him. . . . [I]n order to type information into the drafts feature of he player, one has to touch the on-screen

---

[5] The Court recognizes that for purposes of the Motion for Summary Judgment, the video does not unequivocally demonstrate that Richardson was reading the text on the kiosk screen.

> keyboard much like one would type information into a text message or a
> notes application on a smart phone.

(*Id.* ¶¶ 30–32.)

On January 25, 2021, Richardson composed on the kiosk a well-written, lengthy

letter that was several hundred words long. (*Id.* ¶ 27(f).) In that letter, Richardson

describes to a friend, *inter alia*, his efforts at convincing the Virginia Parole Board his

disabilities would not be an impediment to his successful, independent living if he was

released. (*Id.*) Richardson writes:

> You know I lost my hearing beginning when I was fourteen. Over the
> years, I have learned to read lips often better than I sign, or better than what
> I understand of sign language. I speak English, not ASL. I can get by in
> most circumstances without the aid of an interpreter if I have to do so. In
> technical and medical situations that is just not practical and wise so I always
> ask for an interpreter. Then I have the advantage of several ways of
> interpreting what is being said to me and I generally understand everything.
> I have noticed, however, that my speech is not feeling as good as it once did;
> not as clear.
>      I am about out of time again. I am awaiting a keyboard
> (accommodation) to use with my table player, but it is slow in coming, so I
> have to sit at a kiosk and type on a keyboard that I have that works here, but
> not on the tablet. Supposedly, the other one was sent last week, but maybe
> it is coming by mule train.

(*Id.*)

### G.    Additional Communication Accommodations Provided at DCC

Deerfield also has an UbiDuo device to facilitate communication with
those who are hard of hearing. This device looks like two tablets that are
connected to each other. One person types into their tablet and the other
person can read what is being communicated on the other tablet. The tablets
facilitate written communication back and forth between the users. This
device cannot be set in the blue/green contrast Richardson prefers, and he has
stated that the UbiDuo will not work for him.

Deerfield also has a SARA device. The SARA is a machine that can read printed text out loud for someone who cannot read for themselves, either due to literacy issues or a disability. The user places a piece of printed material on the machine and the machine reads the material out loud. The user can slow down or speed up the pace of the reading and the volume can be increased as needed.

Though Richardson frequently communicates verbally with staff and other inmates, he has stated that the SARA machine will not assist him in reading printed materials because he is hard of hearing.

(2nd Blair Aff. ¶¶ 60–63.)

## H.    Head Coverings at DCC

Prior to December of 2020, at DCC, inmates were entitled to "wear religious head coverings — such as kufis — in the same manner as non-religious head coverings." (Williams Aff. ¶¶ 4, 6, 25.) Inmates could wear their religious head coverings inside and outside of their housing unit, but were required to remove the head covering "in certain areas of the prisons (such as the dining hall, the visiting room, the administrative building, and designated program locations)." (*Id.* ¶¶ 7, 8.) "Staff also must remove any coverings when they enter these areas of the facility." (*Id.* ¶ 9.) Inmates also were allowed to "wear their religious head coverings during an approved religious activity regardless of the location." (*Id.* ¶ 10.)[6]

On December 1, 2020, Chief of Corrections Operations, A. David Robinson, implemented a change to the VDOC policy regarding head coverings. (*Id.* ¶¶ 21, 25.) Pursuant to the new policy, inmates may wear religious and state issued head coverings

---

[6] The Court recites Defendants' reasons for this policy in conjunction with the analysis of Richardson's First Amendment, free exercise claim. *See infra* Part III.B.

14

anywhere inside the facility, but must remove the head covering at the request of the security staff.  (*Id.* ¶ 23.)

## III. ANALYSIS

### A.    Disability Related Claims

The United States Court of Appeals for the Fourth Circuit has held that "'[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements,' and '[b]ecause the language of the Acts is substantially the same, we apply the same analysis to both.'" *Spencer v. Earley*, 278 F. App'x 254, 261 (4th Cir. 2008) (alterations in original) (quoting *Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999)).  In general, a plaintiff seeking recovery under either statute must demonstrate "that (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program, or activity; and (3) he was 'excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of h[is] disability.'" *Id.* (alteration in original) (quoting *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).[7]

Defendants do not dispute that Richardson's auditory and visual impairments constitute a disability, but dispute that Richardson was either excluded from participation

---

[7] "The ADA's Title II and the Rehabilitation Act 'differ only with respect to the third element, causation.'" *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012)).  "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Halpern*, 669 F.3d at 461–62 (quoting *Baird*, 192 F.3d at 468–69).

in or denied the benefit of any services, programs, or activities because of these disabilities. Richardson failed to come forward with evidence reflecting that he was denied participation in any activity or program because of his disabilities.

Furthermore, even if one assumed that Richardson had been denied access to some program, or provided inferior access to a program, he "must propose a reasonable modification to the challenged public program that will allow [him] the meaningful access [he] seek[s]." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (citing *Halpern*, 669 F.3d at 464). The record reflects that Defendants have gone to extraordinary lengths by providing a host of accommodations to allow Richardson to participate in the full variety of services and programs at DCC. Richardson fails to identify a reasonable accommodation he requested that Defendants ignored. Accordingly, Richardson's ADA and Rehabilitation Act claims lack merit. Claims 1 and 2 will be dismissed.

### B.   Religious Exercise Claims

In Claims 5 and 7, Richardson contends that Defendants violated his right to religious exercise under RLUIPA and the First Amendment when they prohibited him from wearing a kufi in certain areas of the prison.

#### 1.   Injunctive Relief

As the current policy permits Richardson to wear his kufi in all areas of the prison, his demands for injunctive relief in Claims 5 and 7 are potentially moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally

16

cognizable interest in the out-come." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). "There is, however, a well-recognized exception to the mootness doctrine holding that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "[A] defendant fails to meet its heavy burden to establish that its allegedly wrongful behavior will not recur when the defendant 'retains the authority and capacity to repeat an alleged harm.'" *Id.* at 364–65 (quoting *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014)). Defendants, however, fail to muster sufficient evidence to reflect that they will not return to the prior policy that provided some limitations on where an inmate could wear a head covering at DCC. Nevertheless, as explained below, Richardson fails to demonstrate that the prior prison policy imposed a substantial burden upon his religious exercise.[8]

---

[8] Even if Defendants' prior policy violated RLUIPA or the First Amendment, Defendants correctly note that 18 U.S.C. § 3626(a) likely prevents the Court from entering an injunctive relief with respect to that prior policy. That statue provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to *correct* the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief

### 2.      RLUIPA Provides a Two-Part Inquiry

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person--
> **(1)** is in furtherance of a compelling governmental interest; and
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Thus, to begin, Richardson must demonstrate that Defendants' actions imposed a "substantial burden" on the exercise of his religion. To determine whether Richardson has met this standard, the Court must answer two questions: "(1) [i]s the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial?'" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

### a.      Whether the Burdened Activity Is a Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Couch*, 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Richardson contends that Defendants limited his ability to wear a religious head covering. Given RLUIPA's broad

---

> unless the court finds that such relief is narrowly drawn, extends no further than necessary to *correct* the violation of the Federal right, and is the least intrusive means necessary to *correct* the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a) (emphasis added).

18

definition of religious exercise, the Court will assume that this activity constitutes religious exercise. *See, e.g.*, *Whitehouse v. Johnson*, No. 1:10CV1175 (CMH/JFA), 2011 WL 5843622, at *3 (E.D. Va. Nov. 18, 2011) (assuming inmate's enrollment in seminary course constituted religious exercise for purposes of RLUIPA).

### b. Richardson Fails to Demonstrate a Substantial Burden on His Religious Exercise

RLUIPA does not define the term "substantial burden." *See Couch*, 679 F.3d at 200. The Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden:

> is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). To meet the substantial burden component of the test, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). "[A]t a minimum," however, "the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's

19

religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[9] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs") (citing *Lovelace*, 472 F.3d at 187). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two decisions issued by the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial

---

[9] In *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01

(citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find that an inmate had demonstrated a

substantial burden where prison officials denied "his requests for an 'outdoor worship

circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*,

496 F. App'x at 322–23. The inmate-plaintiff "asserted that deprivation of the outdoor

worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best*

performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that

the mere denial of the optimal manner for performing the "Blot" ceremony could not

demonstrate a substantial burden where the plaintiff "failed to offer any explanation

regarding the reason why indoor worship would compromise his religious beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden

inquiry. The availability to an inmate, in the most general sense, of other means to

practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *See id.*;

*see also Al-Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts

properly consider whether the inmate retains other means for engaging in the particular

religious activity, such as the 'Blot' ceremony, in assessing whether a denial of the

inmate's preferred method for engaging [sic] that religious exercise imposes a substantial

burden." *Shabazz v. Va. Dep't Corr.*, No. 3:10CV638, 2013 WL 1098102, at *7 (E.D.

Va. Mar. 15, 2013) (first citing *Krieger*, 496 F. App'x at 326; then citing *Coleman v.*

*Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Applying these

21

principles, the United States Court of Appeals for the Eighth Circuit has held that an inmate failed to demonstrate that the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed the inmate to study in his cell. *Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009).  Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876.  As explained below, in light of the foregoing principles, Richardson has not demonstrated any substantial burden upon his religious exercise with respect to Claims 5 and 7.

In Claims 5 and 7, Richardson complains that Defendants previously restricted his ability to wear a religious head covering in certain parts of the prison.  Inmates could wear their religious head coverings inside and outside of the housing unit, but were required to remove the head coverings only in the following areas:  "the dining hall, the visiting room, the administrative building, and designated program locations."  (Williams Aff. ¶¶ 7, 8.)  Richardson fails to explain why his inability to wear his head covering in the few areas noted above substantially burdened his religious exercise. *See Krieger*, 496 F. App'x at 326 (concluding inmate's "blanket assertion" "that the sacred items were 'necessary' to perform 'well-established rituals'" was insufficient to establish a

22

substantial burden when inmate failed to "identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs"). Richardson remained free to wear a head covering throughout the majority of DCC. Thus, Richardson fails to demonstrate that Defendants' prior policy with respect to head coverings substantially pressured him "to modify his behavior and to violate his beliefs." *Couch*, 679 F.3d at 200 (quoting *Lovelace*, 472 F.3d at 187)); *see Coleman*, 413 F. App'x at 875–76.[10]  For this reason alone, Claims 5 and 7 may be dismissed.

Additionally, even if Defendants' prior policy with respect to head coverings imposed a substantial burden on Richardson's religion it would pass constitutional muster under *Turner v. Safley*, 482 U.S. 78, 89–91 (1987).[11]  *Turner* reconciled the principles that inmates retain certain important constitutional protections with the deference owed to prison administrators "by holding that restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (internal citation and quotation marks omitted).  In assessing whether a regulation is reasonable, courts

---

[10] The current policy, which does not limit Richardson from wearing a religious head covering anywhere at DCC, clearly fails to impose a substantial burden upon his religious exercise.

[11] The *Turner* analysis only applies to Richardson's demand for monetary damages with respect to his constitutional free exercise claim in Claim 7.  It is well "settled that RLUIPA does not authorize a private cause of action for money damages against state officials in their official or personal capacities." *Smith v. Booth*, No. 3:19CV75–HEH, 2021 WL 710367, at *4 (E.D. Va. Feb. 23, 2021) (first citing *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), then citing *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009), and then citing *Haight v. Thompson*, 763 F.3d 554, 569–70 (6th Cir. 2014)).

must consider (1) whether a "valid, rational connection [exists] between the prison

regulation and the legitimate governmental interest put forward to justify it," (2) whether

"alternative means of exercising the right [exist] that remain open to prison inmates," (3)

what "impact accommodation of the asserted constitutional right will have on guards and

other inmates, and on the allocation of prison resources generally," and (4) whether there

was an "absence of ready alternatives" to the regulation in question. *Turner*, 482 U.S. at

89–90 (internal quotation marks omitted).  Significantly, in conducting this inquiry,

"[t]he burden, moreover, is not on the State to prove the validity of prison regulations but

on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (first citing

*Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977), then citing *Shaw*

*v. Murphy*, 532 U.S. 223, 232 (2001), and then citing *O'Lone v. Estate of Shabazz*, 482

U.S. 342, 350 (1987)).  With respect to the first factor, the prior restrictions were

rationally related to the penological objective of security and policing for contraband.

The prior restrictions on wearing head coverings were generally limited to high traffic

areas at DCC where an inmate's ability to move contraband or obscure his identity posed

greater security concerns.  (Williams Aff. ¶¶ 12, 13.)  Under the second factor,

Richardson retained the ability to wear a head covering in many areas of the prison.

Further, Richardson does not suggest that he was otherwise restricted in practicing any

other aspect of his religion.  Given the Defendants' recent removal of the policy, the third

and fourth factors do not as starkly favor the Defendants.  However, one must view the

facts of the case in the context of contemporaneous events.  Over the last year everyone

24

has been encouraged to wear a face mask.  Given an environment where everyone is

wearing a mask, it was reasonable for the VDOC to conclude that limiting the use of head

coverings was no longer necessary to prevent inmates from obscuring their identity.

Accordingly, the Court concludes that Defendants' prior policy with respect to head

coverings was rationally related to legitimate penological objectives, and will dismiss

Claims 5 and 7.

## IV.  CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 82) will be granted.

Claims 1, 2, 5, and 7 will be dismissed with prejudice.  Given the preliminary dismissal

of Richardson's federal claims, the Court declines to exercise supplemental jurisdiction

over Richardson's state law claim under the Virginians with Disabilities Act.

Accordingly, Claim 3 will be dismissed without prejudice.  Richardson's Request to

Withdraw Motion for Preliminary Injunction (ECF No. 71) and his new Motion for

Preliminary Injunction (ECF No. 72) will be denied.  The action will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.

It is so ORDERED.

/s/

HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: March 5, 2021
Richmond, Virginia

25